I7J3HORC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MADY HORNIG,

                    Plaintiff,

           v.                          17 CV 3602 (ER)

TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW
YORK, ET AL.,

                    Defendants.

------------------------------x
                                      New York, N.Y.
                                      July 19, 2018
                                      11:30 a.m.

Before:

                      HON. EDGARDO RAMOS,

                                      District Judge

                         APPEARANCES

BRILL & MEISEL
     Attorneys for Plaintiff
BY:  ROSALIND S. FINK
          -and-
EISENBERG & SCHNELL, LLP
     Attorneys for Plaintiff
BY:  HERBERT EISENBERG

BUCKLEY SANDLER, LLP
     Attorneys for Defendant Trustees of Columbia University
BY:  ROSS E. MORRISON
          DANA W. KUMAR

JACKSON LEWIS, P.C.
     Attorneys for Defendant Walter Ian Lipkin
BY:  SUSAN D. FRIEDFEL

I7J3HORC

THE DEPUTY CLERK:  Hornig v. Trustees of Columbia
University, et al.  Counsel, please state your name for the
record.

MS. FINK:  Rosalind Fink, counsel for plaintiff.

MR. EISENBERG:  Herbert Eisenberg, Eisenberg & Schnell
for plaintiff.

MR. MORRISON:  Ross Morrison and Dana Kumar for
Columbia University.

MS. FRIEDFEL:  Susan Friedfel for Walter Lipkin.

THE COURT:  This matter is on for an initial
conference, so Mr. Eisenberg or Ms. Fink, let me begin with
you.  Tell me a little bit about your case.

MS. FINK:  Okay.  Let me start with telling you a
little bit about my client, Dr. Hornig.  She's one of the
world's leading researchers looking at relationships of
infection and immunity on brain disorders, most particularly
chronic fatigue syndrome and autism.

Since she went to Columbia, she has received more than
$24 million in grants where she is named as either a principal
investigator, the person named as in charge of the grant, or as
a local subcontract principal investigator.  Most of that money
is from federal, for federally funded research.

THE COURT:  How long has she been with Columbia?

MS. FINK:  Since 2001.

THE COURT:  Okay.

I7J3HORC

1          MS. FINK:  She's also published more than 120

2     scientific papers, and until June 20, she was a member of

3     Columbia's Center for Infection and Immunity.

4          THE COURT:  June 20 of what year?

5          MS. FINK:  Of this year.  Of this year.  Mr. Eisenberg

6     will explain what happened on June 20, which is the reason why

7     we had asked for this conference.

8          The center is headed by the defendant, Ian Lipkin, and

9     she, Dr. Hornig and Dr. Lipkin began collaborating in 1996 when

10    she was at Penn and they were -- became a couple when she was

11    recruited to Columbia in 2001.

12         She joined Columbia as an associate professor in the

13    School of Public Health and as a researcher.  The personal

14    relationship ended in 2011, but they continued to work together

15    professionally.  And until she was kicked out of the center, in

16    June, she was the person who brought in the most grant money

17    other than Dr. Lipkin in the center.

18         One more introductory point.  Columbia itself has

19    acknowledged she is "one of the world's leading researchers in

20    chronic fatigue syndrome."

21         The events that brought us here started in July of

22    2015.  Dr. Lipkin learned that Dr. Hornig had spoken to human

23    resources at the School of Public Health about an incident that

24    had deeply disturbed her that had happened a few weeks earlier.

25    He had, there had been a meeting, he said I want you to look at

I7J3HORC

1    something in my office, it's urgent.  She accompanied him to

2    his office, he locked the door, he dropped his pants and he

3    said please look at this lesion on my buttocks.  She was

4    embarrassed.  She did it.  She said this is what I think it is

5    because she is an M.D.

6         She went to leave, and as she was trying to leave, she

7    noticed one of his assistants on the other side of the locked

8    door waiting for the door to be unlocked.  She was humiliated.

9    She was humiliated by the whole event, but particularly by

10   that.

11        She confided to one friend.  Didn't want to tell HR,

12   didn't want to do anything with it because she knows about his

13   capacity for retaliation.  It was reported despite her.  She

14   went to speak to HR, she told them about the incident.

15        THE COURT:  It was reported by whom?

16        MS. FINK:  We believe now it was in fact reported by

17   Lipkin after the person she had told, told somebody in the

18   center who said to Lipkin, she has talked about this incident,

19   and that he preemptively went to HR.  That's never been

20   confirmed, but that's what it seems.

21        She was told by someone at the center, HR wants to

22   talk to you, and given the name and the phone number of someone

23   in  HR.  So she went.

