**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
**MADY HORNIG, M.D.,**                                 :

              **Plaintiff,**                     :

       **v.**                                          :

**TRUSTEES OF COLUMBIA**                        :          17 Civ. 3602 (ER)
**UNIVERSITY IN THE CITY OF**
**NEW YORK and WALTER IAN**                   :
**LIPKIN, M.D.,**
                                                       :
           **Defendants.**
                                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Yankwitt LLP
Ross E. Morrison
Michael H. Reed
140 Grand Street, Suite 705
White Plains, New York 10601
Tel: (914) 686-1500
*Counsel for Defendant The Trustees of Columbia*
*University in the City of New York*

Jackson Lewis P.C.
Susan D. Friedfel
Joseph J. DiPalma
44 South Broadway, 14th Floor
White Plains, New York 10601
Tel: (914) 872-8027
*Counsel for Defendant Walter Ian Lipkin, M.D.*

*Of Counsel*
BUCKLEY LLP
1133 Avenue of the Americas, Suite 3100
New York, NY 10036-6710
Tel: 212-600-2315
*Counsel for Defendant The Trustees of Columbia*
*University in the City of New York*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND .............................................................................................................. 2

    A.   The Center for Infection and Immunity .......................................................... 2

    B.   Dr. Lipkin ........................................................................................................ 3

    C.   Plaintiff's Employment at Columbia ............................................................. 4

    D.   The Relationship Between Dr. Lipkin and Plaintiff ...................................... 5

    E.   Plaintiff's EEOC Charge and the Complaint in This Action ......................... 5

ARGUMENT ................................................................................................................... 7

I.    LEGAL STANDARDS .......................................................................................... 7

    A.   Summary Judgment ........................................................................................ 7

    B.   Discrimination and Retaliation Claims Under Title VII and the NYCHRL................... 7

        1.   Discrimination Claims Under Title VII and the NYCHRL ..................... 7

        2.   Retaliation Claims Under Title VII and the NYCHRL ............................ 8

II.   THE COURT SHOULD GRANT DEFENDANTS' SUMMARY JUDGMENT MOTION BECAUSE THE UNDISPUTED MATERIAL FACTS DEMONSTRATE THAT PLAINTIFF WAS NOT DISCRIMINATED OR RETALIATED AGAINST ................... 10

    A.  The Court Should Dismiss Plaintiff's Claims of Discrimination and Retaliation ............................................................................................ 10

        1.   The Court Should Dismiss Plaintiff's Harassment Claim ..................... 10

        2.   The Court Should Dismiss Plaintiff's Failure to Promote Claim........................... 12

        3.   The Court Should Dismiss Plaintiff's Claim Concerning Her Transfer out of the CII ................................................................................. 18

        4.   Plaintiff Was Not Denied Any Rights as a Principal Investigator Based on Her Gender or in Retaliation for Her Complaints .......................... 25

            a.   Dr. Lipkin's Involvement in the CFI Projects Was Not Motivated by Plaintiff's Gender.................................................................. 25

            b.  Plaintiff Was Not Denied Access to Staff for Discriminatory or Retaliatory Reasons ......................................................................... 27

               i.  Postdoctoral Fellows ................................................................... 27

               ii. Research Assistants, Data Managers, Biostatisticians, and Project Managers........................................................................... 28

            c.  Plaintiff Was Not Denied Support in Preparing Grant Applications................. 29

            d.  Plaintiff Was Not Improperly Denied Access to Data ....................................... 30

e.  Plaintiff Was Not Improperly Denied Access to Information ........................... 30

5.  There Is No Evidence that the Authorship Disputes Were Motivated by Gender-Based or Retaliatory Animus .......................................................................... 31

6.  The Court Should Dismiss Plaintiff's Claim Concerning Alleged Destruction of Her  Samples ...................................................................................................... 34

7.  The Court Should Dismiss Plaintiff's Claim Concerning Alleged Misuse of Funds on Certain Grants ............................................................................................ 36

B.  The Court Should Dismiss All of Plaintiff's Retaliation Claims.................................... 37

CONCLUSION........................................................................................................................ 40

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*Agosto v. New York City Dep't of Educ.*,
   982 F.3d 86 (2d Cir. 2020) ............................................................................ 8, 17

*Alam v. HSBC Bank USA, N.A.*,
   2009 WL 3096293 (S.D.N.Y. Sept. 28, 2009) ................................................ 39

*Augustine v. Cornell Univ.*,
   2018 WL 1474402 (S.D.N.Y. Mar. 26, 2018) .................................................. 9

*Bentley v. Autozoners, LLC*,
   935 F.3d 76 (2d Cir. 2019) ............................................................................... 8

*Bickerstaff v. Vassar Coll.*,
   196 F.3d 435 (2d Cir. 1999) ........................................................................... 16

*Boise v. New York Univ.*,
   2003 WL 22390792 (S.D.N.Y. Oct. 21, 2003) ............................................... 32

*Bourara v. New York Trades Council & Hotel Ass'n of N.Y.C., Inc. Emp. Benefit Funds*,
   2020 WL 5209779 (S.D.N.Y. Sept. 1, 2020) ................................................... 8

*Campbell v. Cellco P'ship*,
   860 F. Supp. 2d 284 (S.D.N.Y. 2012) ............................................................ 15

*Chang v. Safe Horizon*,
   2005 WL 2125660 (S.D.N.Y. Sept. 1, 2005) ................................................. 17

*Connolly v. City Of New York*,
   2020 WL 5553843 (E.D.N.Y. Aug. 18, 2020) ................................................ 24

*Cummings-Fowler v. Suffolk County Cmty. College*,
   981 F. Supp. 2d 124 (E.D.N.Y. 2013) ............................................................ 11

*D'Alessio v. Charter Commc'ns, LLC*,
   2020 WL 5638721 (E.D.N.Y. Sept. 21, 2020) ............................................... 36

*Davis-Bell v. Columbia Univ.*,
   851 F. Supp. 2d 650 (S.D.N.Y. 2012) ............................................................ 10

*Fitzpatrick v. New York Cornell Hosp.*,
   2003 WL 102853 (S.D.N.Y. Jan. 9, 2003) ..................................................... 23

*Gertner v. Pace Univ.*,
   2014 WL 11173663 (S.D.N.Y. Jan. 7, 2014) ................................................. 15

*Irons v. Bedford-Stuyvesant Cmty. Legal Servs.*,
   2015 WL 5692860 (E.D.N.Y. Sept. 28, 2015) ............................................... 10

*James v. New York City Health & Hospital's Corp.*,
   2014 WL 1485393 (E.D.N.Y. Apr. 14, 2014) ................................................ 11

*Jeffreys v. City of New York*,
   426 F.3d 549 (2d Cir. 2005) ........................................................................... 40

*Joseph v. Owens & Minor Distribution, Inc.*,
   5 F. Supp. 3d 295 (E.D.N.Y. 2014) .................................................................. 9

*Knox v. Town of Se.*
2014 WL 1285654 (S.D.N.Y. Mar. 31, 2014) ................................................................. 23

*Macshane v. City of New York,*
2015 WL 1298423 (E.D.N.Y. Mar. 23, 2015) ................................................................ 11

*Marshall v. Kingsborough Cmty. Coll. of CUNY,*
2015 WL 5773748 (E.D.N.Y. July 27, 2015) .......................................................... 18, 37

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ......................................................................................................... 7

*Maynard v. Montefiore Med. Ctr.,*
2021 WL 396700 (S.D.N.Y. Feb. 4, 2021) ....................................................................... 8

*Mcdonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973) .......................................................................................................... 8

*Mclee v. Chrysler Corp.,*
109 F.3d 130 (2d Cir. 1997) ...................................................................................... 17, 37

*O'Sullivan v. New York Times,*
37 F. Supp. 2d 307 (S.D.N.Y. 1999) .............................................................................. 17

*Pacenza v. IBM Corp.,*
2009 WL 890060 (S.D.N.Y. Apr. 2, 2009) ..................................................................... 31

*Pacheco v. Comprehensive Pharmacy Servs.,*
2013 WL 6087382 (S.D.N.Y. Nov. 19, 2013) ................................................................ 24

*Patane v. Clark,*
508 F. 3d (2d Cir. 2007) ................................................................................................. 14

*Petyan v. New York City L. Dep't,*
2015 WL 1855961 (S.D.N.Y. Apr. 23, 2015) ................................................................ 38

*Phillip v. City of New York,*
2012 WL 1356604 (E.D.N.Y. Apr. 19, 2012) ................................................................ 23

*Rogers v. Bank of New York Mellon,*
2016 WL 4362204 (S.D.N.Y. Aug. 15, 2016) ................................................................ 10

*Scotto v. Almenas,*
143 F.3d 105 (2d Cir. 1998) .............................................................................................. 7

*Shumway v. United Parcel Serv., Inc.,*
118 F.3d 60 (2d Cir. 1997) ....................................................................................... 14, 31

*Sosa v. Rockland Cty. Cmty. Coll.,*
2017 WL 3105872 (S.D.N.Y. July 20, 2017) ................................................................. 17

*Stern v. State Univ. Of New York,*
2018 WL 4863588 (E.D.N.Y. Sept. 30, 2018) ............................................................... 23

*Stoddard v. Eastman Kodak Co.,*
309 Fed. Appx. 475 (2d Cir. Feb. 13, 2009) ................................................................. 38

*Tanay v. St. Barnabas Hosp.,*
2001 WL 262695 (S.D.N.Y. Mar. 15, 2001) .................................................................. 24

*Tepperwien v. Entergy Nuclear Operations, Inc.,*
663 F.3d 556 (2d Cir. 2011) ........................................................................................... 38

*Torres v. Cent. Ave. Nissan, Inc.*,
  2021 WL 1227098 (S.D.N.Y. Mar. 31, 2021) ........................................... 9

*Toussaint v. NY Dialysis Servs., Inc.*,
  230 F. Supp. 3d 198 (S.D.N.Y. 2017) .................................................... 36

*Univ. of Mich. v. Ewing*,
  474 U.S. 214 (1985) ................................................................... 32

*Univ. of Penn. v. EEOC*,
  493 U.S. 182 (1990) ................................................................... 32

*Univ. of Tex. SW. Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013) .................................................................... 9

*Varughese v. Mount Sinai Med. Ctr.*,
  2015 WL 1499618 (S.D.N.Y. Mar. 27, 2015) ........................................ 12

*Vitale v. Equinox Holdings, Inc.*,
  2019 WL 2024504 (S.D.N.Y. May 7, 2019) ......................................... 37

*Washington v. City of New York*,
  2009 WL 1585947 (S.D.N.Y. June 5, 2009) ......................................... 38

*Weinstock v. Columbia Univ.*,
  224 F.3d 33 (2d Cir. 2000) .................................................. 8, 12, 16

*Wright v. New York City Off-Track Betting Corp.*,
  2008 WL 762196 (S.D.N.Y. Mar. 24, 2008) .................................. 17, 33, 37

*Ya-Chen Chen v. City Univ. of New York*,
  805 F.3d 59 (2d Cir. 2015) .............................................................. 9

RULES

Federal Rule of Civil Procedure 56 ........................................................ 1
Federal Rule of Civil Procedure 56(a) ..................................................... 7

Defendants The Trustees of Columbia University in the City of New York ("Columbia"), and Walter Ian Lipkin, M.D. ("Dr. Lipkin") (collectively, "Defendants"), respectfully submit this memorandum of law in support of their motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## PRELIMINARY STATEMENT

On May 15, 2017, plaintiff, currently an associate professor without tenure at Columbia in the Department of Epidemiology, filed this action, contending that Columbia and her then supervisor Dr. Lipkin, Director of Columbia's Center for Infection and Immunity ("CII"), discriminated against her on the basis of her gender and retaliated against her after she complained in July 2015 about Dr. Lipkin's conduct.  In plaintiff's 400-plus paragraph Complaint and her deposition in this matter, plaintiff contended that Dr. Lipkin's purported actions began in 1998 when they started working together, continued after they both came to Columbia in 2002 -- including when they were in a personal relationship and living together from 1998 until 2011 – and have continued to the present day, with other Columbia employees allegedly engaged in a virtual conspiracy supporting Dr. Lipkin's alleged actions.  According to plaintiff, most aspects of her employment at Columbia, including her failure to be promoted, meet deadlines and publish papers, and obtain independent and sufficient funding for her work, all are attributable to these actions.

