**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x          **ECF CASE**

**MADY HORNIG, M.D.,**                              :

          **Plaintiff,**          :

       **v.**                              :          **17 Civ. 3602 (ER)**

**TRUSTEES OF COLUMBIA**                      :
**UNIVERSITY IN THE CITY OF**
**NEW YORK and WALTER IAN**          :
**LIPKIN, M.D.,**
                  :

          **Defendants.**          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## DEFENDANTS' LOCAL CIVIL RULE 56.1
## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Yankwitt LLP
Ross E. Morrison
Michael H. Reed
140 Grand Street, Suite 705
White Plains, New York 10601
Tel: (914) 686-1500
*Counsel for Defendant The Trustees of Columbia*
*University in the City of New York*

Jackson Lewis P.C.
Susan D. Friedfel
Joseph J. DiPalma
44 South Broadway, 14th Floor
White Plains, New York 10601
Tel: (914) 872-8027
*Counsel for Defendant Walter Ian Lipkin, M.D.*

*Of Counsel*
BUCKLEY LLP
1133 Avenue of the Americas, Suite 3100
New York, NY 10036-6710
Tel: (212) 600-2315
*Counsel for Defendant The Trustees of Columbia*
*University in the City of New York*

Pursuant to Rule 56.1 of the Local Civil Rules of this Court, Defendants The Trustees of Columbia University in the City of New York ("Columbia" or the "University"), and Dr. Walter Ian Lipkin, M.D. ("Lipkin") (together, "Defendants"), submit the following statement of material facts as to which there is no genuine issue to be tried.[1]

## I.      BACKGROUND

### A.      The Center for Infection and Immunity

1.      The Mailman School of Public Health ("Mailman"), is part of the Columbia University Irving Medical Center ("CUMC") and is "dedicated to excellen[ce] in science for the public good." (Ex. B at 15).[2]

2.      Mailman is composed of academic departments and schoolwide centers. Departments focus on the various disciplines of public health, including Epidemiology and Environmental Health Sciences, among others. (Ex. B at 19; Santella Decl., ¶ 3).

3.      Schoolwide centers are "interdisciplinary centers of excellence that are directed to a theme [and] are led by a director." (Ex. B at 19).

4.      While center directors have departmental appointments, they are responsible to the Dean, and unlike department chairs, "lead[] by mandate." (*Id.* at 22, 28).

5.      The Center for Infection and Immunity ("CII"), is one of Mailman's schoolwide centers. (Ex. B at 19-21).

---

[1]Although Defendants dispute some of these facts, they are accepted as true for purposes of this motion only.

[2] "Ex." refers to Exhibits attached to the Declaration of Ross E. Morrison, dated May 20, 2021. Excerpts from the deposition transcripts in this action are attached as exhibits to that Declaration, except for plaintiff's deposition transcript, which is contained in an accompanying binder. "Santella Decl.," and "Susser Decl." refer to the accompanying Declarations of Regina Santella and Ezra Susser, both dated May 19, 2021, respectively. "Kanas Decl.," refers to the Declaration of Allison Kanas, dated October 5, 2018 (Dkt. No. 35), previously filed in connection with Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction. "Lipkin Decl.," refers to the declaration of Dr. Lipkin, dated May 20, 2021.

6.     The CII is an advanced molecular biology laboratory that develops, validates and implements new technologies for discovery of bacteria, viruses and fungi that cause disease, studies how they cause disease, and builds diagnostic tests.  (Santella Decl., ¶ 4).

7.     The CII employs anywhere from 35-60 people and has relationships with researchers around the world.  (Ex. D at 14).  Among the CII's achievements are discovering 1,800 new microbes; showing that the use of folic acid during pregnancy reduces the risk of autism by 40%; and introducing the first sensitive diagnostic test for SARS.  (Ex N).

8.     Columbia does not use its own funds to support research staff or laboratory space at CUMC.  (Santella Decl., ¶ 5).

9.     Scientists must obtain external funding from government agencies, private industry or donors to fund their salaries, and to be able to maintain their positions.  (*Id.*).  Most departments at Mailman require faculty to fund 95% of their salaries through a combination of external sources, and teaching or an administrative position.  (*Id.*).

**B.     Dr. Lipkin**

10.     After medical school and internship, Dr. Lipkin did a residency in Internal Medicine at the University of Washington from 1979-81, followed by a residency in Neurology at the University of California San Francisco from 1981-84.  After two years, Dr. Lipkin left clinical medicine to train for six years in basic research at the Research Institute of Scripps Clinic in La Jolla, CA (1984-1990) where his research focused on developing molecular biology approaches to diagnosis, discovery and surveillance of viruses, and understanding how they cause disease. Dr. Lipkin joined the faculty of the University of California, Irvine in 1990 as an assistant professor and was promoted to full professor with tenure within six years.  There he

held the Louise Turner Arnold Chair of Neuroscience and led a laboratory of approximately 20

faculty and research staff.  (Lipkin Decl. ¶ 4).

11.     In 2001, Dr. Lipkin was recruited to Columbia.  He is the John Snow Professor of

Epidemiology at Mailman and Professor of Neurology and Pathology at Columbia's Vagelos

College of Physicians and Surgeons, all with tenure, as well as the Daldorf Professor for

Research at the Wadsworth Center, New York State Department of Health, and the Director of

the CII.  (Santella Decl., ¶ 12; Ex. D at 13).

12.     As the Director of the CII, Dr. Lipkin supervises "an integrated research program

with a set of thematic goals, and they manage the whole enterprise around achieving those

thematic goals."  (Ex. B at 28).

13.     Dr. Lipkin is responsible for "the scientific excellence and accomplishments of all

the people within the center" and for ensuring that center personnel are securing external

funding.  (Ex. B at 19).

14.     Lipkin is a "world class scientist of the highest caliber."  (Ex. B at 85).  He has

"accomplished more than most scientists do in their career," creating "innovative" science that

"protect[s] the health of the population" and serves "the public good."  (*Id.*).  Among his

accomplishments are identifying AIDS-associated abnormalities, which he showed could be

treated with plasmapheresis; demonstrating that early exposure to viral infections affects

neurotransmitter function; and consulting with the Kingdom of Saudi Arabia on Middle East

Respiratory Syndrome (MERS).  (Ex. T).  In 2003, Dr. Lipkin established a sensitive assay for

SARS infection and hand carried 10,000 test kits to Beijing at the height of the outbreak. For this

work, Dr. Lipkin was named Special Advisor to China for Research and International

Cooperation in Infectious Diseases and presented with a gold medallion in Beijing from President Xi and from the Chinese consulate in New York. (Lipkin Decl. ¶¶ 6-7).

