UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
MADY HORNIG, M.D.

                                        17 CV3602 (ER)

           Plaintiff,

     v.

TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK and
WALTER IAN LIPKIN, M.D.

           Defendants.

-----------------------------------------------------------x


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

EISENBERG & SCHNELL LLP
Herbert Eisenberg
Julian R. Birnbaum
233 Broadway, Suite 2704
New York, New York 10279
(212) 966-8900

Rosalind Fink
LAW OFFICE OF ROSALIND FINK
1 Grace Court
Brooklyn, NY  11201
(917) 912-9907

*Attorneys for Plaintiff Mady Hornig, M.D.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
MADY HORNIG, M.D.

                                    17 CV3602 (ER)

                Plaintiff,

      v.

TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK and
WALTER IAN LIPKIN, M.D.

                Defendants.
------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

EISENBERG & SCHNELL LLP
Herbert Eisenberg
Julian R. Birnbaum
233 Broadway, Suite 2704
New York, New York 10279
(212) 966-8900

Rosalind Fink
LAW OFFICE OF ROSALIND FINK
1 Grace Court
Brooklyn, NY 11201
(917) 912-9907

*Attorneys for Plaintiff Mady Hornig, M.D.*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES……………………………………………………...ii

PRELIMINARY STATEMENT…………………………………………………1

STATEMENT OF FACTS………………………………………………………2

    Dr. Mady Hornig……………………………………………………………2

    Lipkin Drops His Pants, the "Butt" Incident………………………………...3

    Defendants' Response to Hornig's Complaint………………………………5

        Removal of Hornig as Medical Director of CII……………………………...5

        Hornig's Expulsion From CII………………………………………………5

        Destruction of Human Tissue Samples……………………………………6

        Defendants' Violations of NIH Policy………………………………………9

        Denial of access to financial and effort reporting information. …………………9

        Denial of access to data and samples generated
        through work on Hornig's grants……………………………………………10

        Refusal to allow Hornig to hire or access staff funded by her grants…………11

        Wrongful diversion of monies allocated for staff on Hornig's grants………...12

        Columbia's response to Hornig's complaints of these violations ………………13

    Unfounded Criticisms of Hornig's Work, Expertise and Productivity ………………14

    Exclusion From Meaningful Publication Opportunities……………………………18

i

Placement on an ABC prenatal fever paper....................................................18

Placement on the ABC herpes/ToRCH paper..........................................19

Denial of the Right to Build on Prior Research.....................................19

Barriers to Submission of Grant Applications.................................................21

Discriminatory Diminution of Hornig's Role on Grants.....................................21

The Chronic Fatigue Initiative (CFI) Studies.........................................22

ME/CFS grants proposed to CFI for funding..........................................22

ME/CFS R56......................................................................22

The ABC Grant...................................................................23

Demeaning Treatment...................................................................24

Columbia's Inadequate Response to Hornig's Complaints.................................24

Lipkin's Discrimination and Retaliation Against Other Women at CII....................26


ARGUMENT.................................................................................27

SUMMARY JUDGMENT IS NOT AVAILABLE AS THERE ARE
THERE ARE GENUINE MATERIAL QUESTIONS OF FACT IN
DISPUTE...............................................................................27

Summary Judgment Principles...................................................27

Summary of Argument...........................................................28

DEFENDANTS' ACTIONS THAT SUPPORT
THE CONCLUSION OF UNLAWFUL
SEX DISCRIMINATION AND RETALIATION..............................................30

Retaliation Under Title VII...................................................31

Sex Discrimination Under Title VII.................................................33

Columbia's Title VII liability.......................................................36

NYC Human Rights Law Standards Preclude Summary Judgment..............38

Sex Discrimination, Sexual Harassment,
and Hostile Work Environment under the NYCHRL...............................39

Retaliation and Retaliatory Hostile Environment...................................40

CONCLUSION...........................................................................40

## TABLE OF AUTHORITIES

<u>Federal cases</u>                                                                                               <u>Page</u>

*Babcock v. Frank,*
    729 F. Supp. 279 (S.D.N.Y. 1990)..................................................................38

*Bryson v. Chi. State Univ.,*
    96 F.3d 912 (7th Cir. 1996)........................................................................35

*Burlington N. & Santa Fe Ry. Co. v. White,*
    548 U.S. 53 (2006)...................................................................................32

*Chuang v. Univ. of California Davis, Bd. of Trustees,*
    225 F.3d 1115 (9th Cir. 2000)......................................................................35

*Cifra v. G.E. Co.,*
    252 F.3d 205 (2d Cir. 2001)......................................................................31

*Davis-Garrett v. Urban Outfitters,*
    921 F.3d 30 (2d Cir. 2019)........................................................................27

*Doe v. Columbia Univ.,*
    831 F.3d 46 (2d Cir. 2016).........................................................................37

*Forrest v. Brinker Int'l Payroll Co., LP,*
    511 F.3d 225 (1st Cir. 2007)......................................................................38

*Gorzynski v. JetBlue Airways Corp.,*
    596 F.3d 93 (2d Cir. 2010)......................................................................28,31

*Green v. N.Y.C. Transit Authority,*
    No. 15-CV-8204 (ALC), 2020 U.S. Dist. LEXIS 172519
    (S.D.N.Y. Sept. 21, 2020)........................................................................39

*Holcomb v. Iona Coll.,*
    521 F.3d 130 (2d Cir. 2008).....................................................................28,37

*Kaytor v. Elec. Boat Corp.*
    609 F.3d 537 (2d Cir. 2010) .......................................................................34

*Khanna v. MUFG Union Bank, N.A.,*
    785 Fed. Appx. 15 (2d Cir. 2019) (summary order)............................................35

*Kwan v. Andalex Grp., LLC,*
    737 F.3d 834 (2d Cir. 2013).................................................................................33

*Jute v. Hamilton Sundstrand Corp.,*
    420 F.3d 166 (2d Cir. 2005)..................................................................................32

*Leibowitz v. Cornell Univ.,*
    584 F.3d 487 (2d Cir. 2009)..................................................................................27

*Littlejohn v. City of New York,*
    795 F.3d 297 (2d Cir. 2015)............................................................................33,34

*Loeffler v. Staten Island Univ. Hosp.,*
    582 F.3d 268 (2d Cir. 2009) .................................................................................38

*Menaker v. Hofstra Univ.,*
    935 F.3d 20 (2d Cir. 2019).....................................................................................37

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973)........................................................................................29,33

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,*
    715 F.3d 102 (2d Cir. 2013)......................................................................29,38.39,40

*Milord- Francois v. NYS Office of the Medicaid Inspector Gen.,*
    No. 19-cv-00179 (LJL), 2020 U.S. Dist. LEXIS 174439
    (S.D.N.Y. Sept. 23, 2020) .....................................................................................37

*Nugent v. St. Luke's/Roosevelt Hosp. Ctr.,*
    No. 05 Civ 5109 (JCF), 2007 U.S. Dist. LEXIS 28274
    (S.D.N.Y. Apr. 18, 2007)......................................................................................32

*Perks v. Town of Huntington,*
    251 F. Supp. 2d 1143 (E.D.N.Y. 2003).................................................................35

*Rasmy v. Marriott Int'l*, Inc.,
        952 F.3d 379 (2d Cir. 2020) ......................................................35

*Redd v. N.Y. State Div. of Parole*,
        678 F.3d 166 (2d Cir. 2012)......................................................34

*Reeves v. Sanderson PlumbingProducts. Inc.*,
        530 U.S. 133 (2000)..............................................................28

*Richardson v. N.Y. State Dep't of Corr. Serv.*,
        180 F.3d 426 (2d Cir. 1999),
        *abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White*,
        548 US 53 (2006)................................................................32

*Rivera v. Rochester Genesee Reg'l Transp. Auth.*,
        743 F.3d 11 (2d Cir. 2014).......................................................34

*Setty v. Fitness*,
        No. 17-CV-6504 (NGG) (SMG), 2018 U.S. Dist. LEXIS 213878
        (E.D.N.Y. Dec. 18, 2018), *R. & R. adopted*, 2019 U.S. Dist. LEXIS 4723
        (E.D.N.Y. March 21, 2019) .....................................................39

*Staub v. Proctor Hosp., Inc.*,
562 U.S. 411, 421 (2011)................................................................37

*Stern v. Trustees of Columbia Univ. in City of New York*,
        131 F.3d 305 (2d Cir. 1997)......................................................33

*St. Mary's Honor Center v. Hicks*,
        509 U.S. 502 (1993)..............................................................33

*Terry v. Ashcroft*,
        336 F.3d 128 (2d Cir. 2003)......................................................34

*Thomas v. iStar Fin., Inc.*,
        438 F. Supp. 2d 348 (S.D.N.Y. 2006),
        *aff'd* 303 Fed. Appx. 943 (2008) (summary order)...........................................32

*Tolbert v. Smith*,
        790 F.3d 427 (2d Cir. 2015).......................................................34

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013)...................................................................................31

*Vasquez v. Empress Amb. Serv., Inc.*,
    835 F.3d 267 (2d Cir. 2016)....................................................................37

*Vega v. Hempstead Union Free Sch. Dist.*,
    801 F.3d 72 (2d Cir. 2015).................................................................28,29

*Vesey v. Envoy Air, Inc.*,
    No. 20-1606, 2021 U.S. App. LEXIS 16109
    (7th Cir. May 28, 2021...........................................................................37

*Walsh v. New York City Hous. Auth.*,
    828 F.3d 70 (2d Cir. 2016)......................................................................33

*Ya-Chen Chen v. City of New York*,
    805 F.3d 59 (2d Cir. 2015)..................................................................38,40

*Zakre v. Norddeutsche Landesbank Girozentrale*,
    396 F. Supp. 2d 483 (S.D.N.Y. 2005).....................................................35

<u>State cases</u>

*Williams v. N.Y.C. Hous. Auth.*,
    61 A.D.3d 62 (1st Dept. 2009).....................................................29,38.39,40

<u>Statutes</u>

Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§2000e *et seq*.............*passim*

New York City Human Rights Law, N.Y.C. Admin. Code §8-101 *et seq*. ..................*passim*

Plaintiff Mady Hornig, M.D. ("Dr. Hornig," "Hornig," or "plaintiff") respectfully submits

this memorandum of law in opposition to the summary judgment motion submitted by

defendants, The Trustees of Columbia University in the City of New York ("Columbia") and

Walter Ian Lipkin, M.D. ("Dr. Lipkin" or "Lipkin") (collectively "defendants").