24        He then started a campaign of retaliation that had

25   three main goals.  One was to keep her from meeting her goals

I7J3HORC

1   on her grants, to keep her from being productive.  The second

2   one was to keep her from writing successful future grants.

3   Understand she's funded solely by these grants.  She doesn't

4   get money from Columbia.  She has to earn her keep as it were.

5   The third thing was to destroy her reputation.

6          The complaint is very long.  Mr. Eisenberg thinks it's

7   too long, and the reason is it only hits the highlights of the

8   things he did.

9          THE COURT:  Let me ask you this.  You said she is not

10  paid by Columbia?

11         MS. FINK:  Right.  What happens is she brings in

12  grants, the grants include funding for her salary.  So she

13  gets, she's paid by Columbia in the sense they write the

14  checks, but the money comes in from the outside grants.  I

15  think they have to pay 10 percent.  The rule is Columbia has to

16  support her salary by 10 percent.  The other 90 percent is from

17  the grants she brings in.

18         THE COURT:  She is, strictly speaking, a Columbia

19  employee?

20         MS. FINK:  Oh, yes, absolutely.  I'm sorry if that

21  wasn't clear.  Absolutely.  She is a Columbia employee.

22         I just wanted to give you one example of the sorts of

23  things that he did.  And because this is in the complaint and

24  it goes on for a while.  He took, as the person in charge of

25  the center, he was the one in charge of all the people who are

I7J3HORC

1    paid by her grants, his grants and everybody's else's grants,

2    all the staff.  He started telling staff members, technicians,

3    postdocs, that they could not work on her grants.  They had to

4    work on other grants, other projects.  He then took money that

5    were in grants for her projects, for her people, paid other

6    people with them, people who were not doing any work on the

7    grants.  He also kept her from having access to the data that

8    would have shown that he was diverting the money.

9          She complained first internally at the School of

10   Public Health.  They did nothing.  I wrote a letter to

11   Ms. Friedfel who was then representing Columbia as well as

12   Dr. Lipkin, and after that, she was called to a meeting with

13   administrators at the medical school and there was an

14   investigation.  Columbia's never told us the result.  They've

15   never given us the report.  But Dr. Lipkin has said repeatedly

16   in meetings of center faculty we've had to give back --

17          THE COURT:  Meetings of?

18          MS. FINK:  Of the faculty at the Center for Infection

19   and Immunity where they both work.  He has said repeatedly we

20   don't have any money because we've had to give back over a

21   million dollars because of the complainant.  Looking at

22   Dr. Hornig.  And he has said this repeatedly.

23          So we are assuming that Columbia did an investigation,

24   it confirmed what we thought, which is he diverted over a

25   million dollars in funds that were supposed to be used on her

I7J3HORC

1   project, and so they had to return it to the federal government

2   because it wasn't used in the way it was supposed to be used.

3   That's just one example.

4          What does that mean.  It made it harder for her to

5   meet her goals on her projects because the people weren't made

6   available to do the research.  It harmed her career,

7   professionally, it made the granting agencies question her

8   capacity, her abilities.  And he's also harming her reputation,

9   both internally, and with outside collaborators who are hearing

10  these stories about her missing deadlines.  That's just one

11  example.

12         Now if I could ask Mr. Eisenberg to talk about what

13  happened more recently.

14         THE COURT:  Okay.

15         MR. EISENBERG:  Thank you, your Honor.

16         THE COURT:  When was the incident involving the

17  dropping of the pants?

18         MS. FINK:  It was in July 2015.

19         THE COURT:  So, three years ago.

20         MS. FINK:  On July 9, 2015.

21         THE COURT:  Three years ago.

22         MR. EISENBERG:  Yes.

23         THE COURT:  Okay.

24         MR. EISENBERG:  There were significant efforts made to

25  resolve the disputes between all of the parties prelitigation

I7J3HORC

and as well post-litigation.  There was a mediation effort that took approximately a year through the auspices of the Southern District mediation program.

On May 30, the mediator entered his final report on the docket that the parties were unable to reach consensus, resolve the case.  And on May 31, the retaliatory scheme all of the sudden accelerated precipitously.

On May 31, Dr. Hornig received an e-mail from the vice dean of the Mailman School of Public Health, of which the Center for Infection and Immunity is part of, stating that her membership in the center was being revoked, that the new member she was planning to hire pursuant to her grants would be housed at the center, but she would no longer be housed at the center. That her grants would not be managed by the center with the exception of jointly held grants with Dr. Lipkin.