Despite now having engaged in voluminous discovery, and plaintiff having surreptitiously taped and produced in this case hundreds of hours of conversations with Dr. Lipkin and other Columbia employees, plaintiff has adduced no evidence that would support even an inference of gender discrimination.  As was the case when the Court denied plaintiff's application for a preliminary injunction in 2018, plaintiff continues to rely on conclusory and

vague allegations, and fails to identify any comparator or other evidence of discriminatory animus.  As such, these claims fail.

Plaintiff's retaliation claims fare no better.  Plaintiff contends that nearly everything that happened to her at Columbia after July 2015 was retaliatory, but also contends that the same alleged conduct by Dr. Lipkin was occurring before July 2015, thereby negating any potential inference of retaliation.  Moreover, beyond plaintiff's conclusory statements and a few stray remarks by Dr. Lipkin, the material facts do not come close to supporting a reasonable inference of retaliatory animus by Dr. Lipkin or any other Columbia employee sufficient to support plaintiff's claims.  Accordingly, the Court should grant Defendants' motion and dismiss the Complaint.

## BACKGROUND[1]

### A.    *The Center for Infection and Immunity*

The Mailman School of Public Health ("Mailman"), is part of the Columbia University Irving Medical Center ("CUMC") and is "dedicated to excellen[ce] in science for the public good."  (Ex. B at 15).[2]  Mailman is composed of academic departments and schoolwide centers. Departments focus on the various disciplines of public health, including Epidemiology and Environmental Health Sciences, among others.  (Ex. B at 19; Santella Decl., ¶ 3).  Schoolwide

---

[1] Because of the sheer number of plaintiff's factual allegations, only general background facts are set forth here.  Specific facts relevant to the various allegations are set forth in the individual Argument sections addressing those allegations, *infra*, and Defendants' Local Civil Rule 56.1 Statement.

[2] "Ex." refers to Exhibits attached to the Declaration of Ross E. Morrison, dated May 20, 2021.  Excerpts from the deposition transcripts in this action are attached as exhibits to that Declaration, except for plaintiff's deposition transcript, which is contained in an accompanying binder.  "Santella Decl.," and "Susser Decl." refer to the accompanying Declarations of Regina Santella and Ezra Susser, both dated May 19, 2021, respectively.  "Kanas Decl.," refers to the Declaration of Allison Kanas, dated October 5, 2018 (Dkt. No. 35), previously filed in connection with Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction.  "Lipkin Decl.," refers to the declaration of Dr. Lipkin, dated May 20, 2021.

centers are "interdisciplinary centers of excellence that are directed to a theme [and] are led by a director." (Ex. B at 19). While center directors have departmental appointments, they are responsible to the Dean, and unlike department chairs, "lead[] by mandate." (*Id.* at 22, 28).

The Center for Infection and Immunity ("CII"), is one of Mailman's schoolwide centers. (Ex. B at 19-21). The CII is an advanced molecular biology laboratory that develops, validates and implements new technologies for discovery of bacteria, viruses and fungi that cause disease, studies how they cause disease, and builds diagnostic tests. (Santella Decl., ¶ 4). The CII employs anywhere from 35-60 people, and has relationships with researchers around the world. (Ex. D at 14). Among the CII's achievements are discovering 1,800 new microbes; showing that the use of folic acid during pregnancy reduces the risk of autism by 40%; and introducing the first sensitive diagnostic test for SARS. (Ex N).

Generally, Columbia does not use its own funds to support research staff or laboratory space at CUMC. (Santella Decl., ¶ 5). Scientists must obtain external funding from government agencies, private industry or donors to fund their salaries, and to be able to maintain their positions. (*Id.*). Most departments at Mailman require faculty to fund 95% of their salaries through a combination of external sources, and teaching or an administrative position. (*Id.*).

**B.    *Dr. Lipkin***

Lipkin was recruited to Mailman in 2001 from the University of California, Irvine, where he was a tenured professor and held the Louise Turner Arnold Chair of Neuroscience. (Lipkin Decl., ¶¶ 4, 10). Dr. Lipkin is the John Snow Professor of Epidemiology at Mailman and Professor of Neurology and Pathology at Columbia's Vagelos College of Physicians and Surgeons, all with tenure, as well as the Daldorf Professor for Research at the Wadsworth Center, New York State Department of Health, and the Director of the CII. (Santella Decl., ¶ 12; Ex. D at 13). As the Director of the CII, Lipkin supervises "an integrated research program with

3

a set of thematic goals, and they manage the whole enterprise around achieving those thematic goals." (Ex. B at 28). He is responsible for "the scientific excellence and accomplishments of all the people within the center" and for ensuring that center personnel are securing external funding. (Ex. B at 19).

Lipkin is a "world class scientist of the highest caliber." (Ex. B at 85.) He has "accomplished more than most scientists do in their career," creating "innovative" science that "protect[s] the health of the population" and serves "the public good." (*Id.*). Among his accomplishments are identifying AIDS-associated abnormalities, which he showed could be treated with plasmapheresis; demonstrating that early exposure to viral infections affects neurotransmitter function; assisting China on its SARS outbreak; and consulting with the Kingdom of Saudi Arabia on Middle East Respiratory Syndrome (MERS). (Ex. T).

### C.   *Plaintiff's Employment at Columbia*

As a condition of his recruitment to Columbia, Lipkin insisted that Columbia also hire two members of his lab at UC Irvine, plaintiff and Thomas Briese. (Ex. A at 50). At the time, plaintiff was an adjunct assistant professor at UC Irvine, and previously had been an assistant professor at the University of Pennsylvania. (Ex. A at 19, 41). At Mailman, plaintiff was appointed as an associate professor of Epidemiology on the tenure track, and became a member of CII. (Ex. A at 77).

In 2006, plaintiff was reviewed for tenure and told that her publication rate was low and that she needed more first author publications[3] (Ex. A at 83-84 and Ex. K; Santella Decl., ¶ 10), and to demonstrate more independence, including applying for and obtaining an R01 grant, i.e., a grant from the National Institute of Health where the investigator generates an idea and receives

---

[3] A first author is the author who is listed first and generally has written the first draft of the paper and done or led the majority of the work. (Santella Decl., ¶ 10).

funding to research it.  (Ex. A at 85-86; Ex. K; Santella Decl., ¶ 6).  Plaintiff was told that she needed to publish "at least 4-5 seminal papers in high impact journals" by 2009, and subsequently sought and received an exemption from any teaching responsibilities so that she could focus on these goals.  (Ex. A at 87-88; Ex. K).  By 2009, plaintiff had not achieved these goals, and per her request was granted a two-year extension of time to be re-evaluated for tenure, which was supported by Linda Fried, Dean of the Mailman School.  (Ex. A at 92-98, 102-03).  In 2012, because plaintiff still had not met the goals originally outlined to her in 2006, she was informed that she was unlikely to receive tenure.  (*Id.* at 104-06).  As a result, plaintiff requested to be removed from the tenure track.  (*Id.*).  Plaintiff currently is an associate professor at CUMC, a non-tenure track position, in Epidemiology.  (Ex. A at 104-06; Santella Decl., ¶ 12).

In fiscal years 2015-2020, plaintiff's grant support funded between 69% and 88% of her salary, with the shortfalls being covered by the CII.  (Ex. A at 65-72).  Currently, the Mailman Dean's office is covering her grant shortfall, over 22% of her salary.  (Ex. A at 64; Santella Decl., ¶ 35).

### D.    *The Relationship Between Dr. Lipkin and Plaintiff*

From 1998 until 2011, plaintiff and Dr. Lipkin were in an intimate personal relationship and resided together for most of that time with plaintiff's two children from a previous marriage.  (Ex. A at 24-27).  During the period in which they lived together, plaintiff joined Dr. Lipkin in hosting and attending social events related to their work in the CII, such as dinners with prospective donors and collaborators. (Ex. A at 193-94).

### E.    *Plaintiff's EEOC Charge and the Complaint in This Action*

On April 29, 2016, plaintiff filed a Charge of Discrimination with the Equal Opportunity Commission, alleging gender discrimination and retaliation against Columbia.  (Compl., ¶ 6).

On May 18, 2017, plaintiff filed the Complaint in this case, asserting gender discrimination and retaliation claims under Title VII and the New York City Human Rights Law ("NYHRL") against Columbia and Dr. Lipkin.  The Complaint contains over 400 paragraphs alleging that Dr. Hornig was wronged at almost every turn.  According to the Complaint, "[t]hroughout their professional relationship, Lipkin made clear that he expected Plaintiff to be his largely-silent and always subservient partner, forced to work almost exclusively on his projects and to give him undue credit for her own work, to the detriment of her own professional growth, stature in their shared field, and productivity."  (*Id.*, ¶ 23).  At her deposition in this matter, plaintiff further clarified that she believes that Dr. Lipkin has discriminated against her on the basis of her gender from 1998 to the present.  (Ex. A at 31-38).

On August 17, 2018, plaintiff moved for a preliminary injunction, and the Court denied that application on November 15, 2018.  (Opinion and Order, Dkt. No. 39 ("Op.")).  The Court held that plaintiff failed to establish a clear or substantial likelihood of success on the merits of her claims.  As to plaintiff's gender discrimination claims, the Court noted plaintiff's conclusory pronouncements and held that she had failed to demonstrate that she was treated differently from a similarly situated male.  (*Id.* at 7-8).  As to plaintiff's retaliation claims, the Court held that plaintiff "has not persuasively argued that a causal connection exists between her allegedly protected speech and the employer's allegedly inappropriate action."  (*Id.* at 9). The Court also held insufficient the temporal proximity between her complaints about Dr. Lipkin and some of the alleged acts of retaliation, noting that "temporal proximity alone is not enough to establish pretext in this Circuit."  (*Id.* at 11).  The Court also held that plaintiff had not demonstrated irreparable injury, noting that some of her alleged post-complaint injuries -- including a move from one office to another office in the same building -- "borders on the frivolous" (*id.* at 12).

During discovery, Columbia produced over 70,000 documents.  Plaintiff's document production included recordings of hundreds of hours of conversations with other Columbia faculty and staff, including Dr. Lipkin.  Plaintiff made these recordings beginning in 2016, without the knowledge or consent of any of the Columbia employees that she taped, at various CII meetings, including ones held in Dr. Lipkin's office.  (Ex. A at 692-98).

## ARGUMENT

## I.    LEGAL STANDARDS

### A.    Summary Judgment

Federal Rule of Civil Procedure 56(a) requires a court to grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some meta-physical doubt as to the material facts."  *Matsushita Elec. Indus. Co., LTD. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "[T]he non-movant must produce specific facts indicating that a genuine factual issue exists," and "may not rely on conclusory allegations or unsubstantiated speculation."  *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotations and citations omitted).