15.     In January 2020, Dr. Lipkin traveled to China to consult with collaborators and long-time colleagues in the China CDC and Chinese Academy of Sciences concerning control of what we now know to be COVID-19. By April 2020, CII received emergency use authorization from the FDA for a diagnostic test that was licensed by Columbia University. Dr. Lipkin has also received FDA approvals for plasma therapy studies in New York City and Brazil. (Lipkin Decl. ¶ 9).

### C.     Plaintiff's Employment at Columbia

16.     As a condition of his recruitment to Columbia, Lipkin insisted that Columbia also hire two members of his lab at UC Irvine, plaintiff and Thomas Briese. (Ex. A at 50). At the time, plaintiff was an adjunct assistant professor at UC Irvine, and previously had been an assistant professor at the University of Pennsylvania. (Ex. A at 19, 41).

17.     At Mailman, plaintiff was appointed as an associate professor of Epidemiology on the tenure track and became a member of CII. (Ex. A at 77).

18.     In 2006, plaintiff was reviewed for tenure and told that her publication rate was low and that she needed more first author publications (Ex. A at 83-84 and Ex. K; Santella Decl., ¶ 10), and to demonstrate more independence, including applying for and obtaining an R01 grant, i.e., a grant from the National Institute of Health where the investigator generates an idea and receives funding to research it. (Ex. A at 85-86; Ex. K; Santella Decl., ¶ 6).

19.     A first author is the author who is listed first and generally has written the first draft of the paper and done or led the majority of the work. (Santella Decl., ¶ 10).

20.     In her 2006 tenure review, plaintiff also was told that she needed to publish "at least 4-5 seminal papers in high impact journals" by 2009, and subsequently sought and received an exemption from any teaching responsibilities so that she could focus on these goals.  (Ex. A at 87-88; Ex. K).

21.     By 2009, plaintiff had not achieved these goals set out in her 2006 tenure review, and per her request was granted a two-year extension of time to be re-evaluated for tenure, which was supported by Linda Fried, Dean of the Mailman School.  (Ex. A at 92-98, 102-03).

22.     In 2012, because plaintiff had not met the tenure goals originally outlined to her in 2006, she was informed that she was unlikely to receive tenure.  (*Id.* at 104-06).

23.     Plaintiff then requested to be removed from the tenure track.  (*Id.*).

24.     Plaintiff currently is an associate professor at CUMC, a non-tenure track position, in Epidemiology.  (Ex. A at 104-06; Santella Decl., ¶ 12).

**D.     The Relationship Between Dr. Lipkin and Plaintiff**

25.     From 1998 until 2011, plaintiff and Dr. Lipkin were in an intimate personal relationship and resided together for most of that time with plaintiff's two children from a previous marriage.  (Ex. A at 24-27).

26.     During the period in which they lived together, plaintiff joined Dr. Lipkin in hosting and attending social events related to their work in the CII, such as dinners with prospective donors and collaborators. (Ex. A at 193-94).  Often Dr. Lipkin would not invite other faculty involved with the work to attend those meetings or meals.  (Ex. A 193-194).

**E.     Plaintiff's EEOC Charge and the Complaint in This Action**

27.     On April 29, 2016, plaintiff filed a Charge of Discrimination with the Equal Opportunity Commission, alleging gender discrimination and retaliation against Columbia. (Compl., ¶ 6).

5

28.     On May 18, 2017, plaintiff filed the Complaint in this case, asserting gender discrimination and retaliation claims under Title VII and the New York City Human Rights Law ("NYHRL") against Columbia and Dr. Lipkin.

29.     Plaintiff alleges in the Complaint that, "[t]hroughout their professional relationship, Lipkin made clear that he expected Plaintiff to be his largely-silent and always subservient partner, forced to work almost exclusively on his projects and to give him undue credit for her own work, to the detriment of her own professional growth, stature in their shared field, and productivity."  (*Id.*, ¶ 23).

30.     At her deposition in this matter, plaintiff testified that she believes that Dr. Lipkin has discriminated against her on the basis of her gender from 1998 to the present.  (Ex. A at 31-38).

31.     On August 17, 2018, plaintiff moved for a preliminary injunction, and the Court denied that application on November 15, 2018.  (Opinion and Order, Dkt. No. 39 ("Op.")).

32.     Plaintiff's document production in this case included recordings of hundreds of hours of conversations with other Columbia faculty and staff, including Dr. Lipkin.  Plaintiff made these recordings beginning in 2016, without the knowledge or consent of any of the Columbia employees that she taped, at various CII meetings, including ones held in Dr. Lipkin's office.  (Ex. A at 692-98).

II.   **THE COURT SHOULD GRANT DEFENDANTS' SUMMARY JUDGMENT MOTION BECAUSE THE UNDISPUTED MATERIAL FACTS DEMONSTRATE THAT PLAINTIFF WAS NOT DISCRIMINATED OR RETALIATED AGAINST**

   A.   **The Court Should Dismiss Plaintiff's Claims of Discrimination and Retaliation**

      1.   **The Court Should Dismiss Plaintiff's Harassment Claim**

33.   Plaintiff alleges that on July 9, 2015, Dr. Lipkin asked her to come to his office, locked the outer door to the office, lowered his pants, and asked her to examine a lesion on his buttocks to provide her medical opinion as to whether he needed an antibiotic or an antiviral treatment prior to traveling out of the country the next day.  (Ex. A at 305-07).

34.   Dr. Lipkin could not examine the lesion on his backside himself, and needed medical advice as to how to treat it. (Ex. D at 86; Ex. A at 309-10).

35.   Dr. Lipkin did not have time to see his physician before he traveled overseas the next day. (Ex. D at 86).

36.   Dr. Lipkin asked plaintiff to examine the lesion and give him her medical opinion because she was the only other medical doctor in the CII and because he knew that she had personal experience with similar lesions.  (Ex. A at 304-312).

37.   Plaintiff believes Dr. Lipkin asked her to examine his lesion because of her sex or gender based on the fact that she "thinks it would be highly unlikely that he would have called in a male colleague who had the clinical experience that [she] had."  (Ex. A at 307, 312).