PRELIMINARY STATEMENT

Hornig brought this case to challenge the unlawful sex discrimination and retaliation to

which she has been subjected under Title VII of the Civil Rights Act of 1964 as amended, 42

U.S.C. §§2000e *et seq.*, ("Title VII") and the New York City Human Rights Law, N.Y.C.

Admin. Code 8-101 *et seq.* ("NYCHRL" or "City Law").  She had worked at Columbia's Center

for Infection and Immunity ("CII"), a part of Columbia's Mailman School of Public Health

("Mailman") under its director Lipkin, producing and publishing important scientific research.

Lipkin is proud of the work on which he and Hornig collaborated. (HE Ex. 1 at 351)[1] Though she

had been victimized by prior sex discrimination, following a complaint about Lipkin's July 9,

2015 sexually harassing misconduct, defendants engaged in a protracted unrelenting campaign of

discriminatory and retaliatory conduct.  These actions include: precluding Hornig from access to

staff and resources paid for by her grants and necessary for her to conduct, analyze and publish

findings based on her funded research; removing her responsibilities and title as Medical

---

[1] "HE" refers to the Declaration of Herbert Eisenberg, dated June 28, 2021. Excerpts from the
deposition transcripts and deposition exhibits in this action are attached as exhibits to that
Declaration. "MH" refers to the Declaration of Dr. Mady Hornig dated June 28, 2021. "Anthony
" refers to the Declaration of Dr. Simon Anthony dated June 26, 2021. "Eddy" refers to the
declaration of Meredith L. Eddy dated June 27, 2021. "Muller" refers to the declaration of
Dorothy Muller dated June 27, 2021

1

Director of CII; removing her from CII and removing her title as its Director of Translational Research; denying her proper authorship credit for publications; intentionally destroying biological samples necessary for her continued research; and imposing significant barriers and impediments and engaging in financial improprieties to limit and hamper her ability to conduct, analyze and publish findings from her funded research. Defendants' deliberate actions also harmed her standing within Columbia and the scientific research community generally. Hornig's reputation, career trajectory and emotional state have been significantly damaged.

Summary judgment cannot be granted as jury resolution of the abundant material facts in dispute is required. Hornig's Rule 56.1 Counter- statement details material facts to which there exist genuine issues to be tried. These facts will prove defendants' unlawful discriminatory and retaliatory actions. Plaintiff submits a somewhat limited recitation of these facts here.[2]

## STATEMENT OF FACTS

### DR. MADY HORNIG

Dr. Hornig is an internationally recognized physician-scientist focused on the fields of autism, PANDAS (a severe, disabling form of childhood obsessive-compulsive disorder), ADHD and myalgic encephalomyelitis/chronic fatigue syndrome ("ME/CFS"), as well as on the role of microbial, immune, and toxic factors in brain disorders. (MH ¶ 2, 3) She holds a faculty appointment as Associate Professor of Epidemiology. (MH¶ 4) Among her more than 147 peer-reviewed papers (excluding abstracts), and editorship of three scientific books, are first,

---

[2]     Plaintiff withdraws her failure to promote claim. At our initial conference with the Court, this claim was identified as not the heart of Hornig's claim. (ECF No. 22, p. 13)

corresponding and/or senior author papers that reported the first robust physical evidence that ME/CFS is a biological illness, as opposed to a psychological disorder, affecting the immune system with distinct disease stages. Her Columbia biography is listed at this URL: https://www. mailman.columbia.edu/people/our-faculty/mh2092 See also (HE Ex. 18; MH ¶5)

Lipkin directs, supervises and manages CII. During Hornig's tenure at CII, she was one of its very few women scientists and the only woman with an academic appointment. (MH ¶12) After learning that Columbia Human Resources ("HR") was going to be told of Hornig's concerns about his inappropriate sexual harassment, Lipkin immediately commenced a campaign to derail Hornig's research efforts, damage her professional reputation and "demolish" her career, beginning with his removal of her status as CII's Medical Director. (MH ¶13 ) Lipkin's animus was so apparent that, after meeting with Lipkin, Dr. Michaeline Bresnahan, a CII collaborator, told Hornig that Lipkin, "was out to demolish" her. (HE Ex. 2 at 86-87)

LIPKIN DROPS HIS PANTS, THE "BUTT INCIDENT"

On July 9, 2015, Lipkin summoned Hornig to his office, locked the door and dropped his pants, demanding that she look at lesions on his buttocks. ("Butt Incident") (HE Ex. 3 at 310; HE Ex. 1 at 86-87) Because she feared Lipkin's retaliation, Hornig had not intended to report Lipkin's demeaning and humiliating behavior. [3] Lipkin, concerned by his own conduct, contacted HR Director Joanne Bowman, ("Bowman"). Seeking to control the narrative and spin the tale of this incident, Lipkin projected that somehow *he* feared retaliation *from* Hornig. (HE

---

[3] For the same reasons, Hornig had chosen not to report an incident in 2014 when Lipkin also had exposed his buttocks to Hornig or his unwanted and unwelcome comments about his sexual prowess with a donor. (MH ¶ 20)

Ex. 4 at 46-47; HE Ex. 12) Hornig raised her concerns with HR and later to Dean Dr. Linda

Fried ("Fried") of the Mailman School of Public Health ("Mailman") detailing both this incident

and prior instances of Lipkin's sex discrimination. Lipkin does not believe an apology is

warranted as he does not believe he did anything wrong. While he understood this incident was

painful to Hornig, he said it was nothing she hadn't seen before. (HE Ex. 1 at 96-97, 532) Failing

to acknowledge any sexual aspect of forcing Hornig to examine his buttocks, Lipkin's takeaway

was that although Hornig felt uncomfortable, he had not sexually harassed her and had not done

anything inappropriate. (HE Ex. 1 at 101-105)

Columbia policies prohibit sex discrimination, retaliation and harassment and identify

processes to address these claims. (HE Ex. 4 at 41; HE Ex. 13.) Though Lipkin was sent to

sexual harassment training (HE Ex. 5 at 63; HE Ex. 6 at 61-63), Columbia refuses to

acknowledge that Lipkin's conduct was sex harassment. Mailman Vice Dean Regina Santella

("Santella") never spoke to Lipkin about the Butt Incident. She saw no point in doing so and

didn't want to embarrass him. (HE Ex. 6 at 57) She thought Lipkin was "foolish," not because

his behavior was harassing, but because it led to a complaint requiring a response. (HE Ex. 6 at

58) While Fried sent Lipkin to sexual harassment training, she claimed only that Lipkin had not

exercised best judgment. (HE Ex. 5 at 130-31)  Columbia failed to protect Hornig and has

acceded to Lipkin's campaign of discriminatory and retaliatory actions. Fried articulated her

position during Hornig's first meeting with her when she said, "I care about you, but I must

protect my leadership."  (HE Ex. 3 at 631)

<u>**DEFENDANTS' RESPONSE TO HORNIG'S COMPLAINTS**</u>

4

*REMOVAL OF HORNIG AS MEDICAL DIRECTOR OF CII*

Lipkin sought to justify his harassing behavior in a phone call when he also informed

Hornig that he was removing her from the role and title as CII Medical Director. MH¶ 198 That

role never entailed clinical patient responsibilities; its sole function was to develop policies and

serve as CII liaison for public health emergency situations relating to biocontainment of its

laboratories.  (HE Ex. 1 at 99; HE Ex. 3 at 321-22) Removal from this position resulted in

Hornig losing access to Columbia BSL3 (biosafety level 3) laboratories.  (MH¶ 198)

*HORNIG'S EXPULSION FROM CII*

Fearing further retaliation and discrimination, in the Summer of 2016, Hornig sought to

move to a Columbia department that was not part of Mailman. She received expressions of

interest from the Psychiatry and Neurology departments within Columbia's School of Medicine.

However, Richard Mayeux, Chair of Neurology, told Hornig in October, 2017 that he could not

move forward as he was told to "remain neutral until the legal issues are clear." (MH ¶ 26)

Lipkin characterized Hornig's meeting with Dr. Mayeux as making "the Hornig conundrum"

"considerably more complicated." (HE Ex. 1 at 220-227) Although no Columbia policy

precludes faculty transfers between schools, defendants refused to permit her to transfer where

she could work free of Lipkin's control.

Days after S.D.N.Y. mediation failed, Columbia unilaterally expelled Hornig from CII,

causing her to lose her title as its Director of Translational Research, restricting her rights to

5

access CII-controlled labs, spaces, and staff, and moving her to an office elsewhere in Mailman.[4] (MH ¶27) These actions, among others, led Hornig to seek injunctive relief .