So, when a grant is applied for, there is a principal investigator, perhaps two principal investigators, perhaps three.  Could be any number.  But there are many grants that Dr. Lipkin and Dr. Hornig had applied for in tandem, together, they would both be principal investigators.  Each of these grants has line items for their budget.  It includes staffing, it includes salary, it includes equipment, it includes space, it includes any number of things.

THE COURT:  Can I ask, did they jointly apply for grants after this July 2015 incident?

I7J3HORC

1          MR. EISENBERG:  I believe they did, your Honor.

2          THE COURT:  Okay.

3          MS. FINK:  I'm not sure that's true.  And Ross may

4     know.  At one point he announced he would no longer apply

5     jointly with her on any grants.  And then at some point I think

6     he retracted that, that he also had announced she couldn't use

7     any center staff to apply for future grants.  He also backed

8     off on that.

9          MR. EISENBERG:  Dr. Hornig was told that there would

10    be no assistance provided or no accommodation was made to

11    provide assistance to facilitate the transition of her grant

12    portfolio, leaving her fiscal year 2019 budget in jeopardy.  As

13    I said, there is staffing provided for in the grants, there are

14    percentage of effort determinations made in the grant

15    proposals.  Somebody will provide 50 percent of their effort

16    toward a particular project, they should be working 50 percent

17    of their time on that project.  Their salary is covered

18    50 percent by that project.  Yet, one of the people who were

19    ascribed to a 50 percent effort on one of her project was --

20    and she was -- and that person was told that Dr. Hornig could

21    only use 15 percent of that person's time, which we believe

22    didn't comport with the application and the funding

23    prerogative.

24          In addition, access to her lab and clinical data would

25    only be available to her through a shared hard drive, but

I7J3HORC

access to certain data remained unavailable because much of the
data wasn't uploaded to the shared drive, access to that shared
drive remotely was made particularly difficult.

      Dr. Hornig was moved from the center, and her office,
while she was at a conference in London.  All of her items were
boxed up, relocated to another part of the building about 10
minutes away.  It is in the exact opposite corner, different
floor, different elevator banks.

      And she gets back to work from London and she no
longer has her office, and finds herself in a tiny room, a
relatively tiny room filled with boxes from end to end that are
unmarked, that house all of her stuff taken out of file
cabinets, it has no lock, it had no phone, it didn't have
internet.

      THE COURT:  I take it this was done without her
knowledge?

      MS. FINK:  Yes.  They had told her she was going to be
moved.  They didn't tell her while she was gone they were going
to go in there, throw her stuff in boxes, and move her to
another office.

      THE COURT:  Did they provide a reason?

      MS. FINK:  All she was told by the dean is it is our
prerogative.

      MR. EISENBERG:  She specifically asked why I was being
moved, and that was the response.

I7J3HORC

1          THE COURT:  Okay.

2          MR. EISENBERG:  She was also told she would be given

3    lab space.  Her own lab space.  Yet, to date that has yet to

4    occur.

5          Most recently, we have a significant problem.  As a

6    scientist, she has samples that are frozen samples, much of

7    them stored in the center, much of it stored off site at a

8    facility in the Bronx and other sites as well.

9          She is now being told that she can no longer store her

10   samples, meaning on the grants that she has exclusively, and

11   they will, she has to identify which ones she would like to

12   keep, otherwise she will lose control over them, and they will

13   be sent to her.  However, she has no lab and no refrigeration

14   to maintain these samples.  So 20 years of her effort might be

15   placed in significant jeopardy.  We are particularly concerned

16   of the irreparable harm that might ensue from that individual

17   action.

18         But also, as you can imagine, moving somebody from

19   their office without their participation, boxing up their stuff

20   without their participation, and limiting her lab space to one

21   small portion of one floor of the center, the center entails

22   three floors, she is not allowed to be on the other two floors

23   where most of her staff is located, she is not allowed to go up

24   there to meet with her staff.  She can only communicate with

25   them in her office, but sometimes they're not allowed to go to

I7J3HORC

1    her office.  She can only communicate with them by telephone.

2    They put impediments in her ability to perform her functions in

3    a significant and extremely difficult and emotionally

4    challenging way.

5         Her ability to get work done has been compromised.

6    Her ability to apply for additional grants has been

7    compromised.  And we are concerned that her ability to do so in

8    the future will be further compromised by the destruction of

9    much of her effort.

10        THE COURT:  Let me ask you this.  I take it this is

11   not the typical sort of lack of getting tenure type of

12   situation.  Has she been subject to a performance appraisal

13   since July 2015?

14        MS. FINK:  Since July -- she was put up for promotion.

15   But the department in epidemiology that was reviewing it

16   noticed that there was no letter from Dr. Lipkin in that file.