### B.    Discrimination and Retaliation Claims Under Title VII and the NYCHRL

#### 1.    Discrimination Claims Under Title VII and the NYCHRL

As the Court previously explained, discrimination claims under Title VII must satisfy the *McDonnell-Douglas* burden shifting framework.  (Op. at 5).  First, the plaintiff must establish a prima facie case, which requires her to show "(1) she is a member of a protected class, (2) she was qualified for the job at issue, (3) she was subjected to an adverse employment action, and (4) the circumstances of that adverse action give rise to an inference of discrimination based on her

7

class membership." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019).  If the plaintiff

establishes a prima facie case, the burden shifts to the defendant to "articulate some legitimate,

nondiscriminatory reason" for the adverse action.  *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973).  If the defendant is successful, the burden again shifts, and the plaintiff must

"produce not simply some evidence, but sufficient evidence to support a rational finding that the

legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more

likely than not [discrimination] was the real reason for the [employment action]."  *Weinstock v.*

*Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotations and citations omitted).

NYCHRL claims apply the same burden shifting framework, but as to the prima facie

case a plaintiff needs to "show differential treatment—that she [wa]s treated less well—because

of a discriminatory intent."  *Maynard v. Montefiore Med. Ctr.*, No. 18 Civ. 8877 (LAP), 2021

WL 396700, at *5 (S.D.N.Y. Feb. 4, 2021) (internal quotations and citations omitted).  However,

"[t]he NYCHRL still does not impose a general civility code," *id.* (internal quotations and

citations omitted), and "NYCHRL claims are routinely dismissed at the summary judgment stage

. . ."  *Bourara v. New York Trades Council & Hotel Ass'n of N.Y.C., Inc. Emp. Benefit Funds*,

No. 17 Civ. 7895 (DF), 2020 WL 5209779, at *15 (S.D.N.Y. Sept. 1, 2020).

## 2.      Retaliation Claims Under Title VII and the NYCHRL

Under Title VII, a plaintiff must demonstrate that "(1) she was engaged in protected

activity, (2) the employer was aware of that activity, (3) the employee suffered a materially

adverse action, and (4) there was a causal connection between the protected activity and that

adverse action."  *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 104 (2d Cir. 2020)

(internal quotations and citations omitted).  If the plaintiff establishes a prima facie case, then the

defendant must articulate a legitimate, non-retaliatory reason for the adverse employment

action." *Torres v. Cent. Ave. Nissan, Inc.*, No. 18 CIV. 2919 (ER), 2021 WL 1227098, at *10 (S.D.N.Y. Mar. 31, 2021) (Ramos, J.).  "If the defendant provides such an explanation, the presumption of retaliation dissipates, and the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action."  *Id.* (internal quotations and citations omitted); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

To survive summary judgment on an NYCHRL claim for retaliation, a plaintiff must establish that she opposed discrimination and was met with "conduct reasonably likely to deter a person [from] engaging in such action."  *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 76 (2d Cir. 2015).  If the defendant offers legitimate reasons for its actions, summary judgment is appropriate if no reasonable jury could conclude either that the defendant's reasons were pretextual, or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least in part on discrimination.  *Id.*, 805 F.3d at 75-76.  "In the absence of evidence beyond Plaintiff's speculation . . . Plaintiff cannot establish retaliation under the less stringent standard of the NYCHRL."  *Joseph v. Owens & Minor Distribution, Inc.*, 5 F. Supp. 3d 295, 322 (E.D.N.Y. 2014); *see, e.g.*, *Chen*, 805 F.3d at 75-76 (affirming summary judgment where professor offered "no evidence" that decision not to reappoint her was retaliation for affirmative action complaint); *Augustine v. Cornell Univ.*, No. 14 Civ. 7807 (JPO), 2018 WL 1474402, at *15-16 (S.D.N.Y. Mar. 26, 2018) (granting summary judgment because reassignment of administrative assistant to a different doctor and micromanagement of her work were not actions that would "deter a reasonable employee from taking protected activity").

## II.    THE COURT SHOULD GRANT DEFENDANTS' SUMMARY JUDGMENT MOTION BECAUSE THE UNDISPUTED MATERIAL FACTS DEMONSTRATE THAT PLAINTIFF WAS NOT DISCRIMINATED OR RETALIATED AGAINST[4]

### A. The Court Should Dismiss Plaintiff's Claims of Discrimination and Retaliation

### 1.  The Court Should Dismiss Plaintiff's Harassment Claim

Plaintiff cannot maintain any claim for sexual harassment based on Dr. Lipkin's alleged conduct in July 2015.  In order to survive summary judgment on a claim of sexual harassment under Title VII, Plaintiff must establish that: "(1) she is a member of a protected class; (2) she suffered unwelcome harassment; (3) she was harassed because of her membership in a protected class; and (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment."  *Rogers v. Bank of New York Mellon*, No. 09 CIV. 8551 (HBP), 2016 WL 4362204, at *11 (S.D.N.Y. Aug. 15, 2016).  Assuming Plaintiff establishes that she suffered harassing behavior, she must also establish that the harassing behavior occurred because of her sex or gender.  *Irons v. Bedford-Stuyvesant Cmty. Legal Servs.*, No. 13-CV-4467 MKB, 2015 WL 5692860, at *13 (E.D.N.Y. Sept. 28, 2015).  Under the NYCHRL, "[i]n determining whether a claim of hostile work environment survives summary judgment, the relevant consideration is whether there is a triable issue of fact as to whether the plaintiff 'has been treated less well than other employees because of her gender.'"  *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 671 (S.D.N.Y. 2012) (citation omitted).

Plaintiff alleges that on July 9, 2015, Dr. Lipkin asked her to come to his office, locked the outer door to the office, lowered his pants, and asked her to examine a lesion on his buttocks to provide her medical opinion as to whether he needed an antibiotic or an antiviral treatment

---

[4] Defendants move for summary judgment on all of Plaintiff's claims.  The failure to address a particular allegation in Defendants' moving papers should not be considered an admission that there is a material issue of fact as to that allegation.  Defendants reserve the right to respond on reply to any allegation not included herein that Plaintiff believes she has admissible evidence to establish.

prior to traveling out of the country the next day.  (Ex. A at 305-07).  The undisputed facts are that Dr. Lipkin could not examine the lesion on his backside himself, and needed medical advice as to how to treat it (Ex. D at 86; Ex. A at 309-10); he did not have time to see his physician before he traveled overseas the next day (Ex. D at 86.); and he asked plaintiff to examine the lesion and give him her medical opinion because she was the only other medical doctor in the CII and because he knew that she had personal experience with similar lesions (Ex. A at 304-312).

Although it was an exercise of poor judgment, Dr. Lipkin's conduct did not constitute sexual harassment because it is undisputed that the conduct was not of a sexual nature. Plaintiff's only support for her claim that Dr. Lipkin asked her to examine his lesion because of her sex or gender is her belief that she "thinks it would be highly unlikely that he would have called in a male colleague who had the clinical experience that [she] had."  (Ex. A at 307, 312).  Plaintiff's subjective belief that he would not have asked her to examine him if she were a man is not evidence that gender was a factor.  *Cummings-Fowler v. Suffolk County Cmty. College*, 981 F. Supp. 2d 124, 137 (E.D.N.Y. 2013) (holding plaintiff's subjective belief her membership in a protected class was a factor in the alleged harassing conduct insufficient to survive summary judgment), *aff'd*, 588 Fed. Appx. 32 (2d Cir. 2014).  Because plaintiff therefore cannot establish that the July 9, 2015 incident occurred because of her gender the Court should dismiss any sex-based harassment claim.  *See Macshane v. City of New York*, No. 05-CV-06021 RRMRML, 2015 WL 1298423, at **25-27 (E.D.N.Y. Mar. 23, 2015) (granting summary judgment on Title VII and NYCHRL hostile work environment claims where plaintiff presented no evidence that the conduct was based on her gender); *James v. New York City Health & Hospital's Corp.*, No. 12-cv-8762 (KBF), 2014 WL 1485393, at *27, 40 (E.D.N.Y. Apr. 14,

2014) (same); *Varughese v. Mount Sinai Med. Ctr.*, No. 12 CIV. 8812 CM JCF, 2015 WL 1499618, at *63 (S.D.N.Y. Mar. 27, 2015) (granting summary judgment on plaintiff's Title VII and NYCHRL hostile work environment claims where "[n]ot a single piece of evidence even *alludes* unfavorably to [plaintiff's] gender") (emphasis in original), *aff'd*, 693 Fed. Appx. 41 (2d Cir. 2017).

Moreover, Columbia took prompt action to address plaintiff's concerns.  Plaintiff was given an opportunity to pursue an investigation through the University's Office of Equal Opportunity and Affirmative Action, but she declined to do so.  (Compl., ¶ 122-23; Ex. A at 327-29).  In addition, Mailman Dean Linda Fried directed Dr. Lipkin to attend one-on-one training with a legal expert to ensure that he understood Columbia' prohibitions on sexual harassment and retaliation.  (Ex. B at 63).  Vice Dean Regina Santella took further steps to mediate the disputes between Dr. Lipkin and plaintiff to ensure that she was being treated fairly.  (Ex. C at 71-84, 137-38).

**2.     The Court Should Dismiss Plaintiff's Failure to Promote Claim**

Because plaintiff cannot establish that she was not promoted in 2016 to professor because of unlawful gender discrimination or retaliation, the Court should dismiss that claim.

*Relevant Facts*

 In 2016, plaintiff indicated to Dean Santella, who was mediating the ongoing issues involving plaintiff and Dr. Lipkin after plaintiff's complaints in July 2015, that she would like to be considered for promotion from her position of non-tenured associate professor to non-tenured professor.  (Ex. C at 78-82).  The promotion process at Mailman for a non-tenured faculty member is a rigorous, multi-step process that can be initiated either by the faculty member or the Chair of the member's academic department.  (*Id.* at 40).  Each department has a committee on appointments and promotions ("COAP"), which is comprised of senior faculty within the

department and which does an assessment of the candidate's curriculum vitae ("C.V."), in terms of the quality and number of the candidate's publications, record of grant funding, teaching, and invitations to present the candidate's work.  (*Id.* at 41, 49).

Department COAPs, including the Epidemiology COAP, often make preliminary assessments based on a candidate's C.V., and give a candidate an indication as to whether the candidate has a reasonable chance of success if the candidate continues with the full promotion process.  (*Id.* 41).  If the candidate continues with the full process, the candidate submits, along with the C.V., a personal statement and a list of the candidate's top five publications, and the department chair also will send requests to outside reviewers identified by the faculty member for letters of recommendation.  (*Id.* at 42-44).  Based on all of those materials, the department COAP then votes as to whether the candidate should be approved for consideration by the Mailman COAP, a school-wide COAP.  (*Id.*).

Here, following plaintiff's request, Dean Santella contacted Guohua Li, the interim chair of the Department of Epidemiology, and sent him plaintiff's C.V. for an initial review and assessment by the EPI COAP.  (Ex. A at 121, 123-25; Ex. L).  After reviewing her C.V., the EPI COAP stated that it was "not optimistic of a positive vote in the future" on plaintiff's promotion bid because of the following concerns:

- because plaintiff had "few senior authored publications," it would be "challenging" for her to demonstrate "a sustained record of excellence in independent scholarly contributions . . . and recognition of the quality and importance of the work by the wider research community";

- while it was "essential" for plaintiff "to secure and sustain independent grant funding," she "has not served as the PI for an R01 grant and has not demonstrated her ability to successfully compete for federal funding as a principal investigator"; and

- plaintiff has "not contributed sufficiently to teaching/mentoring in the Department of Epidemiology . . .such as [by] teaching a major course or contributing substantially as an instructor . . . in a major course."