38.   Plaintiff was given an opportunity to pursue an investigation through the University's Office of Equal Opportunity and Affirmative Action, but she declined to do so. (Compl., ¶ 122-23; Ex. A at 327-29).

39.     Mailman Dean Linda Fried directed Dr. Lipkin to attend one-on-one training with a legal expert to ensure that he understood Columbia' prohibitions on sexual harassment and retaliation.  (Ex. B at 63).

40.     Dr. Lipkin attended the training, during which the trainer talked with him about appropriate conduct and the obligation not to retaliate against Dr. Hornig for complaining of harassment.  (Ex. D at 91-92),

41.     Dr. Lipkin asked the trainer for advice about how he should go about managing Dr. Hornig's productivity and performance deficiencies without being perceived as retaliating against her.  (Lipkin Decl. ¶ 34).

42.     On November 25, 2015, the trainer reported back to the University about her training session with Dr. Lipkin as follows:

"I spent almost 2.5 hours with Dr. Lipkin.  While I am confident that he understands retaliation and that he will not retaliate against Dr. Hornig, I do think that someone may have to step in to assist with supervising and/or managing Dr. Hornig's going forward.

Dr. Lipkin recognizes that his actions with respect to Dr. Hornig were inappropriate and will not be repeated in the future.  He has also acknowledged that he will treat Dr. Hornig appropriately and respectfully going forward.  Dr. Lipkin will continue to work collaboratively with Dr. Hornig on their joint projects and assign projects to Dr. Hornig on a fair and equitable basis.
Dr. Lipkin did raise some concerns regarding Dr. Hornig's productivity.  These concerns appear to have been raised with Dr. Hornig prior to any complaint and/or the "butt incident."  If Dr. Lipkin's chronology is accurate, the issues discussed with Dr. Hornig remain outstanding.  Dr. Lipkin is unsure if there should be any further discussions with Dr. Hornig regarding her failure to complete research papers by the established deadline since he does not want any discussion to be deemed retaliatory.  I am not sure of the timeline of events.  If there is follow up regarding these concerns, I would recommend that such follow up be done either by someone other than Dr. Lipkin, or that the follow up be done by Dr. Lipkin in conjunction with someone else."

(Ex. Z.)

43.     Vice Dean Regina Santella took steps to mediate the disputes between Dr. Lipkin and plaintiff.  (Ex. C at 71-84, 137-38).

## 2.   The Court Should Dismiss Plaintiff's Failure to Promote Claim

44.    In 2016, plaintiff indicated to Dean Santella that she would like to be considered for promotion from her position of non-tenured associate professor to non-tenured professor. (Ex. C at 78-82).

45.    The promotion process at Mailman for a non-tenured faculty member is a rigorous, multi-step process that can be initiated either by the faculty member or the Chair of the member's academic department.  (*Id.* at 40).

46.    Each department has a committee on appointments and promotions ("COAP"), which is comprised of senior faculty within the department and which does an assessment of the candidate's curriculum vitae ("C.V."), in terms of the quality and number of the candidate's publications, record of grant funding, teaching, and invitations to present the candidate's work. (*Id.* at 41, 49).

47.    Department COAPs, including the Epidemiology COAP, often make preliminary assessments based on a candidate's C.V., and give a candidate an indication as to whether the candidate has a reasonable chance of success if the candidate continues with the full promotion process.  (*Id.* at 41).

48.    If the candidate continues with the full process, the candidate submits, along with the C.V., a personal statement and a list of the candidate's top five publications, and the department chair also will send requests to outside reviewers identified by the faculty member for letters of recommendation.  (*Id.* at 42-44).

49.    Based on all of those materials, the department COAP then votes as to whether the candidate should be approved for consideration by the Mailman COAP, a school-wide COAP.  (*Id.*).

50.     Following plaintiff's request to be considered for a promotion, Dean Santella contacted Guohua Li, the interim chair of the Department of Epidemiology, and sent him plaintiff's C.V. for an initial review and assessment by the EPI COAP.  (Ex. A at 121, 123-25; Ex. L).

51.     After reviewing her C.V., the EPI COAP stated that it was "not optimistic of a positive vote in the future" on plaintiff's promotion bid because of the following concerns:

- because plaintiff had "few senior authored publications," it would be "challenging" for her to demonstrate "a sustained record of excellence in independent scholarly contributions . . . and recognition of the quality and importance of the work by the wider research community";

- while it was "essential" for plaintiff "to secure and sustain independent grant funding," she "has not served as the PI for an R01 grant and has not demonstrated her ability to successfully compete for federal funding as a principal investigator"; and

- plaintiff has "not contributed sufficiently to teaching/mentoring in the Department of Epidemiology . . .such as [by] teaching a major course or contributing substantially as an instructor . . . in a major course."

(Ex. A at 127-28; Ex. M).

52.     The EPI COAP's concerns were essentially the same ones expressed to plaintiff in her failed bid for tenure.  (Ex. A at 104-06; Ex. K).

53.     Given the COAP's concerns, plaintiff did not proceed further with her promotion bid in 2016 or thereafter.  (Ex. A at 149).

54.     Dr. Lipkin was not a member of the Epidemiology COAP.  (Ex. B at 84).

55.     Dr. Lipkin also had no knowledge of plaintiff's promotion application at the time she made it.  (Ex. D at 144-46).

56.     Thomas Briese ("Prof. Briese"), a non-tenured associate professor in the CII, sought promotion to full professor in April 2016.  (Santella Decl., ¶¶ 9-11).

57.     The Epidemiology COAP did an initial review of Prof. Briese's C.V. and found that it did not evidence adequate independence in funding or publications, and Prof. Briese did not further pursue the promotion process as a result.  (Santella Decl., ¶¶ 9-11; Ex. A at 149).

58.     Plaintiff did not ask Dr. Lipkin to write a letter on her behalf in connection with her bid for promotion in 2016.  (Ex. A at 109-10, 126).

59.     Faculty members are not compared in the promotion process, but rather rise or fall on their own merits, and there also is no limit on the number of promotions that can occur at any one time.  (Santella Decl., ¶ 8).

60.     Plaintiff does not contend that anyone on the COAP retaliated against her.

### 3.  The Court Should Dismiss Plaintiff's Claim Concerning Her Transfer out of the CII

61.     For several years prior to 2018, Dean Santella had been made aware of various issues with plaintiff's performance in the CII and that CII faculty and staff were having significant difficulties working with her.  (Santella Decl., ¶ 13).