After her expulsion from CII, Hornig no longer had direct access to her technicians, wet lab space, tissue samples and supplies. (HE Ex. 7 at 244-257) Lipkin barred Hornig from meetings at CII, even those based on grants on which she was a Principal Investigator. ("PI") (MH ¶30) These constraints were not imposed on any male faculty member with grants administered by CII and significantly harmed Hornig's productivity. (MH ¶34)

DESTRUCTION OF HUMAN TISSUE SAMPLES

In April 2018, Tara Conniff, a CII Project Coordinator, was reviewed CII's biological samples stored in on-site CII freezers and in Bronx off-site freezers to determine which samples could be discarded or returned to collaborators. In this process, Conniff created an inventory identifying, by Principal Investigator, ("PI") the freezer, rack and shelf number locations of all stored samples. (HE Ex. 8 at 35) This inventory also identified empty shelves in the freezers. (HE Ex. 8 at 55) Conniff was then tasked with providing each PI a list of the samples that investigator was responsible for.  When samples related to projects with Multiple PIs (MPIs), Conniff was to include these samples on the inventory list for *each* PI. Conniff was also tasked with making lists of samples for which she was uncertain as to who the PI(s) was.  These lists

---

[4]    Defendants claim that they decided to remove Hornig from CII in June, 2018. (Defs. Mem. at 22) In fact, this decision had been made and was well underway much earlier. (Santella ¶¶ 15-16; Defs. Mem. at 20-22) By at least early December 2017, Fried, Santella, and Lipkin were discussing Hornig's removal from CII in January 2018.  An administrative MOU for the move was drafted (HE Ex. 1 at 301, 308-09) in response to Lipkin's request. (HE Ex. 1 at 315) In a list to Dean Fried of "what we have done for Ian over the past years," Anthony Pramberger, Dean for Administration and Finance listed removal of Hornig form CII as "support (*to Lipkin*) re: his conflict with Mady Hornig." (HE Ex. 5 at 92-112; HE Ex. 15.)

were to be reviewed by all CII investigators to ensure identification of the PI(s) and to enable appropriate decisions about the status/disposition of those samples. (HE Ex. 8 at 39, 45)

When creating her sample lists, Conniff failed to refer to past inventories reflecting decades of available information identifying sample ownership utilizing a system of CII project codes. (HE Ex. 8 at 35, 43) Hornig offered to review her samples at the beginning of Conniff's process. This offer was rejected. Hornig was one of the last scientists to be provided "her list" for the Bronx freezers, on July 13, 2018. After reviewing this list and comparing it to past inventories, Hornig identified a very large number of missing samples from her projects. Conniff then provided Hornig with her master inventory for the Bronx freezers which did not include any of the samples Hornig had identified as missing. Using prior inventories, Hornig provided Conniff with the specific known freezer locations: freezer number, shelf and rack numbers of all missing samples. Conniff could not recall her efforts to look for these samples, but confirmed that she had not checked to determine whether these samples were placed on any other scientist's list of samples to be discarded. (HE Ex. 8 at 42)

A summary record was made by Conniff before she left CII detailing the status of the freezer inventory process. Hornig's list of samples that needed to be preserved was a concern to Conniff, "because there are items in this list we do not have a record of. This may come up again in the future because I have not responded to [Hornig] about whether or not we have these samples." (HE Ex. 8 at 74-76, 133; HE Ex. 16)

While Conniff claimed no knowledge of the fate of Hornig's missing samples, her records of discarded samples show precisely what happened. Without her permission and without her consultation, Lipkin had designated thousands of Hornig's samples for destruction. (HE Ex. 8 at 81) Lipkin was not a PI on any of the projects for which those samples were

7

associated. Despite clear records indicating that these samples were from projects for which Hornig was sole PI, many of these samples were placed on Conniff's "Unsure Bronx Freezers" list. Lipkin had then commanded the destruction of thousands of Hornig's samples without consultation with Hornig, despite the expressed purpose of the "Unsure Bronx Freezers" list to try to identify the responsible PI. In the second master freezer inventory Conniff provided to Hornig, freezer locations of Hornig's stored samples were shown to be empty. Hornig saw that Lipkin wrongly attributed many of her samples on Conniff's "Unsure Bronx Freezers" list to Dr. Thomas Briese ("Briese"). Dr. Briese fortunately had not designated those samples for destruction.  This designation made Dr. Briese responsible for the fate of some of Hornig's irreplaceable samples. Remarkably, Lipkin objected to Hornig's involvement with *her own* samples after she provided explicit documentation that they were part of her sole PI projects.

Hornig's samples that Lipkin designated for destruction were irreplaceable, including samples from a landmark over 50 year prospective pregnancy/birth cohort study led by the National Institutes of Health ("NIH"). They should not have been destroyed without Hornig's approval or a prior discussion with Hornig's Harvard, Brown and NICHD collaborators who continue to publish findings based on these samples.  CII's sample destruction project only stopped because of this litigation, (HE Ex. 8 at 137) presumably in response to Hornig's preliminary injunction motion.  Defendants' assertion that the destruction of these samples was "an honest mistake" Defs. Mem p36 a clear example of a disputed fact in this litigation as Lipkin deliberately engaged in this scientifically unthinkable sample destruction to further his retaliatory campaign to sabotage Hornig's work and career trajectory.  (HE Ex. 3 at 682-87; MH ¶¶52-67)

_DEFENDANTS' VIOLATIONS OF NIH POLICY_

Dr. Hornig is, and was, either sole PI or designated as one of at least two MPIs on a number of grants.  Defendants follow National Institutes of Health ("NIH") guidelines for administration of grant funds provided by the government.  (HE Ex. 6 at 34; HE Ex. 9 at 31; HE Ex. 10 at 14; Ex. 5 at 53) Pursuant to NIH stated policy, each PI on a grant, including each PI on an MPI grant, has rights and responsibilities for the financial and scientific integrity of the entire grant, including its data and products, e.g., biological samples (MH ¶¶70, 72) For MPI grants, the NIH recommends that the role of the "contact" PI, designated to communicate with the NIH, should be a rotating roll. (MH ¶73)

The NIH also requires that personnel at the grant-receiving institution do the work funded by a grant; that reallocations of personnel funds in excess of 25% be precleared with the NIH MH ¶74); and that all PIs have access to data and samples generated or used by the project and a right to inclusion in decision-making regarding conduct and analysis of the research and publication of findings. (MH ¶74) Defendants violated these rules.

_DENIAL OF ACCESS TO FINANCIAL AND EFFORT REPORTING INFORMATION._

Lipkin denied Hornig access to financial and effort reporting information on multiple grants where she was a PI on an MPI grant.[5] (MH ¶76) (Eddy ¶9.) This rendered her unable to confirm proper use of grant funds despite NIH's requirement that she certify proper spending of grant funds.  Lipkin contacted Santella on October 11, 2016, complaining that Hornig had

---

[5] NIH ME/CFS R56, CFI Extension Study, Simons Foundation/ SFARI autism study, CFI/Evans Foundation/Simmaron ME/CFS cerebrospinal fluid ("CFI CSF") studies

refused to sign attestations for Hornig's NIH autism R56 grant and SFARI autism award. Hornig had refused to sign these attestations because Lipkin had misused these funds, using them to support work on other projects. (MH ¶76)

For example, Dorothy Muller, a technician training to conduct Luminex assays for this autism project, was reassigned by Lipkin to work on an ME/CFS project while still being funded through Hornig's autism grant. This indicated a serious misappropriation of funds.  (MH ¶77)

*Denial of access to data and samples generated through work on Hornig's grants.*

Hornig was a PI on the NIH ME/CFS R56 grant, the CFI[6] Main Study, the CFI Extension Study, the CFI CSF studies, and the Microbe Discovery Project crowdfunding funds.  Despite her status as PI, Lipkin refused her access to data generated from the CFI Extension study and the Microbe Discovery Project; refused her involvement in refining the NIH ME/CFS R56 research protocol and prohibited her speaking with the project coordinator about it without his permission; had analyses on the CFI Extension Study completed prior to sharing the data with Hornig (HE Ex. 1 at 435-436) and ultimately prevented Hornig from presenting data drawn from her own grants at a scientific meeting in London in June 2016. (MH ¶ 81; HE Ex. 3 552-54).


*REFUSAL TO ALLOW HORNIG TO HIRE OR ACCESS STAFF FUNDED BY HER GRANTS*

Lipkin refused to either hire staff to perform work specifically funded by Hornig's grants or to allow existing CII personnel to perform this work. This significantly impaired Hornig's

---

[6] CFI, the Chronic Fatigue Initiative, is a research funding organization funded through the philanthropy of Glenn Hutchins and the Hutchins Family Foundation.

ability to timely complete and publish work on her funded grants. Examples include: (a) Lipkin's refusal to allow an alternate postdoctoral fellow to be hired he removed Dr. Dorottya Nagy-Szakal from the SFARI autism grant (MH ¶¶100-101);[7] (b) delays in hiring or providing a data analyst to replace Hirotaka Miura on autism projects (MH ¶89); (c) Lipkin's refusal to allow Hornig access to a project coordinator for the NIH ME/CFS R56 study and the CFI Exercise Tolerance Test (TruCulture) Study (MH ¶90); (d) Lipkin's refusal to allow Hornig to use a technician for the NIH autism R56 study (MH ¶ 91 Muller ¶6 ); and (e) Lipkin's refusal to permit Meredith Eddy and other project coordinators on the CFI Main Study, CFI Extension Study, and CFI CSF studies to do all the work funded by and needed to complete the aims of these grants (MH ¶92 , Eddy Decl ¶11, 27)

In early 2018, Lipkin insisted Hornig sign an agreement that she would not use project coordinator Nina Deoras for more than 15% of her time or "effort", despite Ms. Deoras being funded for over 46% of her total time by several of Hornig's grants. He barred Hornig from communicating remotely with Deoras and demanded she be physically at Deoras's desk. Hornig's office at this time was not on CII's site. (MH ¶93) No other Project Coordinator was made available to do this necessary work. (MH ¶84)

On grants where they were co-PIs, Lipkin implored staff that they "work for him," and should ignore Hornig's requests. (MH ¶97) He required that all work and changes be pre-cleared with him. (HE Ex. 3 at 344-46)

---

[7]Lipkin also threatened to block and did not let Hornig hire post-docs for whom funding was available making the spurious claim of inadequate space. (HE Ex. 3 at 596)

11

In contrast, male CII faculty members Associate Professor Briese and Assistant Professor Brent Williams ("Williams") were provided additional staff to help them complete papers. (HE Ex. 3 at 220-21)  Briese does not bring in grant funding independent of Lipkin.  (HE Ex. 1 at 299) Although Dr. Williams brought in less grant funding than Hornig during at least 2015 through mid-2018, Lipkin provided him with staff of two postdocs, two doctorate level research assistants, and six masters level technicians, some of whom were actually funded by *Hornig's* grants.  (MH ¶98)

*WRONGFUL DIVERSION OF MONIES ALLOCATED FOR STAFF ON HORNIG'S GRANTS.*

Lipkin not only failed to allow Hornig to hire or access existing CII staff for her funded projects, he diverted monies from her grants to pay staff doing work unrelated to her projects.