17   She had been told by one of the associate deans that they would

18   explain to the chair of epidemiology why Lipkin was not writing

19   a letter in support.  That apparently was not done.  She met

20   with the head of epidemiology.  He had some explanations for

21   why the promotion was denied, which largely had to do with the

22   fact that she didn't have sufficient publications independent

23   of Dr. Lipkin.  She obviously now is doing publications

24   independent of Dr. Lipkin.

25        But that's not -- that's one of our claims, but it's

I7J3HORC

|    |                                                                      |
|----|----------------------------------------------------------------------|
| 1  | not really the heart of the claim.  The heart of the claim is         |
| 2  | that he is just keeping her from doing her research, and doing         |
| 3  | her science.                                                          |
| 4  |       THE COURT:  But there's no indication that she has |
| 5  | since July 2015 been evaluated to be an unsatisfactory employee       |
| 6  | in any fashion.                                                       |
| 7  |       MS. FINK:  Well, to our knowledge, no.  But there is |
| 8  | an ominous statement in a letter that she got from the dean           |
| 9  | which said something about she would -- was it she would be           |
| 10 | funded through July 2019, something would happen through              |
| 11 | July 2019.  Which seemed to suggest that in their mind, this          |
| 12 | may be some kind of end date.                                         |
| 13 |       As far as she understands, as long as she continues to |
| 14 | fund herself, to bring in the grants to fund her salary, then         |
| 15 | she has a place.  She thought she had a place in the center           |
| 16 | until a few weeks ago.                                                |
| 17 |       THE COURT:  But she has not been told.           |
| 18 |       MS. FINK:  That's correct.  She has not been told |
| 19 | you're out.                                                          |
| 20 |       THE COURT:  She hasn't been told she is under any |
| 21 | disciplinary process.                                                 |
| 22 |       MS. FINK:  No.                                  |
| 23 |       THE COURT:  Okay.                               |
| 24 |       MR. EISENBERG:  In that office that she was placed, |
| 25 | unfortunately there was a water leak, water damage to the             |

I7J3HORC

1    ceiling, ceiling tiles fell, mold and mildew has ensued.  We

2    have a very unworkable professional situation.  That is

3    problematic and needs to be addressed unfortunately more

4    quickly than we think this case will be concluded.

5         THE COURT:  Let me ask this.  Is she still working

6    through grants that have been given to her through the auspice

7    of the university?

8         MR. EISENBERG:  Absolutely.

9         MS. FINK:  Well, the grants come from federal

10   agencies.

11        THE COURT:  I understand.

12        MS. FINK:  But the issue isn't the current funding.

13   It is she has to forever write grants.  And it is much harder

14   for her to write grants.  She doesn't have the support she

15   needs to write future grands.  Grants require you to name

16   specific people who are going to work on the grants.  Before

17   June whatever it was, she was naming people at the center who

18   had the expertise to work on those grants.  Now, it is not at

19   all clear she can name people on the center staff, because she

20   can't even go to where they work.

21        THE COURT:  The grants that she's currently servicing,

22   if that's the appropriate terminology, approximately how much

23   do they amount to if you know?

24        MS. FINK:  I don't know.

25        MR. EISENBERG:  In dollar figures?

I7J3HORC

1          THE COURT:  Yes.

2          MS. FINK:  I don't know.  I know they are throwing off

3     enough money for her salary.  I know that, in other words, she

4     has to bring in 90 percent, I know she has more than 90 percent

5     at the moment, but I don't know the total end.

6          MR. EISENBERG:  We also believe she brings in the

7     second highest amount of grants while she was on the center

8     staff of the entire center staff.

9          THE COURT:  Is she still working collaboratively, if

10    not on a friendly basis, with Dr. Lipkin?

11         MS. FINK:  She has to on the grants where they are

12    both PIs.

13         THE COURT:  The PI is?

14         MS. FINK:  Principal investigator.  There is an issue

15    of his not including her in meetings that he should be

16    including her in on grants where she is a PI or co-PI, and

17    that's an issue we tried to address unsuccessfully.

18         THE COURT:  Let me ask you, are you asking me to do

19    anything in particular concerning the current situation?

20         MR. EISENBERG:  We'd like to hear what defendants have

21    to say with regard to trying to preserve what was the status

22    quo let's say two months ago, so she can get her work done,

23    have lab space, and function in a professional capacity.  And

24    after that, we might have to ask the Court's intervention.