13

(Ex. A at 127-28; Ex. M).  These concerns were essentially the same ones expressed to plaintiff in her failed bid for tenure, in which she had been told by senior faculty beginning in 2006 that her publication rate was too low and that she needed more first or senior author publications, and that she needed to obtain additional funding, including as a principal investigator for an R01 grant, goals which she did not meet.  (Ex. A at 104-06; Ex. K).  Given the COAP's concerns, plaintiff did not proceed further with her promotion bid in 2016 or thereafter.  (Ex. A at 149).

Dr. Lipkin was not a member of the Epidemiology COAP.  (Ex. B at 84).  Dr. Lipkin also had no knowledge of plaintiff's promotion application at the time she made it.  (Ex. D at 144-46)

*Plaintiff's Failure to Promote Claim is Meritless*

Given these undisputed facts, the Court should reject plaintiff's contention that the Epidemiology COAP's assessment as to plaintiff's chances for promotion was discriminatory or retaliatory.  As to discrimination, because plaintiff has not alleged that Dr. Lipkin or Columbia "made any remarks that could be viewed as reflecting discriminatory animus," (Op. at 7 (quoting *Patane v. Clark*, 508 F. 3d 112 (2d Cir. 2007)), plaintiff "must show that she was treated differently from 'similarly situated' males" (*id.* at 7 (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).  "To be 'similarly situated,' the individuals with whom [Hornig] attempts to compare herself must be similarly situated in all material respects."  (*Id.* (quoting *Shumway*, 118 F.3d at 64)).

Here, plaintiff attempts to compare herself to Thomas Briese ("Prof. Briese"), a non-tenured associate professor in the CII and Epidemiology, who also sought promotion to full professor in April 2016.  However, like plaintiff, the Epidemiology COAP did an initial review of Prof. Briese's C.V., and found that it did not evidence adequate independence in funding or publications -- the same concerns expressed about plaintiff -- and Prof. Briese, like plaintiff, did

not further pursue the promotion process as a result.  (Santella Decl., ¶¶ 9-11; Ex. A at 149).

Thus, plaintiff and Briese were not "treated differently"; to the contrary, they were treated

exactly the same.  Prof. Briese therefore cannot serve as a comparator to support plaintiff's

discrimination claim.[5]  *See Gertner v. Pace Univ.*, No. 10 CIV. 4233(PED), 2014 WL 11173663,

at *13 (S.D.N.Y. Jan. 7, 2014), *aff'd*, 590 F. App'x 95 (2d Cir. 2015) ("Plaintiff has failed to

demonstrate that similarly-situated faculty members outside his protected class were treated

more favorably than he was . . . [given that] two non-Brazilian applicants . . . were denied

promotion along with Plaintiff, and both, like Plaintiff, were rejected on [the same] grounds.").

Plaintiff's primary contention concerning Prof. Briese focuses on a letter of

recommendation Dr. Lipkin wrote for Prof. Briese in connection with his 2016 bid for

promotion.  (Ex. A at 106, 125).  According to plaintiff, that letter "no doubt put [his]

independence in context" such that the COAP may not "necessarily" have "applied the same

criteria" to Prof. Briese.  (Ex. A at 147-49).  However, plaintiff's speculation about the letter Dr.

Lipkin wrote for Briese cannot, as a matter of law, create an issue of material fact concerning her

failure to be promoted.  As an initial matter, plaintiff never asked Dr. Lipkin to write a letter on

her behalf.  (Ex. A at 109-10, 126).  Indeed, Dr. Lipkin had no knowledge of plaintiff's

promotion application at the time she made it (Ex. D at 144-46), and no inference of

discrimination therefore can arise from the letter of recommendation.  *Cf. Campbell v. Cellco

P'ship*, 860 F. Supp. 2d 284, 300 (S.D.N.Y. 2012) (recognizing that where a plaintiff fails to

apply for a position, she cannot be "rejected under circumstances that would give rise to an

---

[5]  Plaintiff only conclusorily alleges that that Briese was "similarly situated" to her in "all material
respects."  (*See* Op. at 7-8).  Briese has a much stronger record of accomplishment than Plaintiff: among
other things, he helped discover the cause of encephalitis, and he was the first person to develop a PCR
assay for West Nile Virus and SARS coronavirus.  (Ex. D at 358).  Plaintiff has done none of this.

inference of . . . discrimination").  Moreover, the undisputed evidence is that faculty members are not compared in the promotion process, but rather rise or fall on their own merits, and there also is no limit on the number of promotions that can occur at any one time.[6]  (Santella Decl., ¶ 8).  Critically, the undisputed evidence is that the plaintiff and Prof. Briese were treated exactly the same based on their respective C.V.s, and the letter for Briese therefore played no role in the promotion process.

Finally, even if plaintiff could make out a prima facie case of discrimination, which she cannot, she also cannot rebut the legitimate, nondiscriminatory reasons for the COAP's assessment of her chances for promotion to professor, namely her failure to satisfy the applicable requirements for that position.  It is well settled that Columbia enjoys the academic freedom to set its own requirements for promotion.  *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 455 (2d Cir. 1999) ("[A university] alone has the right to set its own criteria for promotion and then to evaluate a candidate's fitness for promotion under them.").  And Columbia's decision that plaintiff was unlikely to meet the requirements for that position is entitled to deference. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 46 (2d Cir. 2000) ("Columbia had a legitimate, non-discriminatory reason for denying Weinstock tenure—she lacked the requisite scholarship required.").  There can be no reasonable dispute that the COAP had a dim view of plaintiff's chances for promotion based on her inadequate record of publications, grant support and teaching, the same assessment she had received in her failed bid for tenure.

Likewise, plaintiff cannot maintain any claim alleging a retaliatory failure to promote. To prevail on this claim, plaintiff must establish a causal link between her protected activity in

---

[6]  Plaintiff admitted at her deposition in this matter that the "general guideline" at Columbia is that candidates are considered on their own merits, but contended that in "real life" the letter would have made a difference in how the COAP viewed her and Prof. Briese's respective C.V.s.  (Ex. A at 147-49).  Such speculation cannot suffice to establish that the COAP compared her to Prof. Briese.

July 2015 (i.e. complaints about Dr. Lipkin), and the COAP's negative assessment of her chances for promotion in April 2016. *See Agosto*, 982 F.3d at 104. However, as noted above, Dr. Lipkin did not sit on the COAP and therefore had no role in the decision (Ex. B at 84), and plaintiff does not contend that anyone on the COAP retaliated against her.[7] *See Sosa v. Rockland Cty. Cmty. Coll.*, No. 15 CIV. 3329 (JCM), 2017 WL 3105872, at *5 (S.D.N.Y. July 20, 2017) (granting summary judgment where plaintiff lacked evidence the decisionmaker possessed animus, and where the alleged discriminator did not participate in the adverse employment action); *see also See McLee v. Chrysler Corp.*, 109 F.3d 130, 137 (2d Cir. 1997) (affirming summary judgment where alleged bias of individual not involve in termination decision "provide[d] no basis for imputing to [the decisionmaker] an invidious motivation for the discharge"); *Chang v. Safe Horizon*, No. 03 CIV. 10100WHP, 2005 WL 2125660, at *7 (S.D.N.Y. Sept. 1, 2005); *O'Sullivan v. New York Times*, 37 F. Supp. 2d 307, 321 (S.D.N.Y. 1999). Moreover, as noted above, the COAP's view that plaintiff had an inadequate record of publications, grant support and teaching were very similar to the assessment she had received from 2006 through 2012 in her failed bid for tenure. (Ex. A at 77-106, 127-28; Exs. K, M). Given Columbia's consistency in evaluating plaintiff both before and after her protected activity in 2015, plaintiff's retaliation claim fails for this reason as well.[8] *See Wright v. New York City Off-Track Betting Corp.*, No. 05 CIV. 9790 (WHP), 2008 WL 762196, at *5 (S.D.N.Y. Mar. 24,

---

[7] The Complaint alleges that Li told plaintiff that with a letter from Dr. Lipkin, her promotion was "assured" (Compl., ¶ 105), and plaintiff also alleged at her deposition that Li told her that Dr. Lipkin was "blocking" her promotion, but admitted that the only facts supporting that alleged statement was the letter of recommendation that Dr. Lipkin wrote for Prof. Briese (Ex. A at 138-39). As discussed above, that letter was irrelevant to the COAP's decision.

[8] To the extent that plaintiff is claiming that Dr. Lipkin retaliated against her by failing to give her a letter of recommendation, that claim also fails. As noted above, even if the letter was relevant to the COAP's assessment of plaintiff, which it was not, plaintiff did not ask Dr. Lipkin for a recommendation, nor did he even have any knowledge of plaintiff's promotion application at the time she made it.

2008) ("If an employer's conduct before and after an employee complaint is consistent, the post-complaint conduct is not retaliatory."); *Marshall v. Kingsborough Cmty. Coll. of CUNY*, No. 11 CV 2686 PKC RML, 2015 WL 5773748, at *10 (E.D.N.Y. July 27, 2015) (holding that professor who was not promoted both before and after her protected activity could not maintain claim because college rejected her promotion bid on both occasions because of insufficient publications).

**3.     The Court Should Dismiss Plaintiff's Claim Concerning Her Transfer out of the CII**

Because plaintiff cannot establish that she was transferred out of the CII in June 2018 because of unlawful gender discrimination or retaliation, the Court should dismiss that claim.

*Relevant Facts*

For several years prior to 2018, Dean Santella had been made aware of various issues with plaintiff's performance in the CII and that CII faculty and staff were having significant difficulties working with her.  (Santella Decl., ¶ 13).  First, plaintiff's behavior made it clear that she no longer wanted to be in the CII and supervised by or collaborate with Dr. Lipkin.  (Pl. Reply Afd., Dkt. No. 38, Oct. 19, 2018, ¶¶ 67 and 68) (admitting that she no longer wanted to collaborate with or be supervised by Dr. Lipkin by June 2018).  Indeed, at the time of her transfer, plaintiff, on her own initiative, had been seeking a transfer to either the Department of Neurology or Psychiatry at Columbia.  (*Id.,* ¶ 68; Ex. A at 479-80).  Plaintiff also did not keep Dr. Lipkin proactively informed of what she was working or her whereabouts, and did not participate actively in weekly CII meetings as other faculty.[9]  (Santella Decl., ¶ 14; Pl. Reply Afd., Dkt. No. 38, Oct. 19, 2018, ¶¶ 67 and 68).

---

[9]  Plaintiff alleges that she did not participate in CII meetings like other faculty because Dr. Lipkin yelled at her (Rep. Afd. ¶ 55, Dkt. No. 38).  While the record evidence indicates that both Dr. Lipkin and plaintiff yelled at and had difficult interactions with one another (Ex. F at 153; Ex. H at 97-98), plaintiff does not deny her lack of participation in these meetings.  In addition, while she contends that "she never

Second, plaintiff had been abusive and did not work well with CII staff and faculty members on a number of occasions, including:

- In mid-2017, Eleanor Kahn, an Administrative Coordinator at the CII, filed a complaint with Mailman Human Resources that plaintiff had "screamed" at her, causing her to feel "anxious and under attack," which was the second time this had occurred.  (Ex. O; Santella Decl., ¶ 14; Ex. A at 641-43; Pl. Reply Afd., Dkt. No. 38, Oct. 19, 2018 (admitting plaintiff used an "angry tone" with Kahn).