62.     As of June 2018, plaintiff no longer wanted to be in the CII and supervised by or collaborate with Dr. Lipkin.  (Pl. Reply Afd., Dkt. No. 38, Oct. 19, 2018, ¶¶ 67 and 68) (admitting that she no longer wanted to collaborate with or be supervised by Dr. Lipkin by June 2018).

63.     At the time of her transfer out of the CII, plaintiff, on her own initiative, had been seeking a transfer to either the Department of Neurology or Psychiatry at Columbia.  (*Id.,* ¶ 68; Ex. A at 479-80).

64.     Plaintiff did not keep Dr. Lipkin proactively informed of what she was working or her whereabouts and did not participate actively in weekly CII meetings as other faculty. (Santella Decl., ¶ 14; Pl. Reply Afd., Dkt. No. 38, Oct. 19, 2018, ¶¶ 67 and 68).

65.     In mid-2017, Eleanor Kahn, an Administrative Coordinator at the CII, filed a complaint with Mailman Human Resources that plaintiff had "screamed" at her, causing her to feel "anxious and under attack," which was the second time this had occurred.  (Ex. O; Santella Decl., ¶ 14; Ex. A at 641-43; Pl. Reply Afd., Dkt. No. 38, Oct. 19, 2018 (admitting plaintiff used an "angry tone" with Kahn)

66.     In March 2018, Nina Deoras, a project coordinator, complained to Gilbert Smith, the CII Administrative Director, that plaintiff had communicated with her in an unprofessional manner and that she felt uncomfortable meeting in a private office with plaintiff, and also had disagreements on work issues such that Deoras no longer wanted to work with plaintiff.  (Ex. F at 265-72; Ex. D at 121-23; Ex. A at 643-45).

67.     In an email chain ending in April 2017 with Allison Kanas, then the CII's Director of Strategic Initiatives, plaintiff discussed a work issue and stated that Kanas "should consider that defamatory statements like these have consequences.  Please think carefully before making such unfounded allegations in the future."  Kanas, who was pregnant at the time, subsequently complained to Mailman Human Resources about the "hostile and threatening" nature of plaintiff's communication, noting that "this type of thing" had been going on for months and that two administrative employees had recently left the CII as a result.  (Ex. P; Ex. A at 645-46).

68.     Plaintiff worked on the Autism Birth Cohort (ABC) study, which was a study initiated in 2000 and conducted jointly between Columbia and the Norwegian Institute of Public Health ("NIPH"), and which used autism spectrum disorders cases identified from a large pregnancy cohort in Norway.  (Susser Decl., ¶ 3).

69.     Both Dr. Lipkin and plaintiff began working on the ABC study shortly after they came to Columbia.  (Susser Decl., ¶¶ 4-5).

70.     Plaintiff was assigned to be first author on approximately ten ABC papers. (Susser Decl., ¶ 7; Ex. A at 436-42; Ex. Q).

71.     Plaintiff frequently missed deadlines and failed to provide drafts, and to date has only completed and published two ABC papers with her as first author.  (*Id.*; Ex. A at 436-42; Ex. Q (paper table); Ex. D at 510-11).

72.     Dean Fried was aware of plaintiff's productivity issues for several years prior to 2015, based on conversations with Dr. Lipkin.  (Ex. B at 69-72; Ex. C at 70).

73.     Plaintiff was assigned as first author on the Maternal Cord Blood paper and was responsible for selecting the cases and controls from the samples, conducting the analysis, and drafting this paper.  (Susser Decl., ¶ 9; Ex. A at 464).

74.     In or about mid-2017, Michaeline Bresnahan, an assistant professor in Epidemiology and also a member of the Columbia ABC team, identified problems with how Dr. Hornig had selected the cases and controls, which would serve as the foundation for the scientific analysis for this paper.  (*Id.*).

75.     Dr. Bresnahan, along with Ezra Susser, a professor of Epidemiology and Psychiatry and former chair of Epidemiology, and Jason Che, an assistant professor of Biostatistics in the CII, could not understand what plaintiff had done or reproduce her work because plaintiff could not provide them with a protocol as to the cases and controls.  (Susser Decl., ¶ 10).

76.     Although Drs. Susser and Breshanhan asked plaintiff multiple times for a protocol, plaintiff never provided one.  (*Id.*; Ex. D at 505-11

77.     For months Dr. Bresnahan spent many hours trying to understand how the cases and controls had been selected, and ultimately was unable to understand or reproduce what had been done.  (Susser Decl., ¶ 10; Ex. A at 474).

78.     After informing and consulting with the NIPH about the issues with the selection of cases and controls and the resulting significant delays in publishing the maternal cord blood paper, the Columbia ABC team engaged in additional analysis with a new protocol for the cases and controls.  (*Id.*, ¶¶ 11-13 and Ex. A).

79.     Because of the resulting delays in the paper, and the problems with plaintiff's selection of the cases and controls, the rest of the Columbia ABC team (i.e., Profs. Susser, Lipkin, Bresnahan and Che), lost confidence in plaintiff's scientific abilities and decided that it would be better to work independently of plaintiff in connection with future work utilizing ABC datasets.  (Santella Decl., ¶ 15; Susser Decl., ¶ 17; Ex. H at 203-04; Ex. D at 507-16; Ex. A at 495-97; Ex. S).

80.     For all of the reasons set forth in paragraphs 61-79, *supra*, Dean Fried, along with Dean Santella, decided that plaintiff should be transferred out of the CII in June 2018.  (Santella Decl., ¶ 16 and Ex. C; Ex. B at 75-82, 91).

81.     Dean Fried's judgment was that a transfer was the "best decision for the [CII], Dr. Hornig and [Mailman]" to enable plaintiff to "demonstrate her productivity and have the resources she needed and where neither she nor the [CII] were living in an acrimonious environment."  (Ex. B at 91; Santella Decl., ¶¶ 16).

82.     Following her transfer, plaintiff remained in Epidemiology, her current department, at the same salary.  (Santella Decl., ¶¶ 17, 35).

83.     Plaintiff testified at her deposition in this matter that she had "no knowledge" who made that decision to transfer her out of the CII.  (Ex. A at 625, 629-30).

84.     Dr. Lipkin had no authority to transfer plaintiff out of the CII.  (Ex. D at 308-10).

85.     Dean Fried – who previously supported plaintiff in the tenure process (Ex. A at 98-99), has an extensive background concerning academic careers of women in science, including having served on a task force at Johns Hopkins University to analyze and solve obstacles to women in medicine, and has worked actively at Columbia since her arrival in 2008 "to assure an environment that is equitable, inclusive, [and ] respectful" to help all faculty members achieve success.  (Ex. B at 30-34).