Hornig first realized this when she saw that Lipkin had directed that Dr. Dorottya Nagy-Szakal, a postdoc, being paid from funds drawn on Hornig's Simons Foundation/SFARI autism grant. She had been hired to work with Lipkin on ME/CFS microbiome work and had been assigned by him to work with male CII faculty member Assistant Professor Dr. Nischay Mishra, then an Associate Research Scientist (a non-academic appointment).  Despite using Hornig's funding, Lipkin refused to allow Nagy-Szakal to do any work for Hornig.  (MH ¶102). This problem was addressed only after administrators prevailed upon Lipkin to correct it. (HE Ex. 1 at 189,191,194)

Lipkin also paid Briese and Bohyun Lee, a bioinformatician, from SFARI grant funds though they did no work on the research funded by those grants (MH ¶103).  Dorothy Muller

was wrongfully paid from Hornig's NIH autism R56 grant after she was assigned to another project (p.10, *supra*)

Lipkin did not divert and misuse grant money from grants on which other CII faculty PIs, all men. Lipkin did not refuse to fill grant funded staff lines on anyone else's grants. These actions impeded Hornig's productivity and ability to complete funded work,[8] harmed her reputation within the scientific community and damaged her career trajectory. They also caused repeated friction with CII staff, who were continually subjected to competing instructions regarding time they could spend on Hornig's projects. (Eddy ¶27, MH¶ 97)

<u>COLUMBIA'S RESPONSE TO HORNIG'S COMPLAINTS OF THESE VIOLATIONS.</u>

Columbia's administrators, along with Lipkin, justify Lipkin's actions by asserting that Lipkin, as head of CII, had the authority to ignore Hornig s rights as sole PI or MPI on each of her grants.[9] Columbia has provided Lipkin with unfettered authority to refuse to hire persons to do work funded by Hornig's grants; to divert Hornig's grant funds to pay persons not working on her grants; to deny Hornig access to financial data on her grants[10]; and to restrict Hornig's access to grant samples and data. (MH ¶ 82, 84, 112, 113, 115)

---

[8] While the various CII staff listed in the Susser affidavit worked on Hornig's projects, none of them worked for her full-time and in most cases, they devoted less time than authorized from her grants and was necessary to complete the funded work. (HE Ex. 3 at 355-57, MH ¶ 197).

[9] Lipkin also attempted to justify wrongful denial of Hornig's rights by claiming that she was only a "*titular*" PI and therefore not entitled to the rights of a PI under NIH rules. (HE. Ex. 1 at 406-407, 411.) The title "titular PI" is not recognized by the NIH; is nowhere in Columbia's internal documents or submissions to the NIH; and neither Dean Fried nor Dean Santella knew what the title meant. (HE Ex.6 at 162; HE Ex.5 at 53.)

[10] Although Hornig was a PI with Lipkin on the SFARI grant, Hornig was not permitted to see the financial data for the first year of this project (August 2015 – August 2106) until it was necessary for her to sign off on a progress report on August 1, 2016. (Eddy ¶10, MH¶ 76) Project

After an investigation commenced in response to Hornig's challenge to Lipkin's diversion of her grant funds, Columbia returned approximately one year of Dorothy Muller's salary which had been paid from Hornig grant funds for unrelated work. (MH¶ 78,110)  This investigation also revealed improprieties in misuse of funds from another grant on which Lipkin was sole PI, the NIH ABC-2 grant, resulting in a finding of over $824,536 being misspent and a commitment to return these funds to the NIH. (HE Ex. 1 at 479-80; HE Ex. 10 at 123)

However, the investigators into the (mis)use of grant funds from the Simons Foundation SFARI autism grant, did not even inquire of Hornig, despite her raising concerns and being a co-PI on that grant.  Columbia concluded that CII had not misspent any of Simons Foundation money on the SFARI autism grant. (MH¶ 111)

### UNFOUNDED CRITICISMS OF HORNIG'S WORK, EXPERTISE AND PRODUCTIVITY

When Hornig complained to HR about Lipkin's harassing conduct, her productivity exceeded that of many comparable male colleagues at CII. Indeed, in 2015, the year of her complaint, she published nine peer reviewed articles (MH¶ 3 **CV, papers listed in CV 59-67**)including two as sole first author (**62, 63**), one as corresponding author (**62**), one in which she contributed equally to the first listed author (**59**); one from the Norwegian Institute of Public Health Autism Birth Cohort study (**59**), and four that were independent of Lipkin (**60, 61, 64, 67**).  That year she also was awarded as co-PI (along with Lipkin) a significant National Institutes of Health/ National Institute of Allergy and Infectious Diseases ("NIH/NIAID") grant

---

coordinator Meredith Eddy protested to Lipkin that he could not forward the report with Hornig's name without her having seen and reviewed it.  (Eddy ¶11)

for Microbial Discovery and Immunity in ME/CFS. This research supported Columbia's later

successful grant in 2017 leading to the establishment of the Center for Solutions for ME/CFS to

research the pathogenesis of ME/CFS ("Center Grant").  In retaliation, Lipkin insisted he be sole

PI on this grant. MH¶ 122

　　While Hornig had not published some papers relating to older funded work (several of

which were grants on which she was not a PI), this was not uncommon at CII. In most cases,

Lipkin, as CII director, had previously agreed that these should be deferred or abandoned. These

papers were incomplete for a variety of reasons: e.g. lack of publishable findings; the need for

additional work for which there was no funding; or Lipkin's decision to prioritize some papers

over others. (MH¶ 123)

　　Lipkin regularly implored those within CII about the need to complete papers. (Anthony

¶6)  Like his concerns about Hornig's productivity, Lipkin expressed concerns about male CII

faculty members not getting papers done, including Associate Professor Thomas Briese, and

Assistant Professors Nischay Mishra, Brent Williams, Rafal Tokarz. (MH¶ 127) Allison Kanas,

former Director of Strategic Initiatives and Planning for CII, identified those individuals as

people from whom Lipkin wanted papers, saying "It is always a topic of discussion in any of our

meetings, you know, in any of our interactions as to when are the papers going to get out." (HE

Ex.11 at 34; Ex. 11 part 2 at 17)

　　It was only after Hornig's July, 2015 HR complaint that Lipkin raised spurious

"productivity" issues about Hornig to anyone within the Mailman administration. CITE At a

15

January, 2016 meeting with Santella, Lipkin and Hornig, Lipkin acknowledged that none of the papers he had been referring to needed to be completed. (MH ¶128)

Lipkin tried to enlist the support of others in his campaign against Hornig falsely telling Mailman deans, CII employees, external collaborators[11] and funders that Hornig had insufficient expertise in areas where she was conducting research; (Anthony¶13, MH ¶ 191) raising or orchestrating unfounded challenges to her scientific decisions;  diminishing Hornig's contributions to the science she and Lipkin had collaborated on and the independent science she has published on (HE Ex. 5 at 71-72.), and otherwise undermining her reputation and these relationships.[12]

 Hornig acknowledges that her productivity suffered in recent years, but, until contracting COVID last year, this was as a result of Lipkin's discriminatory and retaliatory decision to expel her from her office and lab, and his refusal to provide Hornig access to staff and data to which she was entitled and which she needed to complete her research and analyses.[13]

Lipkin enlisted Bresnahan and Susser, and eventually Mailman's deans, in his most egregious effort to harm Hornig's reputation and career trajectory. Baselessly attacking scientific

---

[11]    For example, Lipkin falsely told a Penn State collaborator (Stephen Schiff) that Hornig would not be able to perform assays on their joint project while falsely telling CII staff that the collaborator requested she not perform them (HE Ex.3 at 586-89)  This prevented Hornig from completing funded work and stigmatized her with CII staff. (MH ¶129)

[12]    Lipkin frequently and publicly worked to turn CII faculty against Hornig saying "Mady Hornig is trying to ruin this center," blaming her for all financial shortfalls. Anthony ¶8-11.
[13]  For example, Lipkin delayed giving Hornig access to the clinical data necessary for her to timely completion of work funded by the NIH ME/CFS Collaborative Center grant and failed to direct that steps be taken to correct thousands of errors in the data when they were eventually provided, resulting in continuing inability to analyze and publish these findings. (MH¶130)

decisions approved by the ABC Steering Committee as early as 2013-2014 for selection of case, control and comparator plasma samples for two ABC studies and failing to take responsibility for his own inappropriate decisions regarding selection of samples for different ABC studies, Lipkin tried to blame Hornig for his own errors. Defendants ironically, but correctly, summarized the entire basis for their criticisms: "we dispute what you state are facts." (Susser Decl., Ex. C ECF No. 73-3????)  See, MH.¶¶ 134-145, explaining the genesis of this issue and its timeline, refuting any claim that this was relevant to the decision to remove Hornig from CII.