25         THE COURT:  Okay.  Ms. Kumar or Mr. Morrison.

I7J3HORC

1          MR. MORRISON:  So I guess there are a few things to

2     address.  Plaintiff's counsel has made a number of allegations

3     and statements about the situation at Columbia, and I guess I

4     will say we couldn't disagree more about what the actual facts

5     are and have been.

6          Let me start very briefly about the background of the

7     case, which kind of informs what has gone on here which

8     plaintiff's counsel alluded to.

9          Dr. Lipkin and Dr. Hornig were in a personal

10    relationship for many years.  Over a decade.  Dr. Lipkin and

11    not Dr. Hornig was recruited to Columbia.  Dr. Lipkin is a

12    world-renowned scientist, he's known throughout the country and

13    the world, he speaks regularly throughout the country,

14    throughout the world, travels internationally very frequently.

15    He's been called the world's most celebrated virus hunter.

16          And plaintiff, by contrast, is really not of the same

17    prominence.  Plaintiff was hired at Columbia because Dr. Lipkin

18    insisted since they were in a relationship, she be able to come

19    with him to Columbia.  In fact, there is notation in the file

20    as to why her application was being pushed through with such

21    alacrity.  That kind of informs the background here.

22          When their relationship broke down in 2011, things

23    sort of went south, and it is clear plaintiff does not like

24    Dr. Lipkin, and really her actions sort of reflect that she's

25    not happy working with him.  She's not happy to have him as her

I7J3HORC

1    supervisor, and was not happy in the center.

2            The bottom line, and I can get into some of the

3    specifics, but I'll try to keep it a little more brief than

4    plaintiff's counsel.  Plaintiff is not a very productive

5    scientist.  For many years when she was together with

6    Dr. Lipkin, they worked together.  They continued to work

7    together, but when they were together and in a relationship,

8    they worked together on many grants and applications for

9    grants.  And he supported her, and in fact in many ways helped

10   her above and beyond what he would do for another co-faculty

11   member.

12           After that relationship ended, he stopped in essence

13   preferring her in that way, and treated her just as he would

14   any other faculty member in the Center for Infection and

15   Immunity, and let her rise or fall on her own accord.  And for

16   the most part, she's fallen.  She is not a good grant writer,

17   which is sort of the lifeblood of the work they do in the

18   center.  She's not very productive.  She regularly misses

19   deadlines.

20           These facts will be borne out not just by Dr. Lipkin,

21   but other members of the faculty inside and outside the center.

22           That's sort of been the driving animus here of what

23   the problems have been in terms of plaintiff's work at the

24   center.

25           In terms of her specific claims, she has a claim of

I7J3HORC

| | |
|---|---|
| 1 | discrimination as far as that relates to failure to promote. |
| 2 | She made one application to be promoted to full professor.  Her |
| 3 | title is still associate professor.  There was another male |
| 4 | applicant which -- this is gender discrimination.  He was also |
| 5 | not promoted.  So I don't think she can state a prima facie |
| 6 | case under Title VII case law. |
| 7 | As far as this incident with the buttocks, which |
| 8 | occurred a number of years ago at this point, Dr. Lipkin at the |
| 9 | time was about to travel to internationally, he had a lesion, |
| 10 | in fact, on his buttocks that was becoming infected.  He was |
| 11 | worried about traveling internationally.  Dr. Hornig happens to |
| 12 | be a medical doctor in addition to a researcher.  And so, given |
| 13 | the nature of their prior relationship, he called her into his |
| 14 | office and did in fact show her the lesion and asked her |
| 15 | whether he can travel internationally, whether he needed some |
| 16 | kind of antibiotic treatment on it.  That was obviously not the |
| 17 | best choice on his part.  He was reprimanded for doing that. |
| 18 | It was not good judgment.  However, it has nothing to do with |
| 19 | any kind of discrimination. |
| 20 | THE COURT:  Was there an investigation conducted by |
| 21 | Columbia in connection with that incident? |
| 22 | MR. MORRISON:  Yes.  HR looked for it.  Dr. Lipkin was |
| 23 | more than forthcoming.  He was informed he should not have done |
| 24 | that, it was inappropriate, and he exercised poor judgment, and |
| 25 | that was we thought the end of that. |

I7J3HORC

1          THE COURT:  When was it resolved?

2          MR. MORRISON:  I think shortly after the incident

3    occurred in July of 2015.  So a month or two.  There has been

4    nothing of any sort since then in terms of a harassment-type

5    claim, and I think as your Honor I'm sure is well aware, under

6    case law, one isolated incident occurring under the

7    circumstances I just described many years ago is certainly not

8    enough to make any kind of harassment claim.  So that informs a

9    lot of the background here.