- In March 2018, Nina Deoras, a project coordinator, complained to Gilbert Smith, the CII Administrative Director, that plaintiff had communicated with her in an unprofessional manner and that she felt uncomfortable meeting in a private office with plaintiff, and also had disagreements on work issues such that Deoras no longer wanted to work with plaintiff.  (Ex. F at 265-72; Ex. D at 121-23; Ex. A at 643-45).

- In an email chain ending in April 2017 with Allison Kanas, then the CII's Director of Strategic Initiatives, plaintiff discussed a work issue and stated that Kanas "should consider that defamatory statements like these have consequences. Please think carefully before making such unfounded allegations in the future." Kanas, who was pregnant at the time, subsequently complained to Mailman Human Resources about the "hostile and threatening" nature of plaintiff's communication, noting that "this type of thing" had been going on for months and that two administrative employees had recently left the CII as a result.  (Ex. P; Ex. A at 645-46).

(*See also* Santella Decl., ¶ 8).

Third, plaintiff had demonstrated a lack of productivity and had repeatedly failed to produce papers in a timely manner.  In particular, plaintiff worked on the Autism Birth Cohort (ABC) study, which was a study initiated in 2000 and conducted jointly between Columbia and the Norwegian Institute of Public Health ("NIPH"), and which used autism spectrum disorders cases identified from a large pregnancy cohort in Norway.  (Susser Decl., ¶ 3).  Both Dr. Lipkin and plaintiff began working on the ABC study in approximately 2002.  (Susser Decl., ¶¶ 4-5).

---

kept anything from Lipkin . . .and answered all questions about my work," (Pl. Rep. Afd. ¶ 55, Dkt. No. 38), she does not contend that she kept him proactively informed as would be expected of other CII employees.

Plaintiff was assigned to be first author on approximately ten ABC papers.  (Susser Decl., ¶ 7; Ex. A at 436-42; Ex. Q).  However, plaintiff frequently missed deadlines and failed to provide drafts, and to date has only completed and published two ABC papers with her as first author.  (*Id.*; Ex. A at 436-42; Ex. Q (paper table); Ex. D at 510-11).  Plaintiff's lack of productivity led to friction with NIPH and prevented progress on understanding the biology of autism.  (Ex. D at 501-11; Susser Decl., ¶¶ 9-16).  Dean Fried was aware of plaintiff's productivity issues for several years prior to 2015, based on conversations with Dr. Lipkin.  (Ex. B at 69-72; Ex. C at 70).[10]

Fourth, plaintiff also failed to manage appropriately the selection of cases and controls on one ABC paper assigned to her as first author, the Maternal Cord Blood paper, which caused Dr. Lipkin and other faculty to lose confidence in her scientific abilities.  (Susser Decl., ¶¶ 7-16; Santella Decl., ¶ 15).  Plaintiff was responsible for selecting the cases and controls from the samples, conducting the analysis, and drafting this paper.  (Susser Decl., ¶ 9; Ex. A at 464).  In or about mid-2017, Michaeline Bresnahan, an assistant professor in Epidemiology and also a member of the Columbia ABC team, identified problems with how Dr. Hornig had selected the cases and controls, which would serve as the foundation for the scientific analysis for this paper. (*Id.*).  In particular, Dr. Bresnahan, along with Ezra Susser, a professor of Epidemiology and Psychiatry and former chair of Epidemiology, and Jason Che, an assistant professor of Biostatistics in the CII, could not understand what plaintiff had done or reproduce her work because plaintiff could not provide them with a protocol as to the cases and controls.  (Susser

---

[10]  Plaintiff's productivity issues were characterized by Prof. Bresnahan, who has a friendship with plaintiff, as "the inability to follow through from beginning til the end," and that plaintiff "goes down the rabbit hole" and "gets lost in the details," and can never "fish or cut bait." (Ex. H at 57-59, 60-61).  In addition, plaintiff obtained an R01 grant in 2017 – with Dr. Lipkin assisting in writing the application for the grant – and to date has published zero papers on that grant as first or senior author. (Ex. A at 503-04, 507-08).

Decl., ¶ 10).  Although Drs. Susser and Breshanhan asked plaintiff multiple times for a protocol, plaintiff never provided one.  (*Id.*; Ex. D at 505-11 (at 511; "We could not get a coherent explanation for what . . .she'd done.  And eventually it became clear this was going to be a mess."); Ex. A at 471-74; Ex. R).  Instead, for months Dr. Bresnahan spent many hours trying to understand how the cases and controls had been selected, and ultimately was unable to understand or reproduce what had been done.[11]  (Susser Decl., ¶ 10; Ex. A at 474).

After informing and consulting with the NIPH about the issues with the selection of cases and controls and the resulting significant delays in publishing the maternal cord blood paper, the Columbia ABC team engaged in additional analysis with a new protocol for the cases and controls.[12]  (*Id.*, ¶¶ 11-13 and Ex. A).  Because of the resulting delays in the paper, and the problems with plaintiff's selection of the cases and controls, the rest of the Columbia ABC team (i.e., Profs. Susser, Lipkin, Bresnahan and Che), lost confidence in her scientific abilities and decided that it would be better to work independently of plaintiff in connection with future work

---

[11]  Plaintiff denies that she did anything wrong with the selection of cases and controls on the Maternal Cord Blood Paper, and has claimed to the rest of the Columbia ABC team and NIPH that the report to the NIPH about problems with the selection procedures was to "gather evidence to further damage my reputation and provide justification from my removal or marginalization with the ABC."  (Ex. A at 475-78; Ex. U; Pl. Reply Decl., ¶¶ 63-66, Dkt. No. 38; Susser Decl., ¶ 16 and Exs. B, C).  This is implausible, as there is no dispute that the ABC grant, and Columbia's relationship with NIPH were very important (Ex. A at 460-61), and there is no evidence that the Columbia ABC team except Dr. Hornig would undermine those things in order to discriminate or retaliate against plaintiff.  Nor is there any dispute that plaintiff failed to provide the requested protocol.

[12]  Most recently, plaintiff agreed to a deadline of August 30, 2020, for her to complete a draft and send to NIPH, but did not meet that deadline.  (Susser Decl., ¶ 14; Ex. A at 490-91).  Given the delays with the paper, the Columbia ABC team then decided to combine it with another pending, related paper.  (Susser Decl., ¶ 14).  Plaintiff was responsible for drafting this combined paper but failed to meet multiple deadlines from fall 2020, until the present to complete it, and to date has never circulated a complete draft.  (*Id.*).  Ultimately, in April 2021, the other members of the ABC team drafted the combined paper, and informed plaintiff that if she would provide comments on the draft she could remain as second author.  (*Id.*, ¶ 15).  Plaintiff chose not to do so, and instead wrote to NIPH stating falsely that she had been excluded from the draft, and that she had previously circulated her own drafts of the paper.  (*Id.*, ¶ 16 and Exs. B, C).

utilizing ABC datasets.  (Santella Decl., ¶ 15; Susser Decl., ¶ 17; Ex. H at 203-04; Ex. D at 507-16; Ex. A at 495-97; Ex. S).

For all of these reasons, Dean Fried, along with Dean Santella, decided that plaintiff should be transferred out of the CII in June 2018.  (Santella Decl., ¶ 16 and Ex. C; Ex. B at 75-82, 91).  Dean Fried's judgment was that a transfer was the "best decision for the [CII], Dr. Hornig and [Mailman]" to enable plaintiff to "demonstrate her productivity and have the resources she needed and where neither she nor the [CII] were living in an acrimonious environment."  (Ex. B at 91; Santella Decl., ¶ 16).  Following her transfer, plaintiff remained in Epidemiology, her current department, at the same salary.  (Santella Decl., ¶¶ 17, 35).

*Plaintiff's Claim Concerning Her Transfer out of the CII is Meritless*

Given these facts, the Court should dismiss plaintiff's claims concerning her transfer out of the CII.  As set forth above, there can be no reasonable dispute that Dean Fried, in consultation with Dean Santella, made the decision to transfer plaintiff, and did so for valid business reasons.[13]  Plaintiff maintains that Dean Fried discriminated and retaliated against her, but only offers a single alleged remark in support of her theory: according to plaintiff, Dean Fried stated to plaintiff in December 2015, that she "cared about plaintiff but had to protect her leadership."  (Ex. A at 714).  There is nothing discriminatory or retaliatory about this statement on its face.  And even assuming that it was made, the statement constitutes an isolated, stray

---

[13]  Plaintiff stated that she "presume[d]" that Dr. Lipkin was involved in the decision to transfer her, but admitted at her deposition in this matter that she had "no knowledge" who made that decision.  (Ex. A at 625, 629-30; *see also* Ex. D at 308-10 (Dr. Lipkin testified that he spoke to Dean Fried about who would pay the portion of plaintiff's salary and other costs that plaintiff's grant funding did not cover, and to ask her to approve plaintiff's transfer).  Because Dr. Lipkin did not have the authority to transfer plaintiff, and did not make that decision, plaintiff cannot make any claim against Dr. Lipkin concerning the transfer.

remark that cannot defeat summary judgment.[14]  "The Second Circuit has explained that the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Knox v. Town of Se.*, No. 11 CIV. 8763 ER, 2014 WL 1285654, at *13 (S.D.N.Y. Mar. 31, 2014) (Ramos, J.), *aff'd*, 599 F. App'x 411 (2d Cir. 2015) (internal quotations and citations omitted).  Dean Fried's remark supposedly occurred in December 2015, two and one-half years before plaintiff's June 2018 transfer out of the CII, during a meeting with plaintiff related to the July 2015 incident (Ex A. at 631), and therefore cannot prove Dean Fried's discriminatory or retaliatory intent in transferring plaintiff. *See Knox*, 2014 WL 1285654 (granting summary judgment where remarks had "no connection" to the allegedly discriminatory act); *Stern v. State Univ. of New York*, No. 16CV5588, 2018 WL 4863588, at *14 (E.D.N.Y. Sept. 30, 2018); *Phillip v. City of New York*, No. 09CIV442, 2012 WL 1356604, at *9 (E.D.N.Y. Apr. 19, 2012).

Moreover, the reasons Dean Fried made the decision to transfer plaintiff are valid business reasons, and plaintiff has not offered sufficient evidence for a reasonable fact finder to determine that those reasons were pretexts for unlawful discrimination or retaliation.  "The Court of Appeals has reminded district courts that they do not have a roving commission to review business judgments and that they must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process." *Fitzpatrick v. New York Cornell Hosp.*, No. 00 CIV. 8594 LAP, 2003 WL 102853, at *6 (S.D.N.Y. Jan. 9, 2003) (internal quotations and citations omitted).  Where employees have been transferred for legitimate

---

[14]  Dean Fried – who previously supported plaintiff in the tenure process (Ex. A at 98-99), has an extensive background concerning academic careers of women in science, including having served on a task force at Johns Hopkins University to analyze and solve obstacles to women in medicine, and has worked actively at Columbia since her arrival in 2008 "to assure an environment that is equitable, inclusive, [and ] respectful" to help all faculty members achieve success.  (Ex. B at 30-34).

business reasons, courts have not hesitated to grant summary judgment in favor of employers. *See, e.g.*, *Connolly v. City of New York*, No. 16-CV-465 (WFK), 2020 WL 5553843, at *8 (E.D.N.Y. Aug. 18, 2020) (finding absence of pretext where plaintiff was transferred because of "disruptive workplace misconduct"); *Pacheco v. Comprehensive Pharmacy Servs.*, No. 12 Civ. 1606 (AJN), 2013 WL 6087382, at **14, 16 (S.D.N.Y. Nov. 19, 2013) (granting summary judgment where terminated plaintiff did not "dispute that her interpersonal skills were the subject of multiple staff complaints" and was unable to establish pretext); *Tanay v. St. Barnabas Hosp.*, No. 99 CIV. 9215 (JGK), 2001 WL 262695, at *7 (S.D.N.Y. Mar. 15, 2001) (finding absence of pretext where plaintiff was transferred because of dispute with co-worker).   The Court therefore should dismiss this claim.