86.     Columbia promptly addressed plaintiff's claims concerning her move to a new office in June 2018 – including that her new office was too small and required a longer elevator ride to travel to the CII laboratory, the movers had left her office in disarray, she lacked computer access, and there was water or mold in her new space, to the extent any of these issues ever existed.  (Santella Decl., ¶¶ 19-25 and Exs. C, D).

87.     Plaintiff had the same access to the CII following her transfer as any non-CII faculty member.  (*Id.*, ¶ 34 and Ex. C).

88.     Plaintiff was provided with lab space, first in the CII immediately following her transfer, and then in the Environmental Health Science department in Mailman, and her laboratory equipment was moved there as well.  (*Id.*, ¶¶ 28-32 and Ex. C).

89.     Plaintiff has not set up her luminex equipment (which the CII donated to her) after it was delivered to her EHS lab space in September 2019.  (Santella Decl., ¶¶ 31-32; Ex. A at 662-70).

90.     Plaintiff was given multiple freezers to store her samples, first in the CII, and then at facilities in Columbia and off-site freezer locations used by many faculty, which plaintiff has access to.  (*Id.*, ¶ 33; Ex. A at 67-72).

### 4.   Plaintiff Was Not Denied Any Rights as a Principal Investigator Based on Her Gender or in Retaliation for Her Complaints

#### a.   Dr. Lipkin's Involvement in the CFI Projects Was Not Motivated by Plaintiff's Gender

91.     Glenn Hutchins approached Dr. Lipkin and another physician at Columbia regarding a family member in need of medical care.  Dr. Lipkin led the pursuit of an answer to the issue.  (Ex. A at 526-527; Ex. D at 49.)  After several meetings between Dr. Lipkin and Mr. Hutchins and based upon Dr. Lipkin's success in helping Mr. Hutchins's family member, Mr. Hutchins agreed to provide financial support for ME/CFS research at the CII under the auspices of the Chronic Fatigue Initiative ("CFI").  (Ex. D at 50-52; Lipkin Decl. 31).

92.     In or about 2010 Dr. Lipkin recommended to the CFI that Dr. Hornig be the principal investigator of the research.  (Ex. D at 51-52; Lipkin Decl. ¶ 32).

93.     Despite their agreement to have Dr. Hornig serve as the PI on the initial CFI grant, Dr. Hornig had concerns that the CFI leadership acted as though "they didn't really view [Dr. Hornig] as the principal investigator" and treated Dr. Lipkin as the lead on the project.  (Ex. A 380-84; Ex. Y).

94.     In March 2013, Dr. Hornig responded to an email from the CFI requesting an update on the project and including a report recently prepared for the foundation's benefactor as follows, "It seems odd to me that my name is nowhere in this report.  I find it disrespectful of my role in this project.  Further it undermines my contributions to date and my ability to continue to contribute to this project."  (Ex. AA; Ex. A at 521).

95.     Dr. Hornig asked Dr. Lipkin for advice on how to improve outcomes in professional interactions, and Dr. Lipkin provided her with his thoughts and advice in an effort to help her.  (Ex. AA; Ex. A at 522).

96.     In September 2013, Dr. Hornig and Dr. Lipkin submitted a proposal to the CFI for funding for an extension study on the microbiome and longitudinal changes in immune profiling.  (Ex. A at 528-529; Ex. BB; Ex. CC).

97.     The CFI relied on Dr. Lipkin's advice to make scientific decisions.  (Ex. A at 531-532; Ex. V).

98.     The CFI asked Dr. Hornig for the status of papers in February 2014.  Although she promised those drafts within a few weeks of February 24, 2014, the papers still were not complete in October, 2014. (Ex. DD; Ex. EE).

99.     On October 21, 2014, Dr. Lipkin wrote to Dr. Hornig, "we must deliver two paper drafts to Glenn Hutchins on Monday.  Please send me your plan for meeting his objective.  ... Your career and the reputation of the CII are in jeopardy.  I can no longer protect you.  You must meet milestones."  (Ex. AA; Ex. EE).

100.    In April 2015, when the CFI requested a meeting with Dr. Lipkin and did not include Dr. Hornig, Dr. Lipkin specifically asked not only that Dr. Hornig be invited to the meeting but that the invitation be sent in such a way as to not make her feel that her presence was an afterthought.  (Ex. Y; Ex. A at 381).

101.    In April 2015, Dr. Hornig believed that CFI leadership viewed "[her] behavior as the source of the problem" and as someone with a "petty little ego."   (Ex. A at 381-382; Ex. Y).

102.    Although Dr. Hornig was listed as PI on the grant paperwork, the CFI leadership contacted Dr. Lipkin, the Director of the CII and their initial contact, for updates and complained

when they were unhappy with the rate at which the research was being completed and published. (Ex. D at 380).

103.    On March 3, 2016, Harry Schroeder of the CFI wrote to Dr. Hornig, "You owe us a few papers.  I would like to have a specific estimate as to when they will be written, when we will see drafts and to what publications you are looking to direct them.  I know there are many things on which you are working, as are all of us, but it has been about a year since your last papers were published.  We would like to see meaningful progress on completing the tasks for which you were engaged and funded."  (Ex. W).

104.    In or about May 2016, after having received a complaint from a clinician, a representative of the CFI contacted Dr. Lipkin for his advice about how the clinicians who had worked on collecting samples should be given authorship attribution on papers derived from those samples.  (Lipkin Decl., ¶ 38.)

105.    Dr. Lipkin suggested that the CFI call a meeting of the group of clinicians to discuss how to approach authorship attribution going forward and offered to help facilitate the discussion if the CFI preferred.  (Lipkin Decl., ¶ 38.)

106.     The CFI organized the call and determined whom to invite, and Dr. Lipkin facilitated the discussion.  (Lipkin Decl., ¶ 38.)

    **b.**  **Plaintiff Was Not Denied Access to Staff for Discriminatory or Retaliatory Reasons**

      ***i.  Postdoctoral Fellows***

107.    Plaintiff and Dr. Lipkin were Co-PIs on the SFARI autism project, and Dr. Lipkin was the contact PI.  (Ex. D at 191-92).