The papers which defendants focus on to support their claim of inadequate productivity also relate to this dispute. Hornig concedes that she had not completed a new draft combining two papers summarizing the findings of the two ABC studies on their schedule. However, defendants fail to acknowledge the many drafts and edits Hornig made to those papers and the reason why she had not been able to provide a final draft: Hornig contracted COVID-19 in early April 2020 and has struggled with "Long COVID" thereafter.  (MH ¶145)

*Exclusion From Meaningful Publication Opportunities*

A scientist's professional reputation is built on publication of papers reporting their research findings.  Placement order of a scientist's name on papers matters. "First authorship" goes to the person who has written the first draft of the paper and has done the majority of the work on the project, either conceiving of the project, doing the work at the lab bench or for biostatistical or bioinformatics analyses, and/or contributed key interpretations of the data. On some occasions, there will be a "contributed equally" credit to the author in the second position, reflecting that their contributions have been equivalent.  Other middle authors have various roles by agreement. The last author listed is considered the senior author, often head of the lab, who is by default considered to have supervised or otherwise contributed meaningfully to the work. Any

17

author may be listed as corresponding authors or co-corresponding author, although it is most common for the 1st or senior authors to have this role. A corresponding author is expected to be able to communicate accurately and meaningfully about all aspects of the manuscript with the journal editor and its reviewers. Each of these positions has reputational implications, with first authorship and/or second position shared equally, corresponding authorship and senior authorship (or shared credits for these other roles) being important markers of a scientist's scientific contributions. (MH ¶146-148)

Lipkin denied Hornig appropriate placement of her name on papers, while consistently allowing male researchers to receive their due credit. (MH ¶149)  For example:

*PLACEMENT ON AN ABC PRENATAL FEVER PAPER.*

By agreement among the other authors, Hornig had been sole first and corresponding author on drafts. Lipkin tried to make himself a corresponding author, twice screaming at Hornig to "*GO CALL YOUR LAWYER!*" and stating, "I won't allow this paper to be submitted" unless he held the corresponding author position.  (MH ¶150)   (HE Ex. 7 at 158-161)  Susser rejected Lipkin's retaliatory demand and supported Hornig's first and sole corresponding author position. (MH ¶150)  Santella told Hornig that Lipkin's demand was "ridiculous." (HE Ex. 6 at 186)

*PLACEMENT ON THE ABC HERPES/TORCH PAPER.*

Lipkin reneged on a prior agreement and removed Hornig's name as co-senior author with him on the ABC herpes/ToRCH paper version approved for submission.   Restoring her appropriate credit required approval of eighteen co-authors and created unnecessary tension between Hornig and her fellow authors.  (MH ¶151)

_DENIAL OF THE RIGHT TO BUILD ON PRIOR RESEARCH_

Principal Investigators are entitled to utilize data and samples from their grants for future work (HE Ex.1 at 434-35); to see data generated by others from research based on their data or samples (HE Ex.1 at 432-34); and to continue working on the aims of a project after funding expired and samples were returned or stored. (HE Ex.1 at 331-32) Project teams typically review data with, and solicit input from, the entire team prior to drafting the manuscript. (HE Ex.1 at 432-434) Lipkin repeatedly denied Hornig these rights, even for grants for which Hornig had been approved by Columbia to be the sole PI. He repeatedly interfered with Hornig's right to access data and samples generated from her grants; to participate in discussions around publication of papers using these data and samples[14]; and denied or impeded her opportunities to conduct future research based on her data and samples. (MH ¶152)

Hornig and Lipkin were both PIs together on the NIH ME/CFS R56 lead-in grant that gathered samples and data that were the basis for and included in the subsequent successful application for the Center Grant. This did not relinquish Hornig's rights with respect to those samples and data. (MH ¶153)   Hornig was also a PI on the Microbe Discovery Project crowdfunding study that provided additional data for the grant. (HE Ex. 1 at 108) Nonetheless, Lipkin refused to include Hornig as PI on the Center Grant despite her close historical collaboration in this area of research, her co-writing of the grant proposal, her collection and interpretation of the data, and her right to use the data generated on grants where she was a PI. (HE Ex. 3 at 348, 555-56) Contrary to defendants' argument (Defs. Mem. at 25 n.17), Hornig's

---

[14] For example, Lipkin prevented Hornig from attending meetings on grants and papers that built on her research or used her data or samples, including meetings concerning the CFI Main Study and CFI Extension, the NIH ME/CFS R56, and the Stanford/Montoya grant.  (MH ¶193)

prior work was an ample and appropriate basis for her involvement in the Center Grant application and future research.[15]

Although Hornig was a PI on the CFI Main and CFI Extension studies from 2011, Lipkin continued to refuse her access to the samples from these studies (HE Ex. 3 at 558-63) and completed analyses and drafting of papers on some CFI Extension study projects prior to giving Hornig access to the data. (HE Ex. 1 at 435-36) In April 2017, Lipkin blocked Hornig's application for a Dean's Initiative Award proposal to generate data for her NIH R01 grant proposal, stating that she did not have a right to propose use of residual CFI Main Study samples, even though the work was in keeping with the scope of CFI grants on which Hornig was a PI, did not involve any laboratory work at CII, and, if funded, would have only proceeded with CFI's permission. (HE Ex. 3 at 689-91)

BARRIERS TO SUBMISSION OF GRANT APPLICATIONS

On January 20, 2016, Lipkin said that, because of Hornig's complaint to HR, he was no longer willing to work with her, would no longer serve as co-PI with her on any future grant applications, and intended to compete with her "head to head" for future grants (MH ¶ 154).

Lipkin reiterated these positions in March 2016 stating, because Hornig had retained counsel, he intended to submit competing applications for autism and ME/CFS grants (with the help of CII staff) but would not allow Hornig to use any CII staff to help her prepare planned grant applications despite her status as a CII faculty member. (HE Ex. 3 at 582-84 and 593-95; MH.¶162 ) After Hornig complained, Lipkin permitted staff to help her, but demanded that help,

---

[15] Lipkin also committed samples and data from grants where Hornig was sole or co-PI to the Center grant project without consulting with her and then blocked her from having input into the studies or access to their results. He also wrongly attempted to list himself as a co-PI on projects where Hornig had been sole PI in his biographical submission.   (MH ¶¶ 42, 115, 166)

if any, was subject to his advance approval. This oversight was not imposed on any male CII

Assistant or Associate Professor faculty at CII and was condoned by Columbia.(MH ¶34,155-56)

Lipkin also prohibited Hornig from applying for several speci6fic grants where she would be

either a subcontract PI, PI on a MPI grant, or a co-investigator, including an application for an

NIH grant by Nursing and Neurology where Hornig would be a co-investigator which would not

have required use of any CII laboratory resources; (HE Ex. 1 at 330-31); a proposal for a Dean's

Initiative Award which did not require use of CII lab resources; a proposal to the NIH for a

MIND study grant; an NIH grant proposal with the Jill Goldstein group at Harvard where Hornig

would be a sub-contract PI; (MH ¶158) and a grant proposal by Christina Hoven in the

Department of Psychiatry which did not require use of CII lab resources. (MH ¶14)

Lipkin refused to allow Hornig to name existing staff with expertise on new grant

applications or include funding for collaboration with other CII faculty on applications, even

when others had agreed to work on the grant, "until the legal issues are resolved." (MH ¶162)

No male CII faculty member was precluded from applying for grants which did not

require the commitment of any CII laboratory resources or preclusion from listing the anticipated

contribution of CII staff or faculty on their grants.  (MH ¶163)

*DISCRIMINATORY DIMINUTION OF HORNIG'S ROLE ON GRANTS*

Following Hornig's July 2015 complaints Lipkin repeatedly changed Hornig's role on

grants and limited her access to collaborators.  Examples include:

*THE CHRONIC FATIGUE INITIATIVE (CFI) STUDIES*

CFI supported key ME/CFS projects led by Hornig and Lipkin since 2011. Columbia

approved Hornig as sole PI (and thereby contact PI) when the CFI "Main Study," CFI Extension

(Microbiome and Immunity) Study, and the CFI/Evans Foundation and Simmaron Cerebrospinal

21

Fluid (CSF) Studies were submitted. (HE Ex. 3 at 384, 429-30) Lipkin believed Hornig to be

competent to be the PI on these studies. (HE Ex. 1 at 52-53) However, when funds arrived,

Lipkin had his staff add him internally as a PI, unilaterally turning the grant into a MPI grant

structure. (HE Ex. 3 at 373-74, 528) [16] No male CII faculty had been listed as a sole PI on a

grant application, to later have Lipkin unilaterally add himself as a multiple PI. (HE Ex. 3 at

374.)