10          Let me talk a little bit about the transfer, recent

11    transfer out of Center for Infection and Immunity.  I think

12    there are a few issues here.  One, let me just start with the

13    basics why that occurred, and then I'll get to how it occurred,

14    which I think what occurred is not what the plaintiff

15    described.

16          The reason she was transferred is because of her lack

17    of collaboration essentially with other faculty, including

18    Dr. Lipkin in the center.  The center is a very closely knit

19    community of scientists, they depend on collaboration for their

20    work there.  They bounce ideas off each other to talk about

21    grants, to talk about future avenues of research.  And they

22    have weekly meetings to do that, which Dr. Lipkin often will

23    hold, and which all the scientists there will talk about what

24    they're working on, bounce ideas, as I said, off one another,

25    and sort of where the center is going and what directions they

I7J3HORC

1    should be doing.

2              Dr. Hornig attended these meetings, and her usual

3    comment -- this will be again borne out by multiple

4    witnesses -- is that her only comment will be I'm working on

5    grants or I'm working on a specific grant, but offer no further

6    details and just stop at that and not really participate.  It

7    is clear she did not want to be in the center nor did she want

8    to be supervised by Dr. Lipkin, which is a little bit ironic.

9    She's complaining about the transfer out of the center, which

10   she wants to be no longer supervised by Dr. Lipkin.  She does

11   not communicate with Dr. Lipkin.  It makes it very difficult as

12   an administrative matter for him or the other administers in

13   center to run the center.  Plaintiff does not tell Dr. Lipkin

14   when she is going to be in the office, when she's out of the

15   office, what she's working on, what she is applying for.  They

16   have trouble communicating even on the grants they are working

17   on as co-principal investigators.

18             So, as a result of that, and the other factor being

19   plaintiff routinely treats staff administrative staff poorly in

20   the center, has yelled at them and castigated publicly,

21   embarrassed them.  There have been complaints to Dr. Lipkin and

22   others about how they've been treated by Dr. Hornig.

23             As a result, a decision was made -- this was not very

24   recent, it was made some time ago, she probably should be

25   transferred out of the center.  As counsel noted, we have been

I7J3HORC

|  |  |
|---|---|
| 1 | mediating the case.  That mediation concluded in May, in the |
| 2 | middle of May.  May 11.  We were told by the mediator there |
| 3 | would be no settlement possible at this time.  What happened |
| 4 | after, there was radio silence from plaintiff. |
| 5 | THE COURT:  When you say "plaintiff," do you mean |
| 6 | counsel? |
| 7 | MR. MORRISON:  Both.  But plaintiff was informed, |
| 8 | mostly from counsel in terms of this case, there was no request |
| 9 | for any kind of conference until the third week of June, so |
| 10 | about a five-week delay. |
| 11 | But plaintiff was informed in the middle of May that |
| 12 | she would be transferred out of the center.  She then had |
| 13 | e-mail correspondence with the dean there and was told the |
| 14 | details, the parameters of that transfer, what would occur.  So |
| 15 | she knew exactly what was happening.  She told the transfer |
| 16 | would be occurring on June 1st. |
| 17 | THE COURT:  When you say, was informed of the |
| 18 | parameters.  Are you talking sort of logistically or the |
| 19 | reasons that she was being moved out? |
| 20 | MR. MORRISON:  She was informed of the logistics and |
| 21 | as well as the new set up in the letter from the dean who was |
| 22 | in charge of administrative side of the transfer. |
| 23 | THE COURT:  So she was aware of the office to which |
| 24 | she was being moved? |
| 25 | MR. MORRISON:  I believe she was at some point, toward |

I7J3HORC

1   the end of May, middle of June.

2              THE COURT:  Is this before she went off on the trip?

3              MR. MORRISON:  I don't know the exact timing.

4   However, we have clear e-mail correspondence informing her of

5   the most important aspects of the transfer, which were she

6   would essentially maintain the same salary, maintain the same

7   resources, the same access to the lab, the same access to

8   personnel that she has, she has all these things.  And her

9   complaints in the letter she wrote to one of the deans

10  following the transfer related to things like that her office

11  was not unpacked, she didn't have carpeting that she needed,

12  she didn't like the furniture she had there.  That it was a

13  water issue or mold issue in the ceiling.