*Plaintiff's Complaints Post-Transfer About Issues with Her Office and Lab Space are Meritless*

Plaintiff's various post-transfer complaints about her new office, access to the CII, lab space and samples are meritless and the Court should dismiss them.[15]   (*See* Op. at 12).   The record evidence indicates that plaintiff's claims concerning her move to a new office in June 2018 – including that her new office was too small and required a longer elevator ride to travel to the CII laboratory, the movers had left her office in disarray, she lacked computer access, and there was water or mold in her new space – are either frivolous and/or not true, or were promptly addressed by Columbia.   (Santella Decl., ¶¶ 19-25 and Exhs. C, D).   Similarly, plaintiff had the same access to the CII following her transfer as any non-CII faculty member.   (*Id.*, ¶ 34 and Ex. C).   Plaintiff also was provided with lab space, first in the CII immediately following her transfer, and then in the Environmental Health Science department in Mailman, and her

---

[15] Plaintiff raised these claims as part of her preliminary injunction motion. (*See* Dkt. No. 25).

laboratory equipment was moved there as well.[16]  (*Id.*, ¶¶ 28-32 and Ex. C).  Finally, plaintiff

was given multiple freezers to store her samples, first in the CII, and then at facilities in

Columbia and off-site freezer locations used by many faculty, which plaintiff has access to.  (*Id.*,

¶ 33; Ex. A at 67-72).

Plaintiff has identified no facts supporting an inference of discrimination or retaliation as

to any of these purported issues.  In addition, Dean Santella worked with and assisted plaintiff to

address her repeated complaints.  While plaintiff claimed that Dean Santella did not take the time

"to ask my side of the story and to gather facts before acting," plaintiff admitted that when she

sent her numerous emails to Dean Santella detailing her concerns, Dean Santella would reply,

even if plaintiff did not always think they were responsive.  (Ex. A at 635-36).  In any event,

plaintiff's general, conclusory statement cannot suffice to show Dean Santella had any unlawful

intent to discriminate or retaliate against her.  The Court therefore should dismiss any claims

concerning these post-transfer issues.  (*See* Op. at 12).

**4.    Plaintiff Was Not Denied Any Rights as a Principal Investigator Based on Her
        Gender or in Retaliation for Her Complaints**

**a.  Dr. Lipkin's Involvement in the CFI Projects Was Not Motivated by Plaintiff's Gender**

Plaintiff makes various allegations that Dr. Lipkin usurped her authority as the named PI

on the initial grants from the Chronic Fatigue Initiative ("CFI").[17]  Plaintiff has not, however,

---

[16]  Plaintiff repeatedly failed to follow-up with Dean Santella about her lab space in EHS, has apparently
only been to that space a handful of time since it was made available to her in the fall of 2018, and has not
even set up her luminex equipment (which the CII donated to her) after it was delivered to that location in
September 2019.  (Santella Decl., ¶¶ 31-32; Ex. A at 662-70).  Given these facts, plaintiff's claims
concerning her lab space are patently frivolous.

[17] Plaintiff further claims that she was not given the opportunity to be a co-PI on the NIH Center for
Excellence grant application in early 2017.  (Compl., ¶¶ 338-39). Without any basis, Plaintiff suggests
that she is entitled to be a co-PI on any project that Dr. Lipkin proposes that in any way relates to their
past work in ME/CFS, and that any time Dr. Lipkin chose not to partner with her as a co-PI it was
discriminatory or retaliatory.  She does not, however, adduce any evidentiary support for this contention.
In contrast, Defendants have presented substantial evidence that Dr. Lipkin had valid reasons to lose

proferred any evidence that Dr. Lipkin's actions were motivated by gender animus or retaliation. The evidence establishes that Dr. Lipkin had legitimate reasons for his high level of involvement in managing the projects.  It is undisputed that it was Dr. Lipkin, not plaintiff, who initially met with the funder, persuaded them to support the CII's research into ME/CFS, and suggested that plaintiff be named the principal investigator of the project. (Ex. A at 526-27; Ex. D at 52-53, 376-77). Further, Plaintiff admits that the funder did not always have a high opinion of her and did not view her as the leader of the project.  (Ex. A at 381-82, 520-24; Ex. Y).  Dr. Lipkin continued to play a significant role in the research and the communications with the CFI because the CFI requested that he do so.  (Ex. A at 526-27; Ex. D at 52-53, 376-77).  Similarly, plaintiff has not identified any factual basis for her claim that Dr. Lipkin's making himself co-PI on the CFI extension study was a discriminatory act.  Dr. Lipkin had a legitimate nondiscriminatory reason for taking an increased role in the leadership of the CFI projects, including as co-PI of the CFI Extension Study; namely, that the CFI sought Dr. Lipkin out for his scientific advice on how to proceed with the extension study, and also was unsatisfied with the rate at which plaintiff was progressing with the research on the CFI Main grant.  (Ex. A at 531-32, Exs. V, W).

Similarly, Plaintiff's contention that Dr. Lipkin improperly excluded her from a call with clinicians about authorship is meritless. (Compl., ¶ 205).  There is no evidence that Dr. Lipkin intentionally excluded Plaintiff, much less for discriminatory or retaliatory reasons.  The undisputed evidence is that the CFI sought out Dr. Lipkin's advice about how to attribute authorship to the clinicians who gathered samples, Dr. Lipkin offered to facilitate a discussion among the clinicians about the topic, and the CFI made the arrangements for the call.  (Lipkin Decl., ¶ 38).

---

confidence in Plaintiff's ability to produce research and papers in a timely manner, including on the ABC grant.  (*See* Point II.A.3, supra).

**b.  Plaintiff Was Not Denied Access to Staff for Discriminatory or Retaliatory Reasons**

   **i.  Postdoctoral Fellows**

There is no basis for plaintiff's contention that she was precluded from working with postdoctoral fellows based on her gender or in retaliation for her complaints.  Plaintiff alleges in her complaint that Dr. Dorottya Nagy-Szakal was wrongfully removed from the SFARI research project and that she was otherwise denied access to a postdoctoral fellow despite the fact that there was a budget line for a fellow on the project.  (Compl., ¶¶ 66-77).  Plaintiff and Dr. Lipkin were Co-PIs on the SFARI autism project, and Dr. Lipkin was the contact PI.  (Ex. D at 191-92).  As to Dr. Nagy-Szakal, she sought out Dr. Lipkin for a post-doctoral fellowship under his mentorship and was hired and slotted to fill the open line for a postdoc on the SFARI grant.  (Ex. A at 349; Ex. D at 191).  However, shortly after she arrived at CII, it became clear that her interests and background were better suited to other work, so Dr. Lipkin assigned her to work on the ME/CFS microbiome project rather than the SFARI autism project. (Ex. D at 191, 195-98).  There is absolutely no evidence that she was reassigned with the intent to harm plaintiff.  The sole motivation was to help Dr. Nagy-Szakal find a research project that better suited her interests (i.e., the microbiome), to enable her to reach her professional goals.[18]

Plaintiff's contention that she was denied access to fellows that male faculty were granted is similarly without factual support.  When asked to identify specific circumstances where a male faculty member was given greater access to resources, plaintiff only referenced a postdoctoral fellow working on a project with Brent Williams, a CII faculty member.  (Ex. A at 221-25).  The fellow to whom she referred reported to Dr. Lipkin, not to Dr. Williams.  (Ex. A at 224-25).  Furthermore, a postdoctoral fellow from the NIPH was assigned to do research on the SFARI

---

[18]  In addition, the ME/CFS microbiome project was associated with another grant on which plaintiff was a PI, and plaintiff was a co-author on Dr. Nagy-Szakal's papers. (Ex. X at 29).

project and, in fact, authored a paper on which plaintiff was a co-senior author. (Ex. X at 29). Plaintiff's claim that she was denied access to fellows is further belied by her own C.V. in which she indicates that she mentored several fellows during this period. (Ex. X at 14-15).

### ii. Research Assistants, Data Managers, Biostatisticians, and Project Managers

Plaintiff's contentions that she was discriminatorily or retaliatorily denied access to research assistants, data managers, biostatisticians, and project managers also are meritless. Plaintiff admitted that she had the assistance of several people in all of these roles at various points in time and on various projects. (Ex A. at 352-57). She claims that she was improperly directed to get Dr. Lipkin's permission to assign work to staff, but she does not provide any basis for an inference of discrimination or retaliation. To the contrary, the record evidence establishes that there were legitimate reasons for Dr. Lipkin to monitor the workload of his staff. It is undisputed that for a significant portion of the time at issue, i.e., late 2016 and 2017, the CII was short-staffed due to unanticipated turnover, which resulted in the remaining staff being spread thin. (Compl., ¶¶ 362-70). As Director of the CII, Dr. Lipkin had responsibility for overseeing all CII resources to ensure that they were deployed efficiently to ensure that all projects could be completed in a timely manner. (Lipkin Decl., ¶ 15). He further felt a responsibility to protect the remaining staff from getting burned out. (Ex. D at 267-68). Furthermore, several staff, some of whom had already resigned, had complained about how Plaintiff treated them. (Ex. D at 121-22, 260-68; *see* Point II.A.3, *supra*). It was for these legitimate reasons that Dr. Lipkin asked Plaintiff to check in with him about staffing assignments.

Other than the shifting of Dr. Nagy-Szakal from one of plaintiff's grants to another, discussed above, plaintiff does not identify any specific instances where she was denied access to a particular staff member for a particular purpose. (Ex. A at 349-53). She further testified that

"other male faculty were regularly given additional staff to work with them even though they weren't the principal investigators on those grants, and it wasn't their direct funding." (Ex. A at 222).  Contrary to plaintiff's suggestion, the fact that a male faculty member was not the PI on a project does not mean that staff were not appropriately assigned to the project based upon the needs of the project.  Nor has plaintiff adduced any evidence to support her contention that research staff were assigned based upon the gender of the faculty member making the request, as opposed to the needs of the project.  When asked the basis of her belief that male faculty were given extra staffing, plaintiff stated:

> "It was described at meetings.  You could hear the… you know, they were told at a meeting, you know, well, so and so, this particular staff member asking, you know, can they work with you, and it would be set up during the meeting.  And then it was clear who was working for whom at different – at different times." (Ex. A at 222-24).

When asked when this occurred, she testified that it would have been over years.  (Ex. A at 224).  These vague and conclusory statements are insufficient to avoid summary judgment.

### c.  Plaintiff Was Not Denied Support in Preparing Grant Applications

Plaintiff's conclusory allegations that she did not receive adequate support and assistance in preparing and submitting grant applications are belied by the evidence.  (Ex. A at 430-31).  Plaintiff testified that she submitted multiple grant applications during her employment in the CII and that, in submitting these applications, she received assistance from the University's Sponsored Projects Administration as well as different teams depending on whether the grant was running through the CII or a different department. (Ex. A at 429-30).  For example, in October 2018, plaintiff received substantial assistance in preparing a grant submission to NIH from Epidemiology staff.  (Santella Decl., ¶¶ 40-45).  Plaintiff was unable to identify any specific grant application for which she had inadequate support or assistance and testified only

that she "thinks" she may have needed more support for a grant application to NIH "looking at ways to phenotype." (Ex. A at 431). Plaintiff explained that she received incorrect information initially as to the staff and personnel who could assist on this grant application, but it was ultimately corrected, and the grant application was submitted. (Ex. A at 433).