108.    Dr. Dorottya Nagy-Szakal sought out Dr. Lipkin for a post-doctoral fellowship under his mentorship and was hired and slotted to fill the open line for a postdoc on the SFARI grant.  (Ex. A at 349; Ex. D at 191).

109.    Shortly after Dr. Nagy-Szakal arrived at CII, it became clear that her interests and background were better suited to other work, so Dr. Lipkin assigned her to work on the ME/CFS microbiome project rather than the SFARI autism project. (Ex. D at 191, 195-98).

110.    The ME/CFS microbiome project was associated with another grant on which plaintiff was a PI, and plaintiff was a co-author on Dr. Nagy-Szakal's papers. (Ex. X at 29).

111.    Dr. Milada Mahic, who was also a postdoctoral fellow did research on the SFARI project and authored a paper on which plaintiff was a co-senior author.  (Ex. X at 29).

112.    Plaintiff notes in her C.V. that she mentored several fellows, including Dr. Nagy-Szakal.  (Ex. X at 14-15).

### ii.    Research Assistants, Data Managers, Biostatisticians, and Project Managers

113.    Many research staff were assigned to work with Dr. Hornig, including:

a)  Meredith Eddy, Project Manager.  (Ex. A at 331-32).

b)  Hiro Matahika, Data Manager.  (Ex. A at 352-353).

c)  Jason Che, PhD, Biostatistician. (Ex. A at 353, 455-456).

d)  Joy Ukaigwe, Project Manager.  (Ex. A at 353-354).

e)  Dorothy Muller, Laboratory Technician.  (Ex. A at 354).

f)  Wai Hung Wong, Technician.  (Ex. A at 355).

g)  Shobun Baile, Technician.  (Ex. A at 355-356).

h)  Andrew Schultz, Data Manager.  (Ex. A at 356).

i)  Noel Pura, Technician.  (Ex. A at 356).

19

j)  Peter Mercado Reyes, Technician.  (Ex. A at 356).

k)  Elizabeth Levine, Data Clerk.  (Ex. A at 356-357).

l)  Nina Deoras, Project Coordinator/Laboratory Technician.  (Ex. A at 357).

m)  Jaime Parker, Animal Model Technician.  (Ex. A at 357).

n)  Gabrielle Velar, Animal Model Technician.  (Ex. A at 357).

(Susser Decl., ¶ 8 (listing staff who worked with plaintiff on the ABC grant over the years and noting the resources Dr. Lipkin provided to plaintiff were far greater than most faculty receive on similar projects given the demands for such resources)).

114.    There was significant staff turnover at the CII in late 2016 and 2017.  (Compl. ¶¶ 362-70).

115.    As Director of the CII, Dr. Lipkin had responsibility for overseeing all CII resources to ensure that they were deployed efficiently to ensure that all projects could be completed in a timely manner. (Lipkin Decl., ¶ 15).

### c. *Plaintiff Was Not Denied Support in Preparing Grant Applications*

116.    Plaintiff submitted multiple grant applications during her employment in the CII with which she received assistance from the University's Sponsored Projects Administration as well as different teams depending on whether the grant was running through the CII or a different department. (Ex. A at 429-30).

117.    For example, in October 2018, plaintiff received substantial assistance in preparing a grant submission to NIH from Epidemiology staff.  (Santella Decl., ¶¶ 40-45).

118.    At her deposition, Plaintiff was unable to identify any specific grant application for which she had inadequate support or assistance and testified only that she "thinks" she may have needed more support for a grant application to NIH "looking at ways to phenotype."  (Ex.

A at 431).  Plaintiff explained that she received incorrect information initially as to the staff and personnel who could assist on this grant application, but it was ultimately corrected, and the grant application was submitted.  (Ex. A at 433).

> ### d.    Plaintiff Was Not Improperly Denied Access to Data

119.    Dr. Hornig was already overdue on a number of papers for the CFI in the spring of 2016.  (Ex. W).

120.    Dr. Nagy-Szakal did research with Dr. Lipkin based on samples derived from a grant on which both Dr. Lipkin and Dr. Hornig were principal investigators.  Dr. Nagy-Szakal performed the research under Dr. Lipkin's supervision and direction.

121.    Dr. Hornig did not participate in the study design.

122.    Plaintiff is not an expert in metabolomics, which was the subject of Dr. Nagy-Szakal's paper. (Ex. A at 258-62, 553).

123.    Plaintiff was given the opportunity to review the data and to contribute to the paper as an author once Dr. Nagy-Szakal and Dr. Lipkin completed their analysis.  (Ex. A at 258-62).

> ### e.    Plaintiff Was Not Improperly Denied Access to Information

124.    On grants with multiple PIs, only the contact PI generally has full access through Columbia's on-line systems to financial and budget information for an entire grant.  (Santella Decl., ¶ 7; Ex. J at 87, 121).

125.    Grants may have multiple PIs; in such a case, pursuant to Columbia and NIH policy, one PI is denominated as the contact PI, who has oversight and ultimate responsibility for all aspects of a grant.  (Santella Decl., ¶ 7; Ex. J at 81-82).  A PI who is not the contact PI in a multi-Pi grant only has responsibility for their aspect of the grant.  (Ex. C at 26).

126.     It is the contact PI who is ultimately responsible for all aspects of a grant, including, for example, financial reports and budgets, and progress reports on a grant.  (Santella Decl., ¶ 7; Ex. I at 74, 117; Ex. J at 81-82; Ex. C at 26).

### 5.   There Is No Evidence that the Authorship Disputes Were Motivated by Gender-Based or Retaliatory Animus

127.     Dr. Lipkin did not have unilateral authority to make determinations about authorship.  In academia, authorship is determined based upon guidelines developed by the specific journal, the International Journal Committee of Medical Editors authorship criteria, and any procedures that may have been set up by the faculty working on a project.  (Ex. A at 239-40).

128.     As the Director of the CII and the senior scientist on most projects, when he is involved with a research project, he generally attempts to control the communications with collaborators and donors even when other CII members are involved.  (Ex. A at 195).

129.     Dr. Lipkin is a competitive person by nature.  He always strives to be the best in his field, and it is important to him that he be given appropriate credit for his work. (Ex. A at 196).

130.     As the senior scientist at the CII, Dr. Lipkin is typically the senior author on any paper produced based on work conducted at the CII for which he meets the authorship criteria as articulated by the International Committee of Medical Journal Editors.  There are, however, some circumstances where it is more appropriate for another CII scientist to be the senior author.  The gender of those involved in the project is not a factor in authorship determinations.  For instance, Komal Jain, the Director of Bioinformatics at the CII, who is a woman, was the senior author on a paper on which Dr. Lipkin was also an author. (Lipkin Decl. ¶ 25).