*ME/CFS GRANTS PROPOSED TO CFI FOR FUNDING.*

On July 8, 2015, one day before the Butt Incident, proposals were submitted to CFI that

named Hornig as a PI with Lipkin on a proposed Exercise Tolerance Test and Microbiome

TruCulture Study in ME/CFS, and named her as Project Lead for an epigenetics ME/CFS study

(MH ¶¶164-167)  Hornig wrote both grant proposals with Lipkin. After these proposals were

approved by CFI with this grant leadership structure, Lipkin changed all forms to list himself as

sole PI when he submitted the grants to Columbia's Sponsored Projects Administration. He

completely removed Hornig from both grant proposals. For the CFI TruCulture Study, Lipkin

additionally deleted all traces of the original Human Subjects Internal Review Board protocols

that listed Hornig's name;  Hornig was only restored to the project as a co-investigator after

intervention by her counsel.  (MH ¶168)

*ME/CFS R56.*

_____

[16] For Lipkin to have officially been given MPI status, both Hornig, as PI and Columbia's
Sponsored Projects Administration would have had to be involved. (HE Ex. 9 at 198, 201)

Lipkin wrongly attempted to take sole public credit for a newly-funded NIH ME/CFS project on which he and Hornig were PIs in a November 2016 article on the award in *Science*. At Hornig's request, Mailman Communications Officer Tim Paul reached out to the author asking for a correction, explaining that Hornig was a co-PI and stating, "Mady Hornig is one of the world's leading ME/CFS researchers, and was lead author on research published last year on immune system markers and ME/CFS." Hornig was later told that Lipkin was angry with Mr. Paul for seeking the correction. (MH¶170)

*THE ABC GRANT.*

In August 2016, Kanas told Hornig that Lipkin barred her from meeting with members of the Norwegian ABC team who had collaborated on her project because she "causes conflict." In response to Hornig's expressed concerns, Dean Santella characterized this exclusion as a, "misunderstanding." (MH ¶171)

*DEMEANING DISRESPECTFUL TREATMENT*

Lipkin repeatedly diminished and demeaned Hornig. He convinced Fried that rather than crediting Hornig with her own work, he had actually written "a good part" of her grants and papers -- even where she was sole PI on a project -- (HE Ex. 5 at 71-72) He spoke to her in a nasty and patronizing way and was disrespectful to Hornig. (Eddy ¶4; Anthony ¶4, 5, 7; HE Ex. 2 at 91.) He showed no interest in her professional opinions. Muller ¶8) (Eddy ¶5 He regularly screamed at her in meetings and told her to "shut up."[17] (HE Ex. 1 at 470-73; MH ¶183) He was

---

[17] In a meeting where Hornig attempted to describe progress on work for the ME/CFS Center grant which Lipkin had earlier approved, Lipkin screamed at Hornig, that "You are not working

disrespectful to her (Eddy ¶14) Lipkin repeatedly spoke ill of her to colleagues and to members

of CII. (Anthony ¶4 Eddy  ¶26, Muller ¶8,9)   Lipkin did not treat any men at CII in this manner.

(MH¶173 )


*COLUMBIA'S INADEQUATE RESPONSE TO HORNIG'S COMPLAINTS.*

Hornig repeatedly detailed Lipkin's misconduct to Mailman HR and/or Fried and/or

Santella and affirmatively chose to work with them rather than file a formal complaint with

Columbia's Office of Equal Opportunity based on her belief that they would be better able to

address Lipkin's discriminatory and retaliatory behavior. [18]

In a very few instances, they succeeded in getting Lipkin to reverse his discriminatory

and retaliatory positions.  But, Columbia mostly ignored Hornig's complaints or affirmatively

refused to intervene. Furthermore, Columbia never even made Hornig aware of several of the

shifting reasons that they now cite as justification for Hornig's removal from CII.

While Santella cited a complaint by Nina Deoras (**Santella Decl., ¶14**) in March 2018

(Defs. Mem. at 19), neither she nor anyone else ever made Hornig aware of this complaint.

Santella also failed to contact Hornig to inquire about her response to Ellie Kahn's complaint and

---

on Project 3 [a portion of the grant]. You are only working on cytokines."  Hornig protested to
Fried, whose responded only by acknowledging receipt of Hornig's complaint.(MH ¶184)

[18] Hornig also chose to continue working with Santella and Fried because the relief contemplated
in the EEO grievance procedures focus on discipline of the person accused, rather than
addressing the harms to the victim (in Hornig's case, addressing the harms to her productivity
and professional advancement and reputation); these procedures did not permit participation by
an attorney; Hornig preferred to keep the matter within Mailman; and Hornig believed that Dean
Santella, with the backing of Dean Fried, would be better able to get Lipkin to stop his
discriminatory and retaliatory behavior, but the EEO grievance procedures stated that those
procedures were "exclusive." (MH ¶22)

24

she not do anything in response (HE Ex. 6 at 94-95), She never spoke with Hornig or do anything about other allegations she may have heard about. (HE Ex. 6 at 115-16)  With respect to Kanas's complaint made to Human Resources by Kanas, there is no indication there was ever any written response, nor does HR representative Bowman remember what she did in response to this complaint. (In fact, Bowman had no official records of her interviews or interactions regarding Hornig (HE Ex. 4 at 194) or even any notes about a workshop she conducted with CII staff to address the "tensions in the workplace...a lack of professionalism and respect." The conclusions of the workshop as reported to Fried was that despite tensions at CII between Hornig and Lipkin, CII personnel were able to work effectively and with enthusiasm, and did not feel they were targeted by the conflict. (HE Ex. 5 at 116-17; HE Ex. 14)  In accord with Lipkin's active campaign against Hornig, the two deans and scientists to whom Hornig looked to for assistance pursued a remarkably non-scientific method to address Hornig's complaints.  Santella, tasked with responding to Hornig's discrimination claims, (HE Ex. 5 at 68), instead viewed her role as a mediator with regard to the issues between Lipkin and Hornig, but in fact made no genuine effort to mediate; she ignored many of Hornig's complaints and rarely asked Hornig for her responses and positions, repeatedly relying on Lipkin's assertions. (HE Ex. 6 at 110-11.) Fried relied on Santella, who accepted and reported Lipkin's assertions to her.  Fried also relied on vaguely described "chatter" she heard second-hand through her staff. (HE Ex. 5 at 79) When Columbia investigated Hornig's concerns about Lipkin's financial impropriety, they were substantiated.  However, when Columbia reported to the NIH on its investigation and offered to return significant sums of money, it inexplicably included a copy of Hornig's Complaint in this case.  Columbia sought to stigmatize Hornig and publicly diminish the import of Hornig's concerns of financial impropriety as well as her claims of unlawful discrimination and retaliation

25

by claiming this litigation "relates to a personal dispute" between Hornig and Lipkin. (HE Ex. 10 at 98, 105; HE Ex. 17)

### LIPKIN'S DISCRIMINATION AND RETALIATION AGAINST OTHER WOMEN AT CII

Dr. *Simon Anthony:*  On March 28, 2020, Dr. Simon Anthony filed an internal Columbia sex discrimination complaint to Columbia's Equal Opportunity Affirmative Action ("EOAA") office asserting that Lipkin had given a letter of non-renewal to staff associate Isamara Navarrete-Macias, allegedly for lack of funding, but in fact in retaliation for "inciting discussions around gender equity." (Anthony ¶34-35) Dr. Anthony later reported that Lipkin refused advice of CII faculty that Ms. Navarrete-Macias be assigned to funded laboratory work which she was the most qualified to perform. (Anthony ¶36)

*Dr. Angela Rasumssen:*  Dr. Rasmussen, a former associate research scientist, filed a complaint that Lipkin as Director of CII retaliated against her because she had said that there was evidence of discrimination against women technicians who received lower salaries than men. She was given a Letter of Nonrenewal and asserted claims of discrimination and retaliation that Lipkin had not gotten her for a faculty position. (HE Ex. 1 at 124-130)

*Ellen Kobak:*  Ellen Kobak, an administrative assistant at CII, complained to Bowman in 2017 about the CII "culture and climate."  She described Lipkin as "intimidating and humiliating," to her in that he had refused to speak with her for two weeks after she made a mistake setting up a call, he failed to acknowledge her in meetings, there was "shouting in the halls" and "people under stress," all of which affected her working and productivity. Bowman viewed her complaint as having "a lot to do with Ian's handling of his own stress under these

26

circumstances and how it manifests throughout the organization" and recommended a transfer. (HE Ex 4. at 163-169) Kobak ultimately left CII.

# ARGUMENT

## *SUMMARY JUDGMENT IS NOT AVAILABLE AS*
## *THERE ARE GENUINE MATERIAL QUESTIONS*
## *OF FACT IN DISPUTE*

### *SUMMARY JUDGMENT PRINCIPLES*

Where there are genuine issues as to material facts, summary judgment cannot be granted. An issue of fact is "genuine" if a reasonable jury could return a verdict for the nonmoving party. *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009). Ambiguities and factual inferences must be credited in favor of the party opposing summary judgment. *Davis-Garrett v. Urban Outfitters*, 921 F.3d 30, 38 (2d Cir. 2019). In a discrimination case, caution must be exercised before granting summary judgment as the merits turn on the employer's intent. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93,101 (2d Cir. 2010) (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). Plaintiff need not proffer remarks reflecting discriminatory animus because where an employer acts with discriminatory intent, "direct evidence of that intent will only rarely be available, so . . . affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gorzynski*, 596 F.3d at 101 (internal quotation marks and citation omitted).

The court must "review all of the evidence in the record." *Davis-Garrett*, 921 at 45 (quoting *Reeves v. Sanderson Plumbing Products. Inc.*, 530 U.S.133, 150 (2000). "'Credibility

27

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

facts are jury functions, not those of a judge.'" *Davis-Garrett*, 921 F.3d at 46 (quoting *Reeves*,

530 U.S. at 150).  The court "*must disregard all evidence favorable to the nonmoving party that*

*the jury is not required to believe.  . . .* the court should give credence to the evidence favoring

the nonmovant as well as that evidence supporting the moving party that is uncontradicted and

unimpeached, at least to the extent that that evidence comes from disinterested witnesses."

*Davis-Garett*, 921 F.3d at 46 (quoting *Reeves*, 530 U.S. at 151) Incidents that do not

independently constitute adverse employment actions may provide relevant background evidence

on motivation and bolster discrimination claims. *Vega v. Hempstead Union Free Sch.Dist.*, 801

F.3d. 72, 88 (2d Cir. 2015).