14              All these issues, and the correspondence will bear

15  this out, have been addressed over and above and beyond what

16  most people would do for anybody.  A high-level administrator,

17  dean of administration I believe of the department, came down,

18  personally supervised the unpacking of her office, the bringing

19  up additional furniture to her office.  She wanted a desk they

20  had in the center that had been purchased by Dr. Lipkin with

21  his own funds, a special type of desk that would be brought

22  down for her at her insistence.  Carpeting was put in despite

23  the fact that other faculty do not -- most faculty do not have

24  carpeting.  The water issue, an environmental remediation

25  company was brought in to check on a mold issue.  There was no

I7J3HORC

1    finding of moisture or mold, and yet she still continued to

2    complain.

3              THE COURT:  This was at her request?

4              MR. MORRISON:  Almost all -- some of it was at her

5    request, some was at Columbia's own initiative in terms of

6    environmental checking, making sure there was no mold or any

7    kind of water problem.

8              THE COURT:  Let me ask you just a couple questions.

9    Was she -- and forgive if I'm using the wrong terminology --

10   was she removed from the center?  Not physically, but was she

11   no longer a member of the center?

12             MR. MORRISON:  She's no longer a member of the center

13   but she's still a member of the department of epidemiology.

14   She has the same title, associate professor.  Her grants that

15   she currently works on through the center are still worked on

16   through the center.  To the extent she'll goes to apply for new

17   grants, it will be administered by the department of

18   epidemiology which was always her department.  And the chair of

19   the department of epidemiology, instead of Dr. Lipkin, will now

20   be the one who determines whether she can apply for the grant,

21   whether it is approved, which is one of her main complaints in

22   this case which we thought would be helpful to her.

23             THE COURT:  Let me ask you this question.  According

24   to plaintiff's counsel she's -- again, I don't want to

25   overstate -- but prohibited from or prevented from using the

I7J3HORC

1  facilities at the center.  Is that not the case?

2          MR. MORRISON:  That's not correct.  That's in writing.

3  She can use the facility, she is allowed to travel to the

4  facilities.

5          I think what occurred was that she wanted to go to the

6  facilities after hours and found that her card key was

7  deactivated, which she's not a member of the center, so she

8  can't just access the center like anybody.  She can go to the

9  center during business hours or meet with someone who is a

10  member of the center at any time in the center.  To the extent

11  she needs to, she also can use her own office, which is I

12  believe now a few floors down from where she was previously

13  sitting.

14          THE COURT:  In the same building?

15          MR. MORRISON:  Yes.  And I think maybe what -- I hope

16  I'm conveying the nature of these complaints here and the type

17  of frivolous nature.  She complained that because now she's no

18  longer on the 17th floor, she is now on the seventh floor, and

19  the lab space, which I'm not sure she travels to the lab space,

20  but the lab space for the center which she can still use is on

21  the 18th floor.  She now has an elevator ride of a longer

22  duration coming from the seventh floor as opposed to coming

23  from the 17th floor.  And she actually raised in a letter to

24  the dean that she has too long of a travel time.  Her commute

25  is a few minutes longer than if she was coming from the 17th

I7J3HORC

1  floor.  This is the nature of the complaints that we've been

2  dealing with.

3          There is certainly a legitimate, more than a

4  sufficient legitimate business reason for why she was

5  transferred, and in many ways she brought this upon herself.

6  It was her failure to collaborate and communicate with others

7  in the center which makes her not a good fit for them anymore.

8  In fact, now as just being separate from the center in the

9  department of epidemiology, she can apply for grants not

10  through Dr. Lipkin, Dr. Lipkin having no role in the processing

11  or the approval of those grants, which has been a complaint

12  previously.

13          THE COURT:  When did their personal relationship end?

14          MR. MORRISON:  I believe 2011, approximately.

15          THE COURT:  And is there documentation detailing when

16  it was that folks started expressing concerns about her lack of

17  collaboration, etc.?

18          MR. MORRISON:  Various e-mail traffic, and there would

19  be testimony from the various witnesses, yes, going back a

20  number of years.  I can't date it exactly, but it's been an

21  ongoing thing.  It's increased in intensity, and I think it

22  really informs what's gone on here.

23          I would just make a few other points.  This claim of

24  harm is not irreparable harm, your Honor.  The complaint

25  claims, which was filed over a year ago in May of 2017, claims

I7J3HORC

1    irreparable harm.  Plaintiff on at least three occasions, her

2    counsel has claimed that Dr. Lipkin's conduct vis-a-vis her in

3    terms of a particular grant is causing her irreparable harm.

4    They've threatened to move for injunctive relief before.  They

5    have not taken any action to do that nor to prosecute this

6    case.  Waiting five weeks after mediation had been concluded to

7    even ask for a court conference.

8         THE COURT:  Okay.  Ms. Friedfel, is there anything you

9    wanted to say?