### d. Plaintiff Was Not Improperly Denied Access to Data

Plaintiff contends that she was initially denied access to ME/CFS data that was derived from the samples that were gathered as part of a grant on which plaintiff was a co-PI with Dr. Lipkin, but she has not proffered any evidence that this denial was discriminatory or retaliatory. (Compl., ¶¶ 195-97). The evidence establishes, however, that there were legitimate reasons for not sharing the data earlier. For one, Dr. Hornig was already overdue on a number of papers for the CFI in the spring of 2016. (Ex. W). There is no dispute that Dr. Nagy-Szakal did the work under Dr. Lipkin's supervision and direction, that plaintiff did not participate in the study design, and that plaintiff is not an expert in metabolomics, the subject of Dr. Nagy-Szakal's paper. (Ex. A at 258-62, 553). Nevertheless, plaintiff contends, without support, that she was entitled to present the data at a research meeting in London in 2016, even though doing so would have improperly precluded Dr. Nagy-Szakal and Dr. Lipkin from being the first to present their own work. (Ex.A at 553-54). Further undermining any inference of discrimination or retaliation, Plaintiff was given the opportunity to review the data and to contribute to the paper as an author once Dr. Nagy-Szakal and Dr. Lipkin completed their analysis. (Ex. A at 258-62).

### e. Plaintiff Was Not Improperly Denied Access to Information

Plaintiff alleges she was denied access to and involvement in preparing budgets and progress reports on various grants, including SFARI and the NIH/NINDS autism/immunity R56 grant. (Compl., ¶¶ 71, 198, 216, 241). However, on grants with multiple PIs, only the contact PI

generally has full access through Columbia's on-line systems to financial and budget information for an entire grant.[19]  (Santella Decl., ¶ 7; Ex. J at 87, 121).  Moreover, it is the contact PI who is ultimately responsible for all aspects of a grant, including, for example, financial reports and budgets, and progress reports on a grant.  (Santella Decl., ¶ 7; Ex. I at 74, 117; Ex. J at 81-82; Ex. C at 26).

Plaintiff was a PI, but not the contact PI on the SFARI or the NIH/NINDS autism/immunity R56 grants.  Thus, her complaints about input into the budget and progress reports, and access to financials, are ultimately complaints about Columbia and NIH policies. There can be no inference of discrimination or retaliation based on such generally applicable policies.  *See, e.g.*, *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 65 (2d Cir. 1997); *Pacenza v. IBM Corp.*, No. 04 CIV. 5831 (PGG), 2009 WL 890060, at *12 (S.D.N.Y. Apr. 2, 2009).  And because Dr. Lipkin was the contact PI on those grants, it was entirely appropriate for him to have an initial meeting with the administrative staff to discuss the upcoming budgetary report and request to carry forward unused funds on those grants.

5.    **There Is No Evidence that the Authorship Disputes Were Motivated by Gender-Based or Retaliatory Animus**

Plaintiff cannot proffer sufficient evidence to establish that gender discrimination was a motivating factor in Dr. Lipkin's position on his and plaintiff's respective authorship roles on various papers.  Plaintiff vaguely alleges that she was not given the same opportunities for authorship as male faculty in the CII.  (Ex. A at 239-57).  As an initial matter, it is undisputed that Dr. Lipkin did not have unilateral authority to make determinations about authorship.  In

---

[19] Grants may have multiple PIs; in such a case, pursuant to Columbia and NIH policy, one PI is denominated as the contact PI, who has oversight and ultimate responsibility for all aspects of a grant. (Santella Decl., ¶ 7; Ex. J at 81-82).  A PI who is not the contact PI in a multi-Pi grant only has responsibility for their aspect of the grant.  (Ex. C at 26).

academia, authorship is determined based upon guidelines developed by the specific journal, the International Journal Committee of Medical Editors authorship criteria, and any procedures that may have been set up by the faculty working on a project. (Ex. A at 239-40). The question of authorship position is a matter of academic judgment that varies from paper to paper depending upon the relative contributions of the authors and is entitled to deference from the courts. *Boise v. New York Univ.*, No. 00 CIV.7844 RWS, 2003 WL 22390792, at *6 (S.D.N.Y. Oct. 21, 2003) ("Universities are entitled to a degree of deference in the exercise of academic judgment."). There is no evidence that Dr. Lipkin's position on authorship decisions was outside the bounds of ordinary exercise of professional academic judgment, and his judgment therefore is entitled to deference. *Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision, . . . they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."); *accord Univ. of Penn. v. EEOC*, 493 U.S. 182, 199 (1990) ("Courts have stressed the importance of avoiding second-guessing of legitimate academic judgments.").

When asked to provide the basis for her claims that gender was a motivating factor in the authorship disputes, plaintiff did not identify any paper on which Dr. Lipkin selected one of her male colleagues for the authorship position she felt she deserved. Instead, she referenced a circumstance where Brent Williams, a male scientist at the CII, was permitted to be the senior author on a paper, arguing that because he had resources to support his work he was able to make the level of contribution necessary to merit senior authorship.[20] (Ex. A at 221-22). Plaintiff has

---

[20] To the extent plaintiff claims that Dr. Williams's access to support from funding he did not obtain himself is evidence of gender discrimination, that claim fails as well. Dr. Lipkin provided substantial funding to support plaintiff's work on animal models in the earlier part of her career in a manner similar to the support provided to Dr. Williams, a junior faculty member. (Ex. A at 254, 300-01).

not, however, presented evidence to support her contention that she was denied any support or resources on this paper to which she was entitled or that having such resources would have permitted her to make the contributions necessary to merit a better authorship position or role. And even if she could present such evidence, the conclusion that she would have made greater contributions would be entirely speculative.[21]

Similarly, Plaintiff cannot adduce sufficient evidence to establish that retaliatory animus motivated Dr. Lipkin to change his position on April 8, 2016 as to who should be the corresponding author on a paper, much less that there would have been no dispute "but for" her complaints. (Compl., ¶¶ 171-76).  It is undisputed that Dr. Lipkin had changed his mind about corresponding authorship on other papers in the past.  For example, in August 2011, Dr. Lipkin changed his position as to whether he or plaintiff should be corresponding author on a joint paper, years before plaintiff engaged in any protected activity.  (Hornig Ex. 39).  There can be no inference of retaliatory animus where the allegedly adverse actions relating to authorship disputes occurred both before and after the protected activity.  *See Wright v. New York City Off-Track Betting Corp.*, No. 05 CIV. 9790 (WHP), 2008 WL 762196, at *5 (S.D.N.Y. Mar. 24, 2008) ("If an employer's conduct before and after an employee complaint is consistent, the post-complaint conduct is not retaliatory.").  And as to plaintiff's suggestion that Dr. Lipkin's statement to "go call your lawyer" is evidence of retaliation as to authorship, Dr. Lipkin's statement of exasperation at the end of a frustrating and unproductive discussion about who would be the corresponding author on a paper is not evidence of retaliatory animus; it

---

[21] Plaintiff's claims are further undermined by the fact that Komal Jain, a female CII member, was the senior author on a paper Dr. Lipkin co-authored, and by plaintiff's admission that Dr. Lipkin did not include Dr. Williams as an author on a paper on which she believed he deserved authorship credit.  (Ex. A at 572-73; Lipkin Decl., ¶ 25).

demonstrates only Dr. Lipkin's continued frustration with plaintiff's unwillingness to work in a collegial, rather than combative, manner. (Ex. D at 467-68).

6.     **The Court Should Dismiss Plaintiff's Claim Concerning Alleged Destruction of Her Samples**

There is no evidence whatsoever that plaintiff's samples were intentionally destroyed without her approval for discriminatory or retaliatory reasons. In March 2018, CII undertook a center-wide review of its biological samples, which are stored at on-site CII freezers or off-site in the Bronx at a cold storage facility and number in the hundreds of thousands. (Kanas Decl., ¶¶ 7, 8). The goal of the review was to determine which samples could be kept, which samples could be discarded, and which samples could be returned to collaborators. (Kanas Decl., ¶ 9). The project was discussed on numerous occasions with all CII faculty, including plaintiff. (Kanas Decl., ¶ 8).

Allison Kanas, then the CII's Director of Strategic Initiatives and Planning, assigned project coordinator Tara Conniff to spearhead the project. (Kanas Decl., ¶ 10). Dr. Lipkin had a high-level, general oversight role over this process and only set "some broad guidelines for culling." (Ex. G at 33; Ex. D at 318). As part of the project, Conniff made lists of the samples belonging to the various principal investigators in CII. (Ex. G at 35). If a sample belonged to a single PI or several PIs, Conniff would put the sample on the list of each PI. (Ex. G at 45). Conniff then would request that the PI review their individual inventory and identify which samples should be kept or discarded. (Kanas Decl., ¶¶ 12-13). Conniff would only discard a sample if all PIs with responsibility for the sample gave their permission. (Ex. G at 139-40).

Conniff approached plaintiff in July 2018 to discuss her samples and provided her with a spreadsheet of samples identified as belonging to her. (Kanas Decl., ¶ 15 and Ex. C). Plaintiff then requested and was provided additional items, including (a) an inventory of all of the

samples in the Bronx freezer farm, regardless of who was identified as the responsible PI; (b) an inventory of samples from projects plaintiff worked on with Dr. Thomas Briese; and (c) an inventory of the samples that had not been claimed by another faculty member.  (Kanas Dec. ¶ 17 and Ex. E).  Plaintiff authorized CII to discard some of her samples, but she maintains that other samples of hers were discarded without her authorization by Dr. Lipkin.  (Ex. A at 679).

Given these facts, there is no reasonable inference that any samples were discarded because of unlawful discrimination or retaliation.  The sample culling process was a CII-wide process involving all faculty members, including plaintiff; Conniff administered the process, with direct oversight from Kanas, and attempted to identify which samples were associated with which faculty; all faculty were asked about any samples identified as theirs; no samples identified as belonging to a PI were discarded without the PI's permission; and plaintiff was part of the process and in fact provided more information, per her request, than other faculty members.  Moreover, there is no evidence that Conniff discriminated or retaliated against plaintiff, or that any samples were intentionally discarded because of unlawful discrimination or retaliation.  (*See* Ex. G at 139 (Conniff only discarded samples "that each PI told me that I could destroy")).

At her deposition, plaintiff was unable to identify the samples she believes were improperly discarded, referring only to unnamed studies involving "investigators at Brown, Harvard, and [NIH]," and the "National Collaborative Perinatal Project."  (Ex. A at 679-80, 672-87).  And in response to an interrogatory asking her to identify documents supporting her allegations as to these sample, she identified more than 100 documents, dating back to 2013, concerning the CII-wide process for culling samples.  It therefore is unclear what specific samples Plaintiff is claiming were improperly discarded.  In any event, there is not a scintilla of

evidence that any of Plaintiff's samples were discarded because of discrimination or retaliation.[22]

The Court therefore should dismiss this claim.

### 7.  The Court Should Dismiss Plaintiff's Claim Concerning Alleged Misuse of Funds on Certain Grants

The Court should dismiss plaintiff's claims that funds were misused by Columbia on the

SFARI and two NIH grants (*see* Compl., ¶¶ 215-59), as those allegations have nothing to do with

plaintiff's claims, and in any event there is no evidence whatsoever of unlawful discrimination or

retaliation in connection with these issues.  In 2016, plaintiff approached Columbia with

allegations that funds had been mis-spent on several grants, asserting in substance that lab

technicians and other personnel were being paid from grants that they were not working on.