131.    Dr. Lipkin did not include Dr. Williams, a male faculty member, as an author on a paper to which he contributed at a level Dr. Hornig believed merited authorship. (Ex. A at 572-573).

132.    Dr. Lipkin expressed frustration for others taking credit for his work in 2011.  (Ex FF).

133.    In August 2011, Dr. Lipkin decided that he should be the corresponding author on a paper, even though they had previously discussed Dr. Hornig being sole and corresponding author.  (Ex. FF).

134.    In April 2016, Dr. Lipkin and Dr. Hornig had a dispute about whether Dr. Lipkin and/or Dr. Hornig should be the corresponding author on a paper.  After lengthy discussion, Dr. Lipkin became frustrated and said something to the effect of "Go call your lawyer." (Ex. D at 467-468).

### 6.  The Court Should Dismiss Plaintiff's Claim Concerning Alleged Destruction of Her Samples

135.    In March 2018, CII undertook a center-wide review of its biological samples, which are stored at on-site CII freezers or off-site in the Bronx at a cold storage facility and number in the hundreds of thousands.  (Kanas Decl., ¶¶ 7, 8).

136.    The goal of the review was to determine which samples could be kept, which samples could be discarded, and which samples could be returned to collaborators.  (Kanas Decl., ¶ 9).

137.    The project was discussed with all CII faculty, including plaintiff.  (Kanas Decl., ¶ 8).

138.    Allison Kanas, then the CII's Director of Strategic Initiatives and Planning, assigned project coordinator Tara Conniff to spearhead the project.  (Kanas Decl., ¶ 10).

139.    Dr. Lipkin had a high-level, general oversight role over this process and only set "some broad guidelines for culling." (Ex. G at 33; Ex. D at 318).

140.    As part of the project, Conniff made lists of the samples belonging to the various principal investigators in CII.  (Ex. G at 35).

141.    If a sample belonged to a single PI or several PIs, Conniff would put the sample on the list of each PI.  (Ex. G at 45).

142.    Conniff then would request that the PI review their individual inventory and identify which samples should be kept or discarded.  (Kanas Decl., ¶¶ 12-13).

143.    Conniff would only discard a sample if all PIs with who had been identified as having responsibility for the sample gave their permission.  (Ex. G at 139-40).

144.    Conniff approached plaintiff in July 2018 to discuss her samples and provided her with a spreadsheet of samples identified as belonging to her.  (Kanas Decl., ¶ 15 and Ex. C).

145.    Plaintiff then requested and was provided additional items, including (a) an inventory of all of the samples in the Bronx freezer farm, regardless of who was identified as the responsible PI; (b) an inventory of samples from projects plaintiff worked on with Dr. Thomas Briese; and (c) an inventory of the samples that had not been claimed by another faculty member.  (Kanas Dec. ¶ 17 and Ex. E).

146.    Plaintiff authorized CII to discard some of her samples.  (Ex. A at 679).

### 7.  The Court Should Dismiss Plaintiff's Claim Concerning Alleged Misuse of Funds on Certain Grants

147.    In 2016, plaintiff approached Columbia with allegations that funds had been mis-spent on several grants, asserting in substance that lab technicians and other personnel were being paid from grants that they were not working on.  (Compl., ¶¶ 241-47).

24

148.    In response to the complaints, Columbia conducted an investigation led by Naomi Schrag, Columbia's Vice-President for Research, Compliance, Training, and Policy, and in-house and outside counsel.  (Ex. I at 12, 45-46).

149.    The investigation included an extensive review of documents concerning several grants, as well as interviews of plaintiff, Lipkin, and CII personnel.  (Ex. I at 70-71, 127).

150.    In relevant part, the investigation concluded that plaintiff's allegations about misuse of funds on the SFARI grant lacked substance, that one NIH grant had borne more than its equitable share of lab technician costs, in that some technicians who had been working on multiple, related projects had been over-allocated to one grant because of inadequate communication between technicians and CII administrators, and that a lab manager performing administrative functions should not have been charged to any NIH grant.  (Ex. I at 110-11, 136-39).

151.    Ultimately, Columbia reported its findings to NIH, offered to return some funds, and developed a corrective action plan to have better administrative oversight, which the CII has since implemented.  (Ex. I at 98, 115-16, 123).

152.    The investigation "did not make any determination that Dr. Lipkin directed resources in any fashion away from or toward anyone."  (Ex. I at 138).

**B.    The Court Should Dismiss All of Plaintiff's Retaliation Claims**

153.    On July 29, 2015, Ms. Kanas and Dr. Lipkin called Dr. Hornig.  During that conversation, Dr. Lipkin apologized for his conduct on July 9, 2015 and for having made Dr. Hornig uncomfortable.  (Ex. A at 325-326).

154.    Plaintiff's role as "Medical Director" was to serve as a "liaison between the CII and the hospital in the event there was an exposure by someone in the lab to something that was unusual and that couldn't be handled through normal channels." (Ex. A at 323).  Plaintiff spent

25

very little time on these duties and she was not given any additional compensation for this role. (Ex. A at 323-324).  Medical Director of the CII was not a formal title that was recognized by the University.  (Ex. D at 107).

155.    Dr. Lipkin determined that it was no longer a good idea for Dr. Hornig to hold herself out as the medical director of the CII because it might lead others to believe that they could ask her for medical advice for which she did not have malpractice insurance or university approval and that may make her uncomfortable. (Ex. A at 322; Ex. D at 105-107).

156.    Dr. Lipkin did not give himself or anyone else the medical director title and instead determined that the University Occupational Health Services would take responsibility for addressing any accidents that might arise in the BSL-3 laboratory.  (Ex. D at 106-107).

157.    A potential donor was planning to meet with Dr. Lipkin, Dr. Hornig, and a collaborator, Dr. Daniel Peterson. (Ex. A at 359-360).  During Dr. Lipkin, Dr. Hornig, and Dr. Peterson's initial planning for the donor's visit, they "had talked about having dinner together" while Dr. Peterson was in town from Nevada "to further discuss the ways in which funds might be used if the donor was in agreement to plan how, you know, how the proposal would be put forward to the family." (Ex. A at 360-361).