### SUMMARY OF ARGUMENT

After learning that HR was going to be made aware of the Butt Incident in July, 2015,

Lipkin, unrestrained and supported by Columbia, engaged in a campaign to "destroy" Hornig's

scientific career and reputation.  Lipkin's motivation was clear. He was obsessed with

demolishing Hornig. (HE Ex. 2 at 86-87) He directly tied his adverse actions against Hornig to

her legal claims seeking relief from defendants' discriminatory and retaliatory actions, screaming

"Go call your lawyer!" when Hornig protested his effort to deny her appropriate credit on a

scientific paper, announcing that he would go "head to head" with her on competing grant

applications in her two fields of expertise, and refusing to allow her to name existing CII staff or

faculty with expertise on grant applications "until the legal issues are resolved."  While Santella

and Fried acknowledged that many of Lipkin's actions were improper, unwarranted, and harmful

to Hornig, they not only chose to ignore most of her concerns, they also took affirmative steps to

support Lipkin's efforts to derail Hornig and her career. This provided license for Lipkin to further abuse his unfettered and unchecked authority. Lipkin's actions, and Columbia's participation in and accession to them, constitute unlawful sex discrimination and retaliation under Title VII as well as unlawful sex discrimination and retaliation under the NYCHRL.

The "ultimate issue" in an employment discrimination case under Title VII is whether plaintiff shows adverse employment decisions were motivated at least in part by impermissible discriminatory reasons – either (a) by direct evidence of intent to discriminate or retaliate or (b) by indirectly showing circumstances giving rise to an inference of discrimination or retaliation, either by (i) meeting the requirements of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), and showing the employer's stated reason for its action was pretext to cover up discrimination or retaliation, or (ii) otherwise creating a "mosaic" by identifying bits and pieces of evidence that together give rise to an inference of unlawful conduct. *Vega*, 801 F.3d. at 87.

Under the NYCHRL, sex discrimination is unlawful if the plaintiff can show that she was treated less well than other employees because of her sex. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013). Retaliation is unlawful if the retaliatory acts were reasonably likely to deter a person from engaging in protected activity. *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 71 (1st Dept. 2009).

Defendants' asserted reasons for their actions against Hornig are either untrue and/or pretextual. The facts presented by Hornig provide a jury with well more than a preponderance of the evidence to find that defendants engaged in unlawful discriminatory and retaliatory conduct.

29

*DEFENDANTS' ACTIONS THAT SUPPORT*
*THE CONCLUSION OF UNLAWFUL*
*SEX DISCRIMINATION AND RETALIATION*

1.)     Removal of Hornig's CII titles of Medical Director and Director of Translational Research

2.)     Refusal to allow Hornig to move to another school within Columbia where she would be free of Lipkin's control because of this litigation.

3.)     Expulsion of Hornig from CII, resulting in barriers to accessing needed samples, supplies and equipment, and bar on attending meetings and discussions of her own work at CII following the expulsion.

4.)     Lipkin's sexual harassment (the Butt incident, the earlier, similar buttocks incident, and Lipkin's comments about sex with a donor.

5.)     Lipkin's constant berating, vocal disrespect, and disparagement of Hornig.

6.)     Lipkin's unfounded criticisms of Hornig's work, expertise and productivity, including the public diminution of Hornig's contributions to the science she and Lipkin collaborated on and the independent science she has published on.

7.)     Lipkin's interference with Hornig's ability to complete funded grant work through refusal to allow her to hire or access staff funded by her grants, wrongful diversion of monies allocated for staff on her grants (and wrongful denial of access to the financial information which illuminated those diversions), and denial of access to data and samples generated through her grants, all in violation of NIH policies.

8.)     Lipkin's repeated efforts to deny Hornig appropriate authorship credit on publications.

9.)     Lipkin's unilateral and improper diminution of Hornig's role on grants.

10.)    Lipkin's imposition of impediments on Hornig's ability to build on her prior research, including the intentional destruction of irreplaceable human samples from her prior work.

11.)    Lipkin's imposition of barriers to Hornig's submission of grant applications and denial of access to data and samples generated through her grants and to meetings discussing grants that built on her research.

12.)    Lipkin's concerted efforts to poison Hornig's relationships with CII colleagues and staff by challenging her directives on projects she led and blaming her for financial hardship resulting from Columbia's need to return over $1 million dollars which Lipkin had misused.

30

13.) Lipkin's scheduling of meetings directly involving Hornig's scientific work at times when she was unable to attend, or purposely preventing her from learning about these meetings or, when she did attend these meetings, treating her with disrespect and derision.

14.) Lipkin's pattern of mysogeny and many complaints of sex discrimination at CII.

15.) Columbia's failure to legitimately investigate and remedy Hornig's complaints of discriminatory and retaliatory treatment about the foregoing;

## RETALIATION UNDER TITLE VII

"To establish a *prima facie* case of retaliation, [plaintiff] must show that (1) that she participated in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between her engaging in the protected activity and the adverse employment action." *Gorzynski*, 539 F.3d at 110. Meeting this minimal burden creates a "presumption of retaliation," which the defendant may rebut by "articulat[ing] a legitimate, non-retaliatory reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). Defendant's rebuttal shifts the burden to plaintiff to provide evidence sufficient for a rational factfinder to conclude the employer's explanation is a pretext for impermissible retaliation, *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001), and "that the desire to retaliate was the but-for cause of the challenged employment action," *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

An adverse employment action under the retaliation provisions of Title VII is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N.& Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); *Vega*, 801 F.2d at 90. "The significance of any given act of retaliation will often depend upon the particular

31

circumstances. Context matters. 'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'" *Burlington*, 548 U.S. at 69 (citation omitted) (actions like changes in schedule or refusal to invite an employee may well deter complaints).

A hostile work environment may also constitute an adverse employment action in the context of a retaliation claim. *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, No. 05 Civ. 5109 (JCF), 2007 U.S. Dist. LEXIS 28274, at *40 (S.D.N.Y. Apr. 18, 2007) (citing *Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006) (hostile work environment may be retaliation for complaints), *aff'd* 303 Fed. Appx. 943 (2008) (summary order). *See also Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 446-47 (2d Cir. 1999) (employee may suffer materially adverse change if employer fails to take appropriate remedial action following notice).

A jury could well conclude that the actions taken against Hornig would dissuade others from complaining, given visible evidence of Lipkin's unrelenting, continuous retaliatory campaign using the full force of his authority to "demolish" Hornig despite her complaints to HR, Mailman Deans, the EEOC and, eventually, the filing of this lawsuit.

Defendants' responses to Hornig's complaints about Lipkin's sex harassment, sex discrimination and the relentless retaliatory campaign would surely dissuade any employee from challenging and complaining about discriminatory mistreatment.

32

<u>SEX DISCRIMINATION UNDER TITLE VII</u>

Claims of sex discrimination under Title VII are analyzed using the burden-shifting

framework established in *McDonnell Douglas. Walsh v. New York City Hous. Auth.*, 828 F.3d

70, 74–75 (2d Cir. 2016).  The employee "must establish a *prima facie* case of sex

discrimination" by showing "(1) she was within the protected class; (2) she was qualified for the

position; (3) she was subject to an adverse employment action; and (4) the adverse action

occurred under circumstances giving rise to an inference of discrimination." *Id.* at 75.  This

burden is "minimal." *Kwan v. Andalex Grp.*, 737 F.3d 834, 844 (2d Cir. 2013).  The defendant

then must produce "'reasons for its actions which, *if believed by the trier of fact*, would support a

finding that unlawful discrimination was not the cause of the employment action." *Stern v.

Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997) (quoting *St.

Mary's Honor Center v. Hicks*, 509 U.S. 502, 507).  To defeat summary judgment, plaintiff must

then show circumstances sufficient to permit a finder of fact to infer that the defendant's

employment decision was more likely than not based in whole or in part on discrimination. *Id.*

Title VII extends to hostile environment claims where the "workplace is permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment." *Littlejohn

v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015)(citations and internal quotation marks

omitted).  The Second Circuit has "repeatedly cautioned against setting the bar too high" on

summary judgment. *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (test is

whether reasonable employee would find employment conditions "*altered for the worse*"

33

(emphasis in original); environment need not be unendurable or intolerable).  To establish a

prima facie case of hostile work environment, a plaintiff must show (1) discriminatory

harassment sufficiently severe or pervasive to alter employment conditions and create an abusive

working environment, (2) a specific basis for imputing objectionable conduct to the employer,

and (3) the hostile conduct occurred because of the plaintiff's protected characteristic.  *Tolbert v.

Smith*, 790 F.3d 427, 439 (2d Cir. 2015).  A plaintiff's protected characteristic need not be the

only motivating factor in the harassment.  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743

F.3d 11, 20, 23 (2d Cir. 2014).  Whether a work environment is sufficiently hostile to violate

Title VII is a question of fact, and interpretation of ambiguous conduct is a jury issue.  *Redd v.

N.Y. State Div. of Parole*, 678 F.3d 166, 178 (2d Cir. 2012).

   "An employer violates Title VII when the "workplace is permeated with discriminatory

intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions

of the victim's employment and create an abusive working environment ... so long as there is a

basis for imputing the conduct that created the hostile environment to the employer." *Kaytor v.

Elec. Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010) (emphasis omitted) (citation and internal

quotation marks omitted). To analyze whether plaintiff meets this burden, a district court must

consider "the totality of the circumstances, including: the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with the victim's [job] performance." *Rasmy

v. Marriott Int'l*, Inc., 952 F.3d 379, 387 (2d Cir. 2020) This test has both "objective and

subjective elements: the misconduct shown must be severe or pervasive enough to create an

34

objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Id.*

The examples comprising the above categories 1-15 factually demonstrate that defendants' actions were more likely than not motivated by discriminatory animus. *See, .e.g, Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1123, 1125-26 (9th Cir. 2000) (forcible relocation of lab disrupted ongoing research, denied access to facilities, delayed experiments, and caused loss of supplemental grants relied upon for salary more than qualified as adverse employment action); *Khanna v. MUFG Union Bank, N.A.*, 785 Fed. Appx. 15, 16 (2d Cir. 2019) (summary order) (less favorable treatment, fewer resources, and higher standard than male co-workers, and being spoken to in a patronizing manner are bits and pieces of mosaic of intentional discrimination); *Zakre v. Norddeutsche Landesbank Girozentrale*, 396 F. Supp. 2d 483, 508 (S.D.N.Y. 2005) (supervisor fostering exclusionary culture by excluding women from meetings, reacting negatively to assertive women, and ignoring them by preferring to speak to male employees evidenced biased attitude); *Bryson v. Chi. State Univ.*, 96 F.3d 912, 916-17 (7th Cir. 1996) (subtle indicia of job status and reward may take on importance far greater in context than would appear on the outside).