10        MS. FRIEDFEL:  Just very briefly.  I would echo what

11   Mr. Morrison just said.  The issues with respect to

12   Dr. Hornig's productivity did go back a number of years, and

13   there was a certain level of tolerance where you try to

14   encourage somebody to be productive and try to help them, and

15   eventually there reaches a point after years of trying to

16   encourage and assist, the person is still not productive.  And

17   there are tables that will demonstrate papers she was supposed

18   to produce and deadlines for those papers and other lack of

19   productivity and actual performance issues that Mr. Morrison

20   didn't mention recently that was uncovered she had made some

21   serious research errors that undermined the faith of the other

22   members of the center in her science, and their willingness to

23   collaborate on her based on her lack of professional scientific

24   judgment and accuracy.

25        So those were the other motivating factors that I

I7J3HORC

1   think went into the issues with the ability of the members of

2   the center to work with Dr. Hornig.

3           MR. EISENBERG:  Your Honor, if I might.

4           THE COURT:  Briefly.

5           MR. EISENBERG:  I heard counsel suggest that she was

6   told prior to the move that she would have same resources, same

7   access to personnel, and same access to lab space.

8           Can we get a commitment from defendants that she will

9   have and does have and can have the same resources, same access

10  to personnel, including coordinators, and same access to the

11  center's space as she had two months ago, three months ago,

12  three years ago?

13          Because if that's the representation, and that hasn't

14  happened, we need to fix it.

15          MR. MORRISON:  Your Honor, I think one part of the

16  issue here in this case is the question of what she had and

17  didn't have is in dispute.  And I think it is very clear, and

18  we put in a letter to the plaintiff in early June that she

19  would maintain the same access to lab space and to her work and

20  to her resources that she previously had.

21          What that is though, your Honor, I think the parties

22  will disagree quite a bit.  And as we just go through

23  discovery, I'm sure the facts will bear out what Columbia's

24  position is and has been.

25          THE COURT:  Okay.  Have the parties worked out a civil

I7J3HORC

1   discovery plan?

2           MR. MORRISON:  We have, your Honor.  We've come to two

3   scheduling orders.  One which complies with your Honor's order

4   of the six-month schedule.  However, I think the parties have

5   agreed that it is not realistic in this case to complete

6   discovery in that time frame.

7           THE COURT:  That's fine, that's fine.

8           MR. MORRISON:  We've agreed on a one-year schedule.

9   Given the volume of discovery that's anticipated, and in

10  particular e-mail discovery which is likely to involve hundreds

11  of thousands if not millions, over a million documents to be

12  reviewed by Columbia.  Which, as an academic institution,

13  constitutes a significant burden.  But I believe that's what

14  we'll be confronted with.

15          THE COURT:  The parties have agreed to that

16  alternative schedule?

17          MR. MORRISON:  We have.

18          THE COURT:  So then just hand it up and we'll so order

19  it.

20          MR. MORRISON:  May I approach, your Honor?

21          THE COURT:  You may.  Absolutely.  It has an outside

22  discovery cutoff of one year.  July 19, 2019.  Based on the

23  representations, I think that's a reasonable.  We will go ahead

24  and so order this and put it on ECF and set the subsequent

25  conference will be on or after that date.

I7J3HORC

1          Ms. Rivera.

2          THE DEPUTY CLERK:   July 19, 2019, at 11 a.m.

3          THE COURT:   Although I'm not expecting this to happen,

4     if the parties, as they proceed through discovery, believe that

5     a settlement may be in the offing and you think that chambers

6     could be useful to you, simply contact chambers and I'll refer

7     you to the assigned magistrate judge who in this case is

8     Magistrate Judge Kevin Fox or to the mediator who tried to help

9     you earlier.   Okay.

10          MR. EISENBERG:   Your Honor, we are concerned, and I

11     apologize to beg your indulgence.   But we believe in light of

12     what was just said that we're going to seek some injunctive

13     relief.   We'd like to have some insight as to how you would

14     like us to go about doing that.   I understand through your

15     motion practice schedule there should be letters going back and

16     forth.   We can do that.   We could also just move.

17          THE COURT:   If you're going to move, if you think this

18     is something that is remediable through the extraordinary leap

19     of Rule 65, you should make your motion.

20          MR. EISENBERG:   Okay.   Would you like us to do the

21     letters back and forth?

22          THE COURT:   No, there is no need for premotion

23     letters.

24          MR. EISENBERG:   Thank you.

25          THE COURT:   Anything else?   Anything from the back?

I7J3HORC

1              MR. MORRISON:  Nothing, your Honor.

2              THE COURT:  We are adjourned.  Thank you, folks.

3              (Adjourned)