(Compl., ¶¶ 241-47).  In response to the complaints, Columbia conducted an investigation led by

Naomi Schrag, Columbia's Vice-President for Research, Compliance, Training, and Policy, and

in-house and outside counsel.  (Ex. I at 12, 45-46).  The investigation included an extensive

review of documents concerning several grants, as well as interviews of plaintiff, Lipkin, and CII

personnel.  (Ex. I at 70-71, 127).  In relevant part, the investigation concluded that plaintiff's

allegations about misuse of funds on the SFARI grant lacked substance, that one NIH grant had

borne more than its equitable share of lab technician costs, in that some technicians who had

been working on multiple, related projects had been over-allocated to one grant because of

inadequate communication between technicians and CII administrators, and that a lab manager

performing administrative functions should not have been charged to any NIH grant.  (Ex. I at

---

[22] If some of Plaintiff's samples were discarded by mistake this also would not support her claims.  *See D'Alessio v. Charter Commc'ns, LLC*, No. 18-CV-2738 (NG) (LB), 2020 WL 5638721, at *8 (E.D.N.Y. Sept. 21, 2020) (granting summary where plaintiff "has come forth with no evidence that would allow a jury to infer that defendant's proffered non-retaliatory reason, i.e., that this was essentially an honest mistake, is pretextual"); *Toussaint v. NY Dialysis Servs., Inc.*, 230 F. Supp. 3d 198, 218 (S.D.N.Y. 2017) (granting summary judgment where employer might have terminated employee based on incorrect report, but where there was no evidence that the "mistake was based on discriminatory animus").

110-11, 136-39).  Ultimately, Columbia reported its findings to NIH, offered to return some

funds, and developed a corrective action plan to have better administrative oversight, which the

CII has since implemented.  (Ex. I at 98, 115-16, 123).

There is not a shred of evidence that Schrag or any of Columbia's counsel conducting the

investigation were in any way biased against plaintiff.  *Vitale v. Equinox Holdings, Inc.*, No.

17CV1810 (JGK), 2019 WL 2024504, at *7 (S.D.N.Y. May 7, 2019) (granting summary

judgment where plaintiff offered "no evidence" that internal investigation of plaintiff's

complaints was tainted by "discriminatory intent").  Moreover, the investigation "did not make

any determination that Dr. Lipkin directed resources in any fashion away from or toward

anyone."  (Ex. I at 138); *see McLee v. Chrysler Corp.*, 109 F.3d 130, 137 (2d Cir. 1997)

(affirming summary judgment where alleged discriminator not involved in allegedly

discriminatory decision).  No reasonable inference of discrimination or retaliation against

plaintiff arises from these facts.

## B.    The Court Should Dismiss All of Plaintiff's Retaliation Claims

Plaintiff claims, in essence, that every unfavorable event that occurred after July 9, 2015

was retaliatory.  The Court can dismiss all of plaintiff's retaliation claims for a number of

reasons.  First, plaintiff's testimony that the types of conduct underlying her retaliation claims

has been occurring throughout her entire career at Columbia (i.e., from 2002 to the present)

precludes any inference of retaliatory motive based on her complaints in July 2015.  (Ex. A at

24-27, 31-38; Compl., ¶ 23; *see also* Ex. A at 35-37 (listing many of the "major types" of

allegations found in the Complaint and which allegedly also existed from 2002 to the present).

"If an employer's conduct before and after an employee complaint is consistent, the post-

complaint conduct is not retaliatory."  *Wright*, 2008 WL 762196, at *5; *Marshall v.*

*Kingsborough Cmty. Coll. of CUNY*, No. 11 CV 2686 PKC RML, 2015 WL 5773748, at *10

(E.D.N.Y. July 27, 2015) (holding that professor who was not promoted both before and after her protected activity could not maintain  claim because college rejected her promotion bid on both occasions because of insufficient publications); *Petyan v. New York City L. Dep't*, No. 14 Civ. 1434 (GBD)(JLC), 2015 WL 1855961, at *13 (S.D.N.Y. Apr. 23, 2015) ("Logically, therefore, conduct that began or took place entirely before Petyan lodged his internal complaint cannot be considered the result of retaliation for that complaint, and cannot now form the basis of Petyan's retaliation claims."); *Washington v. City of New York*, No. 05 CIV. 8884LAP, 2009 WL 1585947, at *8 (S.D.N.Y. June 5, 2009) ("[M]ere continuation of an adverse employment condition initiated long before the protected activity in question does not, without more, logically support an inference that the protected activity prompted retaliation.").

Second, plaintiff cannot establish retaliatory animus based solely on temporal proximity. (*See* Op. at 11 (citing cases)); *Stoddard v. Eastman Kodak Co.*, 309 Fed. Appx. 475, 480 (2d Cir. Feb. 13, 2009) (finding that two months was too long a gap between protected activity and adverse action to establish a causal nexus based on temporal proximity).  Third, plaintiff cannot establish that a reasonable person would be dissuaded from complaining as a result of the conduct alleged.  Significantly, after plaintiff reported her discomfort to human resources after the July 2015 incident, plaintiff complained, and has continued to complain, about her alleged mistreatment.  *See Tepperwien v. Entergy Nuclear Operations, Inc*., 663 F.3d 556, 572 (2d Cir. 2011) (affirming summary judgment and concluding "that a reasonable employee in [plaintiff's'] situation would not have been deterred from engaging in protected activities.  Indeed, while the test is an objective one, it is relevant that [plaintiff] himself was not deterred from complaining -- he complained numerous times").  Because plaintiff was never deterred from making additional complaints, her retaliation claims cannot stand.

Fourth, plaintiff's various retaliation claims also fail because plaintiff has failed to adduce sufficient evidence of retaliatory animus, as follows:

- *Medical Director* (Compl., ¶¶ 50-52):  Plaintiff claims that her CII medical director title was removed in retaliation for her complaint about the July 9, 2015 incident.  It is undisputed that plaintiff's only responsibility as "Medical Director", which was not a formal title, was to serve as a "liaison between the CII and the hospital in the event there was an exposure by someone in the lab to something that was unusual and that couldn't be handled through normal channels." (Ex. A at 323; Ex. D at 107).  Plaintiff spent very little time on these duties and did not receive compensation for them. (Ex. A at 323-24.)  After learning that plaintiff had indicated that she was uncomfortable with having been asked to provide her medical opinion about his lesion, Dr. Lipkin apologized and told her that she would no longer have the medical director responsibilities. (Ex. A at 321-22).  Given these facts, plaintiff cannot establish that removal of the Medical Director title would dissuade a reasonable person from making additional complaints.  Even if she could, the evidence is that Dr. Lipkin removed the responsibility as an ameliorative measure to prevent plaintiff from being presented with future requests for medical care that could make her uncomfortable or put the institution at risk, as a result of her lack of medical malpractice insurance. (Ex. D at 106-09). Plaintiff adduces no evidence to rebut these reasons.

- *Exclusion from Dinner with Dr. Peterson* (Compl., ¶¶ 78-81):  Plaintiff alleges that in August 2015, she was disinvited from a business dinner with Dr. Lipkin and Dr. Peterson, a collaborator. Plaintiff is unable to provide any evidence to support an inference that Dr. Lipkin's decision not to invite plaintiff to join them was motivated by discrimination or retaliation. (Ex. A at 364).  It is undisputed that Dr. Lipkin often did not invite fellow faculty to join him when meeting with collaborators.  Furthermore, the evidence establishes that there was a legitimate, nondiscriminatory reason for not inviting her: Dr. Lipkin and Dr. Peterson are friends who have known each other since the 1980s, and the dinner was social in nature.  (Ex. A at 362).  In addition, plaintiff continued to collaborate and work with Dr. Peterson after this dinner. (Ex. A at 362-64).

- *Interview* (Compl., ¶¶ 91-97): Plaintiff cannot proffer any evidence that Dr. Lipkin directed Allison Kanas to "babysit" her during an interview with a journalist on November 17, 2015 for retaliatory reasons. (Ex. A at 369).  Plaintiff's only basis for her allegation of retaliation is her belief that Ms. Kanas was not asked to sit in on others' interviews.  The undisputed evidence however is that Ms. Kanas was asked to sit in on interviews with several other CII members.  (Ex. E at 125-28).  Furthermore, there is a legitimate, nondiscriminatory reason for the request—namely that, after having been previously threatened with legal action based upon a media comment that was misconstrued, Dr. Lipkin was seeking to limit such risk, a fact Plaintiff admits she cannot refute.  (Ex. A at 369).

- *The Chinese Consulate Dinner* (Compl., ¶¶ 169-70):  Plaintiff cannot establish a claim of retaliation based upon her seating assignment at a March 2016 awards dinner at the Chinese Consulate.  (Ex. A at 578-581).  First, a seating assignment is not something that would dissuade a reasonable person from bringing a complaint.   More significantly, it is undisputed that Dr. Lipkin did not determine the location of plaintiff's seat, and plaintiff's supposition to the contrary is insufficient to withstand summary judgment.  *Alam v. HSBC*

*Bank USA, N.A.*, No. 07 CIV. 3540 LTS/JCF, 2009 WL 3096293, at *11 (S.D.N.Y. Sept. 28, 2009) ("While a court must interpret all evidence in favor of the plaintiff, it need *not* blindly accept the plaintiff's testimony where that testimony is largely unsubstantiated and is contradictory or incomplete.") (citing *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)).

- *The Science Magazine Article* (Compl., ¶¶ 308-14):  There is no evidence that Dr. Lipkin misrepresented his or plaintiff's role on the ME/CFS grant to the reporter from Science Magazine in November 2016. (Ex. A at 574-75.)  Furthermore, even if he did, plaintiff has not adduced any evidence to support an inference of retaliatory animus.[23]

## CONCLUSION

The Court should grant Defendants' motion for summary judgment and dismiss the complaint.

Dated: May 20, 2021
      White Plains, New York

<div style="margin-left:40%">

Yankwitt LLP
*Counsel for Defendant The Trustees of Columbia University in the City of New York*

/s/ Ross E. Morrison
Ross E. Morrison
Michael H. Reed
140 Grand Street   Suite 705
White Plains, New York 10601
Tel.: (914) 686-1500
ross@yankwitt.com
michael@yankwitt.com

Jackson Lewis P.C.
*Counsel for Defendant Walter Ian Lipkin, M.D.*

/s/ Susan D. Friedfel
Susan D. Friedfel
Jackson Lewis P.C.
44 South Broadway, 14th Floor
White Plains, New York 10601
Tel: (914) 872-8027
susan.friedfel@jacksonlewis.com

</div>

---

[23] Likewise, plaintiff adduces no evidence of retaliatory animus concerning a dispute over the language used to describe her role in previous research in a biographical sketch for a grant application.  (Compl., ¶¶ 341-61).

joseph.dipalma@jacksonlewis.com

*Of Counsel*
Andrew W. Schilling
Dana Walsh Kumar
BUCKLEY LLP
1133 Avenue of the Americas, Suite 3100
New York, NY 10036-6710
Tel: 212-600-2315
*Counsel for Defendant The Trustees of Columbia*
*University in the City of New York*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2021, the foregoing document was served electronically

via email upon the following:

Herbert Eisenberg
heisenberg@eisenbergschnell.com
Julian R. Birnbaum
jbirnbaum@eisenbergschnell.com
EISENBERG & SCHNELL LLP
233 Broadway, Suite 2704
New York, New York 10279
(212) 966-8900

Rosalind Fink
rozfink@igc.org
LAW OFFICE OF ROSALIND FINK
1 Grace Court
Brooklyn, New York 11201
(917) 912-9907

*Attorneys for plaintiff*

/s/ Ross E. Morrison
Ross E. Morrison