158.    On or about August 10, 2015, Dr. Hornig attended the planned meeting with the donor. (Ex. A at 359-360). Dr. Lipkin and Dr. Peterson had been friends for many years. (Ex. A at 362). Dr. Hornig was told that there would be no working dinner.

159.    Dr. Peterson and Dr. Lipkin did, however, decide to have dinner together to catch up socially.  Dr. Hornig was not invited to attend.  (Ex. A at 360-361).

160.    Neither Dr. Lipkin nor Dr. Peterson ever said anything to suggest that business was discussed at the dinner without Dr. Hornig.  (Ex. A at 362).

161.    The potential donor did not ultimately provide research support for either Dr. Lipkin or Dr. Hornig. (Ex. A at 362).  Plaintiff continued to collaborate and work with Dr. Peterson thereafter. (Ex. A at 363). Dr. Hornig has also had dinners with Dr. Peterson without Dr. Lipkin present. (Ex. A at 364).

162.    In November 2015, Dr. Lipkin asked Ms. Kanas to sit in on an interview Dr. Hornig was giving in her office. (Compl. ¶¶ 91-97).  He told Ms. Kanas that "It was a productivity issue… and also being careful about the things that were communicated."  "Both [Dr. Lipkin] and [Dr. Hornig] had had issues in the past with misspeaking or being misrepresented and were trying to avoid that as well."  (Ex. E at 135-136.)

163.    Dr. Lipkin asked Allison Kanas to sit in on all media interviews, including his own interviews with the media. (Ex. D at 342, 346, 361-362; Ex. E at 125-28).  Dr. Lipkin was in the process of instituting a formal written policy applicable to all CII faculty, not just Dr. Hornig. (Ex. D at 342).

164.    Dr. Hornig's interview in November 2015 was with a representative of MSPH regarding a piece relating to tryptophan in an internal MSPH publication.  (Ex. A at 368).  Ms. Kanas sat in on Dr. Hornig's interview and left shortly after determining the purpose of the interview.  (Ex. A at 370).

165.    On March 17, 2016, members of the CII attended an awards dinner honoring Dr. Lipkin at the Chinese Consulate. (the "Dinner").  (Ex. A at 576-577).

166.    Dr. Hana Lin, the CII's laboratory manager, coordinated the Dinner's logistics related to the CII faculty's attendance and the seating arrangements. (Ex. A at 578-579).

167.    Dr. Lipkin did not make determinations regarding where guests would be seated, nor did he request that Dr. Hornig not be seated with other members of the CII faculty.  (Lipkin Decl., ¶ 37).

168.    Neither Dr. Hornig nor Dr. Thomas Briese was seated with the rest of the CII faculty at the dinner.  (Ex. A at 578).

169.    In November 2016, Science Magazine published an article regarding ME/CFS work funded by the NIH listing Dr. Lipkin as "the" Principal Investigator rather than as "a" principal investigator or noting that Dr. Hornig was also a principal investigator.  (Ex. A at 574-575).  Dr. Hornig has no information as to what Dr. Lipkin said to the reporter.  (Ex. A at 575).

**C.    Dr. Lipkin Repeatedly Made Efforts to Support Dr. Hornig and Promote Her Career**

170.    Dr. Lipkin invested CII discretionary funds to support Dr. Hornig's work on animal models after the external support for that work had expired.  (Ex. D at 131-132; Ex. A at 294-295).

171.    With the support of Dr. Lipkin and the CII staff, Dr. Hornig applied for an R01 grant from the NIH on which she was to be the sole PI based on the animal work, but the application was unsuccessful.  (Ex. A at 300-301.)

172.    Dr. Hornig did not publish any primary papers based on animal model work after 2011.  (Ex. A at 300).

173.    In 2009, when another researcher sought out Dr. Lipkin to collaborate on cutting edge microbiome research, Dr. Lipkin directed the opportunity to Dr. Hornig, rather than doing the work himself or directing it to Dr. Williams, a male faculty member who was capable of doing that work.  (Ex. A at 565-567).

174.    Dr. Lipkin led a groundbreaking study on XMRV and ME/CFS, which was known by many as "the Lipkin study."  (Ex. A at 515).

175.    Based upon the XMRV research, Dr. Jose Montoya of Stanford University sought out Dr. Lipkin to collaborate with him on a pathogen discovery project relating to ME/CFS in or about 2011.  (Ex. A at 516).

176.    Dr. Lipkin suggested that Dr. Hornig lead the project.  As a result, Dr. Hornig became the sole principal investigator on the sub-award agreement with Stanford University ("Stanford Subaward") in or about October 2011.  (Ex. A at 516).

177.    After more than four years, Dr. Hornig had not produced a single manuscript. (Ex. GG).  In December 2017, Dr. Montoya requested all data files derived from the research.  (Ex. GG).

Dated: May 20, 2021
         White Plains, New York

Yankwitt LLP
*Counsel for Defendant The Trustees of Columbia University in the City of New York*

/s/ Ross E. Morrison
Ross E. Morrison
Michael H. Reed
140 Grand Street   Suite 705
White Plains, New York 10601
Tel.: (914) 686-1500
ross@yankwitt.com
michael@yankwitt.com

Jackson Lewis P.C.
*Counsel for Defendant Walter Ian Lipkin, M.D.*

/s/ Susan D. Friedfel
Susan D. Friedfel
Joseph J. DiPalma

Jackson Lewis P.C.
44 South Broadway, 14th Floor
White Plains, New York 10601
Tel: 914-872-8027
susan.friedfel@jacksonlewis.com
joseph.dipalma@jacksonlewis.com

*Of Counsel*
Andrew W. Schilling
Dana Walsh Kumar
BUCKLEY LLP
1133 Avenue of the Americas, Suite 3100
New York, NY 10036-6710
Tel: 212-600-2315
*Counsel for Defendant The Trustees of Columbia*
*University in the City of New York*

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2021, the foregoing document was served electronically

via email upon the following:

Herbert Eisenberg
heisenberg@eisenbergschnell.com
Julian R. Birnbaum
jbirnbaum@eisenbergschnell.com
EISENBERG & SCHNELL LLP
233 Broadway, Suite 2704
New York, New York 10279
(212) 966-8900

Rosalind Fink
rozfink@igc.org
LAW OFFICE OF ROSALIND FINK
1 Grace Court
Brooklyn, New York 11201
(917) 912-9907

*Attorneys for plaintiff*

/s/ Ross Morrison
Ross E. Morrison