Dropping one's pants is not typical workplace conduct. The evidence details Lipkin's constant blatant and open hostility toward Hornig as well as its impact both on Hornig and on the work environment at CII. Lipkin's unlawful actions altered Hornig's working conditions making it significantly more difficult to work, publish, apply for grants and interact productively

and successfully with her colleagues.  A jury verdict finding that Lipkin created a sexually

harassing and retaliatory hostile work environment is wholly supportable.

COLUMBIA'S TITLE VII LIABILITY

Fried and Santella did not just accede to, but empowered Lipkin in his unrelenting

discriminatory and retaliatory campaign. They adopted Lipkin's unhinged assertion that Hornig

was not a good scientist and that he had written "a good part" of her grants and papers  -- even

where she was sole PI on a project. (HE Ex. 5 at 71-72.) They accepted Lipkin's responses to

many of Hornig's complaints without even inquiring of Hornig. Most significantly, they enabled

him to expel Hornig from CII and place significant barriers to her ability to conduct funded

science while at the same time refusing to allow her to transfer to a department outside of

Mailman and outside of Lipkin's control.  (HE Ex. 5 at 71-72, 108-112; HE Ex. 15.)

An institutional defendant is liable for discrimination of an employee endowed with

supervisory authority or institutional influence in recommending and thus influencing the

adverse action by a non-biased decision-maker.  *Doe v. Columbia Univ.*, 831 F.3d 46, 59 (2d Cir.

2016) (citing *Holcomb*, 521 F.3d at 143) (plaintiff entitled to succeed, even absent evidence of

illegitimate bias of ultimate decision maker, so long as biased person endowed with institutional

influence played meaningful role in process). An employee subjected to adverse employment

action by a supervisor without discriminatory motive may claim discrimination under the "cat's

paw" doctrine, where the supervisor has been manipulated by a person with discriminatory

motive whose actions proximately cause the adverse employment action.  See *Vasquez v.*

*Empress Amb. Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016).  Lipkin's complaints about Hornig

36

were unquestionably the proximate cause of Hornig's removal from CII, an adverse result that

Lipkin sought. See, *Menaker v. Hofstra Univ.*, 935 F.3d 20, 37-39 (2d Cir. 2019); *Milord-*

*Francois v. NYS Office of the Medicaid Inspector Gen.*, No. 19-cv-00179 (LJL), 2020 U.S. Dist.

LEXIS 174439, at *37-39 (S.D.N.Y. Sept. 23, 2020).  Proximate cause exists if the investigation

of a complaint "relies on facts provided by the biased supervisor." *Vesey v. Envoy Air, Inc.*, No.

20-1606, 2021 U.S. App. LEXIS 16109, at *8-9 (7th Cir. May 28, 2021) (citing *Staub v. Proctor*

*Hosp., Inc.,* 562 U.S. 411, 421 (2011).  Here, there is even the more basic question of whether

Hornig's complaints were ever investigated, given that Santella viewed her role as "mediator"

rather than as fact-finder.

Defendants cannot obfuscate Lipkin's misconduct by focusing on the prior romantic

relationship between Hornig and Lipkin that ended years earlier, after which they collaborated

successfully. (HE Ex. 1 at 351;(Muller ¶2.) He treated her differently from other employees. He

exposed his buttocks without warning or her willingness to perform an examination.  It was clear

that her position as Medical Director of CII, "did not mean she was supposed to be doing

medical care for people."(HE Ex. 1 at  99) While Columbia viewed Lipkin's action as sexual

harassment,  they now suggest this isn't even a question of fact, despite sending Lipkin to sexual

harassment training.(HE Ex. 5 at 63; He Ex. 6 at 61) The law cannot possibly suggest that once a

supervisor has engaged in a sexual relationship with an employee, even years earlier, he

subsequently has *carte blanche* to harass that employee with impunity, even though that behavior

would violate Title VII.  *Babcock v. Frank*, 729 F. Supp. 279, 287-88 (S.D.N.Y. 1990); *Perks v.*

*Town of Huntington*, 251 F. Supp. 2d 1143, 1156-57 (E.D.N.Y. 2003); *see also, Forrest v.*

*Brinker Int'l Payroll Co., LP*, 511 F.3d 225, 229-30 (1st Cir. 2007).  Simply, Lipkin's conduct

was sexual harassment.

<u>NYC HUMAN RIGHTS LAW STANDARDS PRECLUDE SUMMARY JUDGMENT</u>

      Claims under the NYCHRL must be analyzed "more liberally" than claims under Title

VII.  *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)  "(C)ourts must

analyze NYCHRL claims separately and independently from any federal and state law claims,"

so that "even if the challenged conduct is not actionable under federal and state law, federal

courts must consider separately whether it is actionable under the broader New York City

standards." *Mihalik,* 715 F.3d at 109 (citations omitted).  "[T]he challenged conduct need not

even be "'tangible" (like hiring or firing).'"*Id.* (quoting *Williams,* 61 A.D.3d at 79).  A plaintiff

need only prove "by a preponderance of the evidence that she has been treated less well than

other employees because of her gender [or other protected characteristic]."

      Summary judgment should normally be denied if triable issues of fact exist, *Williams,* 61

A.D.3d at 78, and is only appropriate if the record establishes as a matter of law that discrim-

ination played no role in the defendant's actions. *Mihalik*, 715 F.3d at 110 n.8; *Ya-Chen Chen v.*

*City of New York*, 805 F.3d 59, 76 (2d Cir. 2015).

      Under the NYCHRL, it is an "unlawful discriminatory practice for any person to aid,

abet, incite, compel or coerce the doing of any of the acts forbidden under [NYCHRL],"

including discrimination and retaliation.  NYCHRL § 8-107(6).  Individuals may be liable for

discrimination regardless of possessing any decision-making power; they need only participate in

the conduct giving rise to a discrimination claim.  *Green v. N.Y.C. Transit Authority*, No. 15-CV-8204 (ALC), 2020 U.S. Dist. LEXIS 172519, at *28-29, 31 (S.D.N.Y. Sept. 21, 2020).

*SEX DISCRIMINATION, SEXUAL HARASSMENT,*
 *AND HOSTILE WORK ENVIRONMENT UNDER THE NYCHRL*

"To establish a gender discrimination claim under the NYCHRL, the plaintiff need only demonstrate by a preponderance of the evidence that she has been treated less well than other employees because of her gender."  *Mihalik*, 715 F.3d at 110 (internal quotation marks and citations omitted).  The NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct, but focuses instead on being treated less well because of a prohibited motive. *Setty v. Fitness*, No. 17-CV-6504 (NGG) (SMG), 2018 U.S. Dist. LEXIS 213878, at *24 (E.D.N.Y. Dec. 18, 2018), *R.&R. adopted*, 2019 U.S. Dist. LEXIS 47236 (E.D.N.Y. March 21, 2019)*; Williams*, 61 A.D.3d at 84 n.30 ("[o]ne can easily imagine a single comment that objectifies women being made in circumstances where that comment would, for example, signal views about the role of women in the workplace and [can] be actionable").

There can be no question that the actions constituting discrimination under Title VII also violate NYCHRL as they resulted in Hornig being treated "less well than other male employees because of her gender," *See Williams*, 61 A.D.3d at 78.  The evidence here permits a jury to determine that Hornig was discriminated against under the NYCHRL.

*RETALIATION AND RETALIATORY HOSTILE ENVIRONMENT*

"NYCHRL's retaliation provision is broader than Title VII's."  *Ya-Chen Chen*, 805 F.3d 59 at 76.  "The retaliation or discrimination complained of under this subdvision need not result

39

in an ultimate action with respect to employment . . . or in a materially adverse change in the

terms and conditions of employment . . . provided, however, that the retaliatory or discriminatory

act or acts complained of must be reasonably likely to deter a person from engaging in protected

activity." NYCHRL §8-107(7); *Mihalik*, 715 F.3d at 112 (plaintiff must show employer conduct

reasonably likely to deter a person from engaging in protected activity); *Williams,* 61 A.D.3d at

71 (retaliation claims sustainable unless a jury could not reasonably conclude the challenged

conduct was "reasonably likely to deter a person from engaging in protected activity," an

assessment requiring "a keen sense of workplace realities" and recognition that "'chilling effect'

of particular conduct is context-dependent"). Surely, Hornig's factual recounting of defendants'

unlawful retaliatory actions will support a jury finding under the liberal standards of the

NYCHRL.

## *CONCLUSION*

This case presents an overwhelming number of disputed material questions of fact. In the

decision denying preliminary injunctive relief, this Court stated that the facts in dispute at that

time could tip the balance to deny summary judgment, despite their failing to meet the much

higher standard for granting preliminary injunctive relief. Because this case now poses even

more disputed facts which require jury resolution, this Court should deny defendants' motion for

summary judgment and grant such other relief as is just.

Dated: New York, New York
      June 28, 2021

Respectfully submitted,

EISENBERG & SCHNELL LLP

By: _____

Herbert Eisenberg
Julian R. Birnbaum
Christopher Pacelle
233 Broadway, Suite 2704
New York, New York 10279
(212) 966-8900

Rosalind Fink
LAW OFFICE OF ROSALIND FINK
1 Grace Court
Brooklyn, NY 11201
(917) 912-9907

41