UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MADY HORNIG,

Plaintiff,

– against –

TRUSTEES OF COLUMBIA UNIVERSITY IN
THE CITY OF NEW YORK and WALTER IAN
LIPKIN,

Defendants.

**OPINION AND ORDER**

17 Civ. 3602 (ER)

Ramos, D.J.:

  Mady Hornig, M.D., brings claims against Walter Ian Lipkin, M.D., and the Trustees of Columbia University in the City of New York ("Columbia," and together with Lipkin, "Defendants") for sex-based discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York City Human Rights Law ("NYCHRL").[1]  Doc. 3.  Lipkin and Columbia now move for summary judgment. Doc. 72.  For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

## I.   FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.  Hornig and Lipkin's Relationship and their Employment at Columbia

  In 2001, Lipkin was recruited from the University of California Irvine ("UC Irvine"), where he was a tenured professor, to Columbia.  Doc. 78 ¶ 11.  As a condition of his recruitment, Lipkin insisted that Columbia also hire two members of his laboratory at

---

[1] *See* 42 U.S.C. §§ 2000e, *et. seq.*, and N.Y.C. Admin. Code § 8-107, *et. seq.*, respectively.

[2] The Court assumes familiarity with the facts and holdings in its prior November 5, 2018, opinion denying Hornig's motion for a preliminary injunction.  Doc. 39.  The facts included here are drawn from the parties' Rule 56.1 statements, Docs. 78 (Def.'s 56.1), 87 (Pl.'s Resp. 56.1 and 56.1), and 97 (Def.'s Resp. 56.1), and other submissions on this motion, and are construed in favor of Hornig as the non-moving party.  *See Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017).  The facts are undisputed unless otherwise noted.

UC Irvine, Hornig and Dr. Thomas Briese.  *Id.* ¶ 16.  At that time, Hornig was an assistant adjunct professor at UC Irvine.  She had previously been an assistant professor at the University of Pennsylvania, and when she accepted the position at Columbia, she had competing offers for positions as a professor at both UC Irvine and the University of Pennsylvania.  Doc. 78 ¶ 16; Doc. 87 ¶ 16.

Since 2002, Hornig and Lipkin have served on the faculty of the Mailman School of Public Health ("Mailman") at Columbia.  Doc. 3 ¶¶ 14, 21.  At Mailman, they both worked at the Center for Infection and Immunity (the "Center").  *Id.* ¶¶ 15, 17.  The Center is an advanced molecular biology laboratory that develops, validates, and implements new technologies for discovery of bacteria, viruses, and fungi that cause disease; studies how they cause disease; and builds diagnostic tests.  Doc. 78 ¶ 6.  Lipkin is the director of the Center.  *Id.* ¶ 11.

Lipkin is an acclaimed scientist who has achieved many breakthroughs in the study of infectious diseases, including:  identifying AIDS-associated abnormalities, which he showed could be treated with plasmapheresis; demonstrating the effect on neurotransmitter function of viral infections; consulting with the Kingdom of Saudi Arabia on Middle East Respiratory Syndrome (MERS); developing a sensitive assay for SARS infection and assisting with efforts to control the 2003 outbreak of that disease; working closely with Chinese collaborators on COVID-19; and licensing tests and developing plasma therapy studies for diagnosis and treatment of COVID-19.  *Id.* ¶¶ 14–15.  He is a tenured professor of epidemiology at Mailman and a professor of neurology and pathology at the Vagelos College of Physicians and Surgeons, Columbia's medical school.  *Id.* ¶¶ 11, 24.  He is also the Dardof Professor for Research at the Wadworth Center at the New York State Department of Health.  *Id.* ¶ 11.

Hornig is a physician-scientist whose work focuses on the fields of autism, PANDAS (a severe, disabling form of childhood obsessive-compulsive disorder), ADHD and myalgic encephalomyelitis/chronic fatigue syndrome ("ME/CFS"), as well as on the

role of microbial, immune, and toxic factors in brain disorders.  Doc. 87 ¶ 178.  Hornig is

a non-tenure-track associate professor of epidemiology.  Doc. 78 ¶ 24.  In 2006, Hornig

was told at a performance review at Columbia that she needed to publish "at least 4–5

seminal papers in high impact journals" by 2009 in order to be on track for tenure.[3]  *Id.*

¶ 20.  At her request, Hornig was granted an exemption from teaching responsibilities so

she could focus on publishing.  *Id.*  By 2009, Hornig had not achieved the publishing

goals that had been set for her.  *Id.* ¶ 21.  In 2012, Columbia informed Hornig that she

was unlikely to receive tenure, and she asked to be removed from the tenure track.[4]  *Id.*

¶¶ 22–23.

From approximately 1998 until 2011, Hornig and Lipkin were also in a personal

relationship.  *Id.* ¶ 25.  They lived together for most of that time, along with Hornig's two

children from a prior marriage.  *Id.*  During the time they were together, Hornig and

Lipkin often hosted and attended social events related to their work at the Center,

including dinners with prospective donors and collaborators.  *Id.* ¶ 26.  Even while they

were together, Hornig and Lipkin sometimes had work conflicts.  Doc. 76-1 (Hornig

Dep.) at 10–12; Doc. 78 ¶ 29.  They broke up in approximately 2011.

At some time after their breakup, Dr. Michaeline Bresnahan, an assistant

professor of epidemiology who also worked at the Center, warned Hornig that Lipkin was

out to "demolish" her.[5]

---

[3] The parties dispute whether this review was a tenure review, as Lipkin and Columbia assert, or a four-year review, as Hornig asserts.  Doc. 78 ¶¶ 18, 20; Doc. 87 ¶¶ 18, 20.  Hornig also disputes Defendants' characterization of her publication record.

[4] Hornig disputes that the anticipated denial of tenure was based on her publication record and writes that she had 77 publications by 2012, including 12 in high profile journals.  Hornig was the first author or equivalent in 19 of those publications, and she had worked on 28 of them independently of Lipkin.  Doc. 87 ¶ 22.

[5] Hornig's complaint alleged that this conversation took place in August 2015, after she had reported the July 2015 incident, described below, and after a performance review meeting with Bresnahan and Ezra Susser, former chair of the epidemiology department and a collaborator on projects at the Center.  Doc. 3 ¶¶ 85–87.  At her deposition, Bresnahan testified that she did not remember whether she had this conversation with Hornig before or after the July 2015 incident, but that the general "topic" of the

### B. Hornig's Work at the Center

Hornig has published 147 peer-reviewed papers and edited three scientific books. Doc. 87 ¶ 179.  She is a first, corresponding, or senior author[6] on many papers making breakthroughs in the understanding of ME/CFS as a biological disorder, as well as on papers finding an increased risk of autism associated with second trimester prenatal fever, rather than with certain childhood vaccinations.  *Id.*

Hornig has worked on several studies at the Center and before, including the Autism Birth Cohort ("ABC") study, a study initiated in 2000 and conducted jointly between Columbia and the Norwegian Institute of Public Health, based on autism spectrum disorder cases identified from a large pregnancy cohort in Norway.  Doc. 78 ¶ 68.  Both Lipkin and Hornig had worked on the ABC Study since approximately the time they came to Columbia from UC Irvine.  *Id.* ¶ 69; Doc. 87 ¶ 69.  She was a principal investigator, along with Lipkin, on the Simons Foundation/SFARI autism study.  Doc. 78 ¶ 107.  Lipkin and Hornig both also worked on ME/CFS research funded by a private donor, Glenn Hutchins, under the auspices of the Chronic Fatigue Initiative ("CFI").  *Id.* ¶ 91.  Hutchins established the CFI and began funding its work in approximately 2009; in 2010, Lipkin recommended that Hornig be named as the principal investigator on that grant.  *Id.* ¶ 92; Doc. 77 (Lipkin Decl.) ¶¶ 31–32.  During the relevant time period, she

---

conversation was to counsel Hornig that she needed to be more productive.  Bresnahan recalled telling Hornig to "get your act together.  You're an employee.  You know, [Lipkin] can – you know, you miss all these deadlines, he can ruin you, and that's your career."  Bresnahan also stated that she made the "demolish" comment because "[T]his was part of the thing to try to get her to understand that she was playing in a different ballpark.  She wasn't the one who was sleeping with the guy.  She was an employee. She never understood that, and she had an inflated sense of her own value to the project."  Doc. 91-3 (Bresnahan Dep.) at 3.  Neither Hornig's 56.1 statement nor deposition includes her recollection of the timing of the "demolish" comment.

[6] The placement of a scientist's name on a paper indicates their role in the research and is important to their professional reputation.  "First authorship" goes to the person who has written the first draft of a paper and done the most work on the project, while the last author is the "senior author" who is considered to have supervised the work, often the head of the laboratory.  Middle authors have various roles by agreement and may be listed as "corresponding" or "co-corresponding" authors, meaning that they are able to communicate accurately and meaningfully about all aspects of the manuscript with journal editors and reviewers.  Doc. 87 ¶¶ 246–49.

was also a principal investigator on several other studies funded by the CFI, a ME/CFS grant funded by the National Institutes of Health ("NIH"), and the Microbe Discovery Project.  Doc. 87 ¶ 219.

Although Hornig was the principal investigator on the initial CFI grant, she was concerned that the CFI leadership treated Lipkin as the real head of the project.  Doc. 78 ¶ 93.  The CFI relied on Lipkin's advice to make scientific decisions.  *Id.* ¶ 97.  In March 2013, Hornig responded to an email from the CFI, in which she complained that her name had been left out of a report and she felt the omission was "disrespectful of [her] role in the project."  *Id.* ¶ 94.  In February 2014, the CFI asked Hornig about the status of certain papers that apparently were behind schedule; although she promised to submit drafts within a few weeks, she still had not completed them by October 2014.  *Id.* ¶ 98.  On October 21, 2014, Lipkin wrote to Hornig, "we must deliver two paper drafts to [Hutchins] on Monday. . . . Your career and the reputation of the [Center] are in jeopardy."  *Id.* ¶ 99.

### C.  2014 and 2015 Incidents

At some point in 2014, Lipkin called Hornig into his office late in the day and asked her to look at a lesion on his buttocks.[7]  Doc. 87 ¶ 190.  Hornig provided her opinion about what kind of lesion it was and then left, but she was "rattled" and thought the experience was "unpleasant[,] shocking . . . and degrading[.]"  Doc. 76-2 (Hornig Dep.) at 31–32.  She described the incident as inappropriate, but not sexual.  *Id.* at 32.

In the fall of 2014, Lipkin called Hornig into his office on another occasion.  They discussed a progress report on funds from a restricted donation made by a donor with whom Lipkin had had an affair.  Lipkin asked Hornig how the donor could break up with

---

[7] Hornig testified that, while she and Lipkin were living together, he had asked her to look at scars on his body and asked her advice on how to treat them.  Doc. 76-2 (Hornig Dep.) at 31.

him by email right after they had had great sex. [8]  Hornig told him that the conversation was making her uncomfortable and started to leave his office, at which point Lipkin yelled at her, "This conversation is over!"  Doc. 87 ¶ 191.

On approximately July 9, 2015, Lipkin asked Hornig to come to his office to "look at something."  Doc. 78 ¶ 33; Doc. 87 ¶ 33.  He locked the door to his office, dropped his pants, and asked her to examine a lesion on his buttocks and to opine as to what kind of lesion it was and whether he needed antibiotic or antiviral treatment for it.  Doc. 78 ¶ 33.  Hornig was "surprised and shocked" by Lipkin's behavior.  Doc. 87 ¶ 33.  While Hornig was in Lipkin's office with the door locked, his assistant, Ellie Kahn, tried to enter; Hornig felt "awful," and worried that Kahn might think there was something "unusual" and "sneaky" about her being in his locked office.  Doc. 91-4 (Hornig Dep.) at 10.  Lipkin testified that he wanted Hornig to examine the lesion because he did not have time to make an appointment with his personal physician before traveling the next day, and because he knew that she was an MD with experience in such lesions.  Doc. 76-7 (Lipkin Dep.) at 8; Doc. 78 ¶¶ 34–36.  Lipkin does not believe he did anything wrong or that his conduct constituted sexual harassment and does not believe an apology is warranted.  He stated "it was nothing [Hornig] hadn't seen before."  Doc. 87 ¶¶ 183–84.  Hornig believes that Lipkin asked her to examine his lesion because of her sex or gender.  Doc. 78 ¶ 37.  She testified that the encounter was not sexual, but she was "shocked" and "upset" that her boss was asking her to inspect his buttocks.  Doc. 76-2 (Hornig Dep.) at 33.

Hornig reported the incident to Columbia's Human Resources ("HR") department and spoke with HR representative Joanne Bowman.  Doc. 87 ¶ 190.  When she spoke to Bowman, she reported the 2014 incident of Lipkin exposing his buttocks as well.  *Id.*

---

[8] At his deposition, Lipkin denied saying anything of this nature to Hornig.  Doc. 96-2 (Lipkin Dep.) at 19.  However, Defendants' 56.1 response statement notes that Hornig's version of events is undisputed for the purposes of summary judgment.  Doc. 97 ¶ 191.

Lipkin also separately reported the July 2015 incident to Bowman.  *Id.* ¶ 182; Doc. 91-16. In response, Mailman Dean Linda Fried directed Lipkin to attend one-on-one training with a legal expert to review Columbia's prohibitions on sexual harassment and retaliation.  Doc. 78 ¶¶ 38, 39.  Hornig was asked if she wished to pursue an investigation through Columbia's Office of Equal Opportunity and Affirmative Action ("EOAA") but decided against it, preferring instead to work with Dean Fried and Vice Dean Regina Santella to address her concerns about Lipkin's conduct.  *Id.* ¶ 38; Doc. 3 ¶ 123.

In November 2015, the legal expert reported to Columbia that she had completed the training with Lipkin.  Doc 78 ¶ 42.  Her report stated that Lipkin had raised some concerns about Hornig's productivity and recommended that if there were to be any further discussions with Hornig "regarding her failure to complete research papers by the established deadline[,] . . . I would recommend that such follow up be done either by someone other than Dr. Lipkin, or that the follow up be done by Dr. Lipkin in conjunction with someone else."  *Id.*

### D.  Incidents of Alleged Discrimination and Retaliation

Hornig alleges that Lipkin undertook many harmful actions against her and her career, and that his harmful actions escalated after she reported the 2014 and 2015 incidents.  *See Hornig v. Trustees of Columbia Univ. in City of New York*, No. 17 Civ. 3602 (ER), 2018 WL 5800801, at *1 (S.D.N.Y. Nov. 5, 2018) (*"Hornig I"*).  In addition to her own deposition testimony and declaration, Hornig has submitted declarations by Dr. Simon Anthony, former assistant professor in the Department of Epidemiology, who worked at the Center with Lipkin and Hornig (Doc. 82); Dorothy Muller, a former technician at the Center from 2011 to approximately April 2018 (Doc. 83); and Meredith Eddy, a former project coordinator at the Center from December 2013 through January 2017

(Doc. 89), which detail some of these purportedly harmful actions.[9]  Because the instant motion may be resolved without reference to every allegedly adverse action, which are laid out in great detail in Hornig's memorandum of law, Doc. 81, the Court will refer only to the most salient.

### 1.  Removal of Medical Director Title

Three weeks after the July 9, 2015 incident, on July 29, Lipkin and Allison Kanas (at the time, Lipkin's chief of staff) called Hornig, and Lipkin apologized for his behavior and for making her uncomfortable.  Doc. 78 ¶ 153; Doc. 76-7 (Lipkin Dep.) at 9.  In the same conversation, Lipkin informed her that he was removing her from her role as the Center's Medical Director and she would no longer have that title.  Doc. 87 ¶ 192; Doc. 97 ¶ 153.  As Medical Director, Hornig had served as the Center liaison for public health emergency situations relating to biocontainment of the Center's laboratories; she did not see patients or have any clinical patient responsibilities.  Doc. 87 ¶¶ 154, 193.  While the Medical Director role was uncompensated and was not a formal title recognized by Columbia, Hornig lost access to Columbia's biosafety level 3 (BSL-3) laboratories as a result of losing the title, and she felt "embarrassed" before Columbia's environmental health group.  Id. ¶¶ 154, 194.  Lipkin maintains that he decided to remove Hornig's Medical Director title "because it might lead others to believe that they could ask her for medical advice for which she did not have malpractice insurance or university approval and that may make her uncomfortable."  Doc. 78 ¶ 155.  Hornig believes that he removed her title in retaliation.  Doc. 87 ¶ 155.  No one else at the Center was given the Medical

---

[9] Defendants challenge these declarations as merely conclusory and therefore inadmissible.  Doc. 97 ¶ 276.  The Court disagrees.  While some portions of the declarations indeed contain hearsay or are conclusory, in general each declaration describes the declarant's role at the Center and includes some personal observations about Lipkin's and Hornig's interactions at the Center.  "An affidavit or declaration submitted to oppose a motion for summary judgment 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'"  *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (quoting Fed. R. Civ. P. 56(c)(4)).  Accordingly, the Court will consider relevant and admissible portions of these declarations.

Director title; instead, Lipkin decided that University Occupational Health Services should take responsibility for addressing any incidents that might arise in the BSL-3 laboratories.  Doc. 78 ¶ 156.

> ### 2.  *Alleged Denials of Hornig's Rights as Principal Investigator (Access to Staff, Data, Donors, and Grant Applications)*

> *Infringement of Hornig's Role as Principal Investigator for the CFI Studies*

By April 2015, Hornig believed that the CFI leadership viewed her behavior as a problem and thought of her as having a "petty little ego."  Doc. 78 ¶ 101.  Although Hornig was listed as the principal investigator on grant paperwork, CFI leadership often contacted Lipkin for updates.  *Id.* ¶ 102.  On March 3, 2016, Harry Schroder of the CFI contacted Hornig to ask about the status of papers, writing, "You owe us a few papers. [ . . . ]  We would like to see meaningful progress on completing the tasks for which you were engaged and funded."  *Id.* ¶ 103.  In approximately 2016, in response to complaints from a clinician about the attribution of authorship, the CFI convened a meeting of clinicians to discuss how to fairly attribute authorship, and Lipkin facilitated the discussion; Hornig was not involved with the call.  *Id.* ¶¶ 104–06.

Although Hornig had initially been the principal investigator on the main study for the CFI, Lipkin later had his staff add him as a principal investigator on three CFI studies.  Doc. 87 ¶ 270.  Hornig co-wrote certain grant applications with Lipkin that they submitted to the CFI, but Lipkin then removed her name from those grants when they were submitted internally to Columbia's Sponsored Projects Administration.  *Id.* ¶ 273; Doc. 76-2 (Hornig Dep.) at 42.

> *Lack of Support from Fellows and Staff*

Hornig and Lipkin were co-principal investigators on the SFARI Autism grant,

and Lipkin was the contact principal investigator.[10]  Doc. 78 ¶ 107.  In approximately 2015,[11] Dr. Dorottya Nagy-Szakal was hired for a post-doctoral fellowship at the Center and was slotted for a position on the SFARI grant.  *Id.* ¶ 108.  Although Nagy-Szakal was paid out of the SFARI grant, Lipkin assigned her to work with him on a ME/CFS micro-biome project instead of supporting Hornig with the SFARI grant.[12]  *Id.* ¶ 109.

Although Nagy-Szakal did not work on the SFARI grant, her work did support some of Hornig's grants:  Hornig was a principal investigator on another grant associated with the ME/CFS project and a co-author on Nagy-Szakal's papers.  *Id.* ¶ 110.  Hornig worked with another post-doctoral fellow, Dr. Milada Mahic, on the SFARI grant, and served as a co-senior author on a paper with Mahic.  *Id.* ¶ 111.

From approximately 2013 until 2015, Briese and Dr. Brent Williams, another member of the Center, were provided additional staff and support from post-doctoral fellows to help them complete papers.  Doc. 87 ¶ 227; Doc. 91-4 (Hornig Dep.) at 3.  Briese received the additional support even though he did not bring in grant funding independent of his work with Lipkin.  Doc. 87 ¶ 227.

Hornig also claims that Lipkin limited her ability to ask project coordinator Nina Deoras for support with her grants, which Defendants dispute.  Doc. 87 ¶ 223; Doc. 97 ¶ 223.

---

[10] Hornig disputes the co-principal investigator title, arguing that the NIH does not use it even for grants with multiple principle investigators, instead using the term "PI" for all principal investigators.  Doc. 87 ¶ 107.  Pursuant to Columbia and NIH policy, on grants with multiple principal investigators, one investigator is designated the "contact principal investigator."  Doc. 78 ¶ 125.  The NIH webpage on grants and funding explains that the contact principal investigator is responsible for communications between the NIH and the rest of the research team, and that this title does not imply any particular role on the leadership team.  Other members may assume the role at the request of the grantee institution.  *See* https://grants.nih.gov/grants/multi_pi/overview.htm#features (last accessed February 17, 2022).

[11] Doc. 76-28 at 16.

[12] Hornig asserts that, while Dr. Nagy-Szakal was paid from the SFARI grant, she was actually hired to work with Lipkin on the ME/CFS grant from the outset.  Defendants argue that Hornig has not supported this assertion and that Dr. Nagy-Szakal was originally hired to work on the SFARI autism project, but Lipkin reassigned her based on her research interests.  Doc. 78 ¶¶ 108–09; Doc. 87 ¶¶ 108–09; Doc. 97 ¶ 109.

*Denial of Support with Grant Applications*

On January 20, 2016, at a meeting with Hornig and Vice Dean Santella, Lipkin stated that he was no longer willing to work with her, would no longer serve with her on any future grant applications, and intended to compete with her "head to head" for future grants.  Doc. 87 ¶ 262; Doc. 86 (Hornig Decl.) ¶ 154.  Hornig claims that in March 2016, Lipkin told her that he intended to submit competing applications for autism and ME/CFS grants.  Moreover, he would have the assistance of Center staff, but he would not allow Hornig to have help from other Center staff in preparing her planned grant applications "until the legal issues are resolved."[13]  Doc. 87 ¶ 263.  After Hornig complained, Lipkin permitted Center staff to assist her with grant applications but required any help to be subject to his advance approval.  *Id.* ¶ 264.  Hornig claims such oversight was not imposed on any comparable male faculty at the Center.  *Id.* ¶ 265; Doc. 86 (Hornig Decl.) ¶ 156.  Hornig also claims that Lipkin prohibited her from applying for several specific grants where she would be either a principal investigator or a co-investigator.[14]  Doc. 87 ¶ 265.  She testified that in approximately 2017 or 2018, he prevented

---

[13] Defendants dispute whether Hornig has provided admissible evidence to support this assertion.  Lipkin's deposition testimony supports that he refused to work with Hornig on any future grants, but not that he refused her the support of Center staff.  Doc. 96-2 at 8.

[14] Defendants argue that Plaintiff has not submitted admissible evidence supporting her assertion that Lipkin prevented her from applying for specific grants, and that the citations in her 56.1 statement do not support her assertion.  Doc. 97 ¶ 265.  In support, Defendants cite Lipkin's deposition testimony that he knew Hornig and Dr. Christina Hoven, who worked in the psychiatry department, had applied for grant support together, but that he did not work with Hoven and had no involvement with those applications.  Doc. 96-1 (Lipkin Dep.) at 7.  However, Hornig's deposition testimony cited in her 56.1 statement, while not totally clear, does support that she was either discouraged from submitting certain grant applications, or told that the Center did not have the money to support certain projects:

> Q:  Have there been any circumstances in the period since 2013 in which you sought to apply for a grant from an external source, and Dr. Lipkin precluded you from doing so?
>
> A:  I asked for opportunities to apply for external funding with the mind study . . . and . . . I was told that that was not . . . the time to, you know, to do that, and it might be considered in the future.  I had discussed using—applying for application of the CFI samples for external sources and was discouraged from—from doing that.

her from using samples from the CFI for an internal grant proposal, but that otherwise there were no other grant proposals that she was unable to submit because of inadequate support from the Epidemiology Department, the Center, or Columbia's Sponsored Projects Administration.  Doc. 76-3 (Hornig Dep.) at 6.

*Access to Donors and Information*

According to Hornig's testimony, Lipkin blocked her from participating in meetings with potential donors and about donor relations.[15]  Doc. 87 ¶ 267; Doc. 94-1 (Hornig Dep.) at 5–6.  For example, at one point in approximately 2014, Lipkin took a meeting with a potential donor to the ME/CFS project at the Center alone.  Doc. 94-1 at 5.  She testified that this pattern became worse after the July 2015 incident.  *Id.*

Hornig claims that Lipkin denied her access to financial and other reporting information on multiple grants where she was one of many principal investigators.  Columbia's online reporting system provides full access to financial and budget information for the entire grant to the contact principal investigator, even if there are multiple principal investigators on a grant.  Doc. 78 ¶ 124.  The parties agree that Columbia's policy on distribution of grants funded by NIH is to follow NIH guidance, but they dispute whether Columbia's online reporting practices comport with those policies.  Doc. 78 ¶ 125; Doc. 87 ¶¶ 125, 211–16; Doc. 97 ¶¶ 211–16.  Hornig maintains that under NIH policy, all principal investigators have rights and responsibilities for financial and scientific integrity of the grant and have equal authority, and although one principal investigator may be

---

Q: Anything else?

A: There were opportunities to building collaborations . . . from external sources, but where I wouldn't be making the primary application, but I'd be joining a group.  So with a group at Harvard, Dr. Joel Goldstein.  I was told that there wasn't enough money to make it worthwhile. [. . .]   [And] a grant with Dr. Christina Hoven who's at the New York State Psychiatric Institute.

Doc. 91-5 (Hornig Dep.) at 12–13.

[15] Defendants argue that Hornig's cited deposition testimony does not support the statement in her 56.1 statement.  However, she did testify that she was excluded from communications about fundraising meetings.  Doc. 91-4 (Hornig Dep.) at 5–6.

designated as "contact PI," that does not give them additional responsibility; she further maintains that the NIH recommends the rotation of contact principal investigators. Doc. 87 ¶¶ 125–26, 212–16. Defendants dispute that Hornig has raised a triable issue of material fact and argue that she cites only her declaration and a NIH webpage that is not consistent with NIH policy on grant management. Doc. 97 ¶¶ 125–26, 211–16; Doc. 96-6.

While Hornig claims such restrictions were deliberate, Defendants claim that any limitations on information accessible to her were a function of Columbia's policies. Doc. 86 ¶¶ 76, 217; Doc. 97 ¶ 217.

Hornig has reported her complaints to Mailman HR, Dean Fried, and Vice Dean Santella from 2015, when she first reported Lipkin's conduct to HR, through at least 2018.

### 3. *Hornig's Reporting on Misuse of Funds*

In 2016, Hornig approached Columbia with allegations that certain grant funds had been misspent and allocated to lab technicians and personnel who were not in fact working on those grants. Doc. 78 ¶ 147. Columbia began an investigation into her allegations led by Naomi Schrag, Columbia's Vice President for Research, Compliance, Training, and Policy. As part of the investigation, several grants were reviewed and Hornig, Lipkin, and other Center staff were interviewed. *Id.* ¶¶ 148–49. The investigation concluded that, on the whole, costs for certain lab technicians' work and for one lab manager's work should not have been billed to one of the NIH grants, but that otherwise there was no substantive misuse of funds on the SFARI autism grants. *Id.* ¶ 150. Columbia reported its findings to the NIH and offered to return over $800,000. The Center subsequently developed a corrective plan for better administrative oversight of funds. *Id.* ¶ 151; Doc. 87 ¶ 235. Columbia's investigation "did not make any determination that Dr. Lipkin directed resources in any fashion away from or toward anyone." Doc. 78 ¶ 152.

Hornig claims that Lipkin blamed her for the additional oversight, for the need to return nearly one million dollars to the NIH, and for jeopardizing the Center's financial

stability, thereby straining her relationships with other staff at the Center.  Doc. 87 ¶ 150; Doc. 82 (Anthony Decl.) ¶¶ 8–9.[16]

### 4.  Hornig's Authorship on Papers

In scientific academia, authorship is based on guidelines developed by the relevant scientific journal, the International Journal Committee of Medical Editors authorship criteria, and any procedures that may have been established by the scientists working on a particular project.  Doc. 78 ¶ 127.

Hornig alleges that Lipkin denied the appropriate placement of her name on papers, while not similarly hampering male researchers.[17]  Doc. 87 ¶¶ 129–30.  In August 2011, Lipkin decided he would be a corresponding author on a certain paper, even though he had told Hornig approximately a week earlier that she should be the first and sole corresponding author on that paper.  Doc. 78 ¶ 133; Doc. 87 ¶ 133.  On a separate 2016 paper for the ABC study about the effects of prenatal fever, Hornig had been determined to be the sole first and corresponding author by agreement with the other scientists involved.  Doc. 87 ¶ 259.  In April 2016, Lipkin and Hornig argued about her authorship on the paper.  Lipkin sought to make himself a corresponding author, screaming at Horning to "Go call your lawyer!" and stating that he would not allow the paper to be submitted unless he were corresponding author.  *Id.* ¶ 260.  With the support of Bresnahan and Dr. Ezra Susser, professor of epidemiology, Hornig retained her position as first author.  *Id.*  According to Hornig, Lipkin later went back on an agreement that she would be a co-senior author with him on another paper for the ABC study about reactivity to herpes simplex virus and the risk of autism spectrum disorder.  *Id.* ¶ 261.  Ultimately, she was credited as co-senior author.  *See* Doc. 76-28 (Hornig C.V.) at 30, No. 69.

---

[16] The Court does not take Anthony's statements of what Lipkin said about Hornig to be submitted for the truth of the matter asserted, and therefore they are not hearsay.

[17] Defendants dispute Hornig's characterization and assert that Lipkin is a competitive person, and it is important to him that he be given appropriate credit for his work.  Doc. 78 ¶ 129.

Hornig claims that Lipkin did not place similar barriers in the way of male researchers, while Defendants argue that she has not identified any paper on which Lipkin selected a male colleague for a position she deserved. They also point to the example of Komal Jain, a female Center staff member, who was a senior author on a paper that Lipkin co-authored.  Doc. 78 ¶ 130.

   5.  *Destruction of Frozen Samples*

 In March 2018, the Center undertook a center-wide review of its hundreds of thousands of biological samples, which are stored on-site in freezers or off-site at a cold storage facility in the Bronx.  The goal of the review was to determine which samples needed to be kept, which could be discarded, and which could be returned to collaborators.  Project coordinator Tara Conniff was assigned to spearhead the review, and the project was discussed with all Center faculty.  Doc. 78 ¶¶ 135–38.

Conniff made lists of the samples belonging to the various principal investigators at the Center, then requested that each investigator review their list and identify which samples could be discarded.  *Id.* ¶¶ 140–42.  Conniff provided Hornig with a spreadsheet of her samples in July 2018, and Hornig authorized the Center to discard some of her samples.  *Id.* ¶¶ 144, 146.  Hornig maintains that the inventory of samples she was given was incomplete, and that she identified a number of specific missing samples and their freezer locations but was never given answers to her questions about those samples.  Doc. 87 ¶¶ 144–45.

In addition to the lists organized by researcher, Coniff created another list titled "Unsure Bronx Freezers" of samples whose principal investigator Conniff had not identified.  *Id.* ¶ 203.  Hornig maintains that Lipkin deliberately commanded the destruction of thousands of her irreplaceable human samples that were on the "Unsure Bronx Freezers" list without further review, and that he wrongly attributed many of her samples on the "unsure" list to Briese.  Doc. 87 ¶¶ 143, 204, 206–08.  Defendants assert

that Hornig has not identified specific samples that were improperly discarded, and that if any of her samples were discarded improperly, it was an unintentional mistake.

### 6.  Transfer from the Center

In the summer of 2016, Hornig began efforts to move to a different Columbia department, outside of Mailman.  Doc. 87 ¶ 195.  Hornig maintains that she received "expressions of interest" from the psychiatry and neurology departments at the Medical School.[18]  *Id.* ¶ 196.  However, Hornig ultimately did not transfer to another department and remained at the Center.

In June 2018, shortly after this case was filed and court-ordered mediation was unsuccessful, Hornig was unilaterally transferred out of the Center, and her office was relocated to a different part of the Mailman building.  Docs. 78 ¶ 80; 87 ¶ 198.  According to Defendants, Dean Fried and Vice Dean Santella came to this decision based on Hornig's delays in completing papers, professional conflict with other scientists working on the ABC Study, and her own stated desire to move out of the Center and no longer collaborate with Lipkin.  Doc. 78 ¶¶ 62–80.  Dean Fried testified that in her judgment, a transfer was the "best decision for the [Center], Dr. Hornig and [Mailman]" to enable plaintiff to "demonstrate her productivity and have the resources she needed and where neither she nor the [Center] were living in an acrimonious environment."  *Id.* ¶ 81.  Defendants maintain that although Hornig was no longer a member of the Center, she remained a member of the epidemiology department and kept the same salary.  *Id.* ¶ 82.  Hornig testified at her deposition that she had "no knowledge" of who made the decision to transfer her.  *Id.* ¶ 83.  However, Lipkin testified that he had spoken with Dean Fried and Vice Dean Santella about removing Hornig from the Center and sought Fried's approval for the move.  Doc. 87 ¶ 80; Doc. 91-2 (Lipkin Dep.) at 4–6.  Mailman

---

[18] Defendants dispute Hornig's assertion and argue that she has not adduced evidence supporting the assertion that either department had an interest in her becoming a member, and that the term "expression of interest" is unclear.  Doc. 97 ¶ 197.

administration added Hornig's removal from the Center to a list they maintained of "what we have done for Ian over the past years."[19]

Hornig claims that her new office space was inferior, that the movers who transported her office equipment left her office in disarray and broke her printer, that there was mold, mildew, and water damage in her new office, and that she did not have internet access for at least three weeks.  Doc. 87 ¶ 86.  She further maintains that her new office was farther away from the Center laboratory, that her access to Center-controlled spaces and labs was restricted, and that she no longer had direct access to Center staff, samples, and supplies. [20]   *Id.* ¶¶ 198–99.  As a result of the transfer, Hornig also lost her title as the Center's Director of Translational Research.  *Id.* ¶ 198.  Defendants assert that Columbia addressed Hornig's concerns about the conditions in her new office.  Doc. 78 ¶ 86.

### 7.  *Other Demeaning Treatment*

At various times, Lipkin interrupted Hornig in meetings, kicked her under the table, told her to "shut up," or "shut the fuck up," and yelled at her in public.  Doc. 82 (Anthony Decl.) ¶ 3; Doc. 91-4 (Hornig Dep.) at 4; Doc. 86 (Hornig Decl.) ¶ 172; Doc. 91-2 (Lipkin Dep.) at 13; Doc. 89 (Eddy Decl.) ¶¶ 18–19.  After mid-2015, he referred to her as "Dr. Hornig" in meetings, while he referred to other Center staff members by their first names.  Doc. 82 (Anthony Decl.) ¶ 3.  According to Anthony, Lipkin "ostracized and isolated" her.  *Id.*

---

[19] *See* Doc. 91-8 (Fried Dep.) at 9–12; Doc. 91-19.  Mailman Vice Dean of Finance and Administration Anthony Pramberger maintained a list, which he emailed to Dean Fried, that was a "long-standing list that we had created to keep track of the commitments that were made to Dr. Lipkin and whether or not they were met . . . [a]nd he added to that . . . the work we were doing to support the transfer of Dr. Hornig to – out of the [Center] and into a faculty office in the Department of Epidemiology."  Doc. 91-8 at 9.  The last item on the list was "Provided support re his conflict with Mady Hornig, and moved Hornig off of [Allan R. Rosenfield Building] 17."  Doc. 91-19 at 3.

[20] Defendants argue that Plaintiff has not adduced admissible evidence to support this assertion, as her 56.1 statement is based entirely on her declaration.

Hornig claims that she was more productive than several comparable male colleagues, and that Lipkin only began criticizing her productivity after she reported the 2014 and 2015 incidents. [21]  Doc. 87 ¶ 236.

In approximately August 2015, Hornig was not invited to a dinner with Lipkin and Dr. Daniel Peterson, a collaborator of theirs who was visiting New York for a meeting with a potential donor.  Doc. 78 ¶¶ 157–61.

In November 2015, Lipkin asked Kanas to sit in on a media interview that Hornig was giving in her office for an internal Mailman publication on tryptophan, an essential amino acid found in turkeys.  *Id.* ¶¶ 162–64.  Kanas sat in for part of the interview.  *Id.* ¶ 164.  Hornig's complaint characterized this as "babysitting."  Doc. 3 ¶ 91.

On March 17, 2016, members of the Center attended an awards dinner honoring Lipkin at the Chinese consulate.  Doc. 78 ¶ 165.  At the dinner, Hornig was not seated with the rest of the Center faculty but with administrative staff.  Doc. 76-3 (Hornig Dep.) at 74–75.  Hornig felt that she was "segregated" from the rest of the faculty and that her seating assignment was disrespectful.  *Id.*

In November 2016, *Science* magazine published an article about Hornig and Lipkin's NIH-funded work on ME/CFS that described Lipkin as "the" principal investigator rather than "a" principal investigator.  Doc. 78 ¶ 169.  Hornig testified that the magazine ultimately ran a correction.  Doc. 76-3 (Hornig Dep.) at 41.

Hornig asserts four causes of action on the basis of the foregoing[22]:  disparate treatment based on sex discrimination and retaliation in violation of Title VII by Columbia (Counts I and II); and disparate treatment based on sex discrimination and

---

[21] Defendants argue that Hornig has not adduced admissible evidence in support of this assertion and that she has not established either comparators or how to measure productivity.  Doc. 97 ¶ 236.

[22] In her opposing papers, Hornig notes that she withdraws her failure to promote claim in her complaint.  Doc. 81 at 2 n.2.  As discussed in more detail below, Hornig's complaint and the parties' submissions make clear that she also raises a hostile work environment claim.

retaliation in violation of NYCHRL by Columbia and Lipkin (Counts III and IV).  Doc. 3 ¶¶ 386–426.

### E.  Procedural History

On April 29, 2016, Hornig filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging gender discrimination and retaliation against Columbia.  Doc. 3 ¶ 6.  On December 21, 2016, the EEOC terminated its investigation of her charge and issued a right-to-sue notice.  Doc. 3-2.  The parties subsequently entered into a tolling agreement, effective as of March 13, 2017, in order to attempt to resolve their disputes without litigation.  The agreement provided that it would terminate five working days after either party provided written notice of cancellation to the other.  Doc. 3-3.  On May 8, 2017, Hornig gave notice of cancellation of that agreement.  Doc. 3-4.  On May 15, 2017, Hornig initiated this action.[23]  On August 17, 2018, following the move of her office from the Center, Hornig moved for a preliminary injunction, seeking an order compelling Columbia to provide her with laboratory space, staff, equipment, materials, and support as it had previously provided her; a commitment that Columbia would provide her the same resources in support of her grant applications as it had previously; and a prohibition on Lipkin interfering with her work.  The Court denied the motion on November 5, 2018.  Docs. 23, 39.

Defendants now move for summary judgment.  Doc. 72.

## II.   LEGAL STANDARD

### A.  General Summary Judgment Standard

Summary judgment is only appropriate where the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, [and] other materials" show "that there is no genuine

---

[23] Defendants' 56.1 statement states that Hornig filed the complaint on May 18, 2017.  Hornig's complaint, filed May 15, 2017, was bounced due to a filing error and re-filed on May 18.  Docs. 1, 3.

dispute as to any material fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a)–(c).  "An issue of fact is 'genuine' if the evidence is such that a
reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford
Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint
Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it
might affect the outcome of the litigation under the governing law.  *Id.* (citing
*Warshawsky*, 559 F.3d at 137).

The party moving for summary judgment is first responsible for demonstrating the
absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317,
323 (1986); *see also Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir.
2005).  If the moving party meets its burden, "the nonmoving party must come forward
with admissible evidence sufficient to raise a genuine issue of fact for trial in order to
avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504
(S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir.
2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in
the light most favorable to the non-moving party and must resolve all ambiguities and
draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156,
164 (2d Cir. 2011) (internal quotation marks and citation omitted).  However, a motion
for summary judgment cannot be defeated on the basis of conclusory assertions,
speculation, or unsupported alternative explanations of facts.  *Major League Baseball
Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008); *see also Senno*, 812 F.
Supp. 2d at 467 (citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).  The non-
moving party must do more than show that there is "some metaphysical doubt as to the
material facts."  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  To defeat
a motion for summary judgment, "the non-moving party must set forth significant,

probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citation omitted).

### B. Additional Standards for Employment Discrimination Cases

Courts are cautious in granting summary judgment in employment discrimination cases where the employer's intent is at issue. *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). However, "[s]ummary judgment is appropriate even in discrimination cases, for . . . the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to other areas of litigation." *Hongyan Lu v. Chase Inv. Servs. Corp.*, 412 F. App'x 413, 415 (2d Cir. 2011) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)). Indeed, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)). Furthermore, "[e]ven in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137. A "nonmoving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'" *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)).

"[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted). "Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the

Court may conclude that no material issue of fact exists and it may grant summary judg-ment to the employer." *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 493 (S.D.N.Y. 2010) (citing *Budde v. H & K Distrib. Co.*, 216 F.3d 1071 (2d Cir. 2000)).

## III.   DISCUSSION

Defendants move for summary judgment on each of Hornig's claims.  Hornig's pleadings and her submission in opposition do not distinguish between the incidents giv-ing rise to her hostile work environment, disparate treatment, and retaliation claims.  *See* Docs. 1, 81.  Rather, in her memorandum of law opposing Defendants' motion for sum-mary judgment, Hornig sets out a lengthy factual statement and argues that there are dis-puted issues of fact as to whether she was unlawfully targeted by Lipkin and Columbia because of her gender or in retaliation.  The Court will first consider her sex discrimina-tion claims and then her retaliation claims.

### A.  Sex Discrimination

Title VII encompasses both disparate treatment claims and hostile work environ-ment claims, including hostile work environment claims based on sexual harassment. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993); *see also Redd v. New York Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012).  While both kinds of claims constitute sex discrimination, "they are distinct causes of action governed by different analytical stand-ards," and "allegations sufficient to establish one claim . . . do not necessarily support an action based on another claim[.]"  *Desouza v. Off. of Child. & Fam. Servs.*, No. 18 Civ. 2463 (PKC) (SMG), 2019 WL 2477796, at *4 (E.D.N.Y. June 12, 2019).  Hornig alleges sex discrimination under two theories:  hostile work environment, including sexual har-assment, and disparate treatment.[24]  For the reasons below, the Court finds that triable

---

[24] While Counts I and III of Hornig's complaint are captioned "disparate treatment," Doc. 3 ¶¶ 386–95 and 407–18, she alleges throughout that Lipkin subjected her to a hostile work environment, *id.* ¶¶ 34, 76, 114, 192.  Both parties address Hornig's claims about Lipkin's 2014 and 2015 conduct as sexual harassment claims, and therefore the Court applies the relevant sexual harassment analysis.

issues of fact exist as to Hornig's hostile work environment claim, but that summary judgment is properly granted on her Title VII disparate treatment claims.

###### 1.  Legal Standard for Hostile Work Environment Claim

 "An employee seeking to bring a hostile work environment claim must demonstrate that:  (1) she is a member of a protected class; (2) she suffered unwelcome harassment; (3) she was harassed because of her membership in a protected class; and (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment." *Rogers v. Bank of New York Mellon*, No. 09 Civ. 8551 (HBP), 2016 WL 4362204, at *11 (S.D.N.Y. Aug. 15, 2016), *on reconsideration*, No. 09 Civ. 8551 (HBP), 2017 WL 4157376 (S.D.N.Y. Sept. 19, 2017) (quoting *Miller v. McHugh*, 814 F. Supp. 2d 299, 314 (S.D.N.Y. 2011) and collecting cases); *see also Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015).  Adverse employment actions are not required to sustain a hostile work environment claim.  *See Raniola v. Bratton,* 243 F.3d 610, 617 (2d Cir. 2001).  In addition, plaintiffs may bring sexual harassment claims based either on direct discrimination (*quid pro quo*), which is not at issue here, or based on a hostile environment due to sexual harassment.  *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011) (citation omitted).

"For sexual harassment to be actionable, it must be sufficiently severe or pervasive—both subjectively and objectively—to alter the conditions of [the victim's] employment and create an abusive working environment." *Redd*, 678 F.3d at 175 (2d Cir. 2012) (internal quotation marks and citations omitted); *see also Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 103 (2d Cir. 2020).  The plaintiff also "must establish that the hostile or abusive treatment was because of his or her sex." *Redd*, 678 F.3d at 175 (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998)).  "[T]he kinds of workplace conduct that may be actionable under Title VII . . . include '[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.'" *Id.* (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986)).

However, "the harassing conduct *need not be motivated by sexual desire*," so long as it was motivated by sex.  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010) (quoting *Raniola,* 243 F.3d at 617).  "Sexual harassment is gender discrimination, even under Title VII, when there is unwelcome sexual conduct."  *Garrigan v. Ruby Tuesday, Inc.*, No. 14 Civ. 155 (LGS), 2014 WL 2134613, at *5 (S.D.N.Y. May 22, 2014).  Finally, "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," *Harris,* 510 U.S. at 23, and "[t]he question of whether a work environment is sufficiently hostile to violate Title VII is one of fact," *Chin-McKenzie v. Continuum Health Partners*, 876 F. Supp. 2d 270, 283 (S.D.N.Y. 2012) (internal quotation marks and citation omitted); *see also Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 605 (2d Cir. 2006); *Feldesman v. Interstate Hotels LLC*, No. 16 Civ. 9352 (ER), 2019 WL 1437576, at *9 (S.D.N.Y. Mar. 31, 2019).

For purposes of the NYCHRL, which was "designed to be 'broader and more remedial' than Title VII," a plaintiff's "hostile work environment claim need not meet the Supreme Court's 'severe or pervasive' threshold to be actionable."  *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 671 (S.D.N.Y. 2012) (quoting *Williams v. New York City Housing Authority,* 872 N.Y.S.2d 27, 38 (N.Y. App. Div. 2009)).  Rather, "the relevant consideration [at summary judgment] is whether there is a triable issue of fact as to whether the plaintiff has been treated less well than other employees because of her gender."  *Id.* (internal quotation marks and citations omitted).

2.  *Analysis*

a.  Hostile Work Environment Claim

Hornig alleges sexual harassment based on three incidents:  Lipkin exposing his buttocks to her on two occasions and making comments to her about having had sex with

a donor.[25]  Doc. 78 ¶ 33, Doc. 87 ¶¶ 180, 190–91.  Defendants argue that Lipkin's con-

duct was not sexual in nature because he sought her medical opinion on the lesions on his

buttocks, and that after Hornig reported the incidents, Columbia promptly took remedial

steps by directing Lipkin to complete sexual harassment training.

Whether Lipkin's conduct towards Hornig in the 2014 and 2015 incidents rises to

the level of sexual harassment is an issue of fact.  Nothing in Lipkin's behavior was

explicitly sexual, as Hornig acknowledges, and he has proffered a non-sexual reason for

his conduct—that he wanted Hornig's clinical opinion on his lesions.  At the same time,

his action in exposing himself during the July 2015 incident was abrupt and

nonconsensual[26] and followed two other incidents that had left Hornig upset; in fact,

during their conversation in which he told her about having had sex with a donor, she told

him that she was uncomfortable.  Doc. 87 ¶ 191.  Viewing the record as a whole and in

"the social context in which particular behavior occur[ed] and [was] experienced by

[Hornig]," *Oncale*, 523 U.S. at 81, a reasonable jury could find that Lipkin's actions were

demeaning and humiliating on the basis of sex, even if they did not "involve[] explicit or

implicit proposals of sexual activity," *id.* at 80.  Moreover, there is no dispute that Lipkin

did not similarly expose himself to male faculty at the Center.  Although the parties agree

that there were no other men at the Center with the same clinical training as Hornig

(besides Lipkin), his treatment of her provides "some evidentiary basis for inferring that

facially sex-neutral incidents were motivated by [Hornig's] gender."  *Kaytor*, 609 F.3d at

---

[25] As noted above, Hornig's complaint alleges generally that Lipkin subjected her to a hostile work environment.  Doc. 3 ¶¶ 34, 76, 114, 192.  Although she did not specifically allege sexual harassment in her complaint, the parties' briefing and submissions in connection with the instant motion make clear that her claim stemming from the 2014 and July 2015 incidents is for sexual harassment.

[26] According to contemporaneous notes taken by Bowman about the July 2015 incident, Lipkin told Bowman that Hornig agreed to examine him.  Doc. 91-16 at 2.  Hornig's testimony and declaration indicate that he did not ask her consent before displaying his lesions.  Construing the ambiguity in Hornig's favor, the Court assumes for purposes of this motion that the July 2015 incident was nonconsensual.  Hornig's deposition testimony about the 2014 buttocks incident indicates that Lipkin asked her to examine his lesion, and she "quickly gave him [her] impression" but was "rattled" by the request.  Doc. 76-2 (Hornig Dep.) at 31–32.

548; *see also Bonterre v. City of New York*, No. 18 Civ. 745 (ER), 2021 WL 4060358, at *5 (S.D.N.Y. Sept. 7, 2021) (finding that "unwanted contact with an intimate body part could certainly raise an inference of being motivated by gender"); *Swiderski v. Urban Outfitters, Inc.*, No. 14 Civ. 6307 (JPO), 2017 WL 6502221, at *5–6 (S.D.N.Y. Dec. 18, 2017); *Redd*, 678 F.3d at 179 ("when the physical contact surpasses what (if it were consensual) might be expected between friendly coworkers . . . it becomes increasingly difficult to write the conduct off as a pedestrian annoyance." (internal quotation marks and citations omitted)).  Moreover, Hornig subjectively experienced these incidents as shocking and degrading.

Lipkin's behavior must be considered in light of Hornig and Lipkin's prior long-standing personal relationship—as Lipkin gracelessly stated, it was "nothing she hadn't seen before."  Doc. 87 ¶ 183.  That Lipkin and Hornig had a prior relationship for several years is surely relevant to whether his actions constituted sexual harassment.  Whether "unwanted sexual conduct occur[ing] after the termination of a consensual relationship . . . is gender-based under Title VII," is an open question in this Circuit.  *See Garrigan*, 2014 WL 2134613, at *5 n.1; *see also Duverny v. Hercules Med. P.C.*, No. 18 Civ. 07652 (DLC), 2020 WL 1033048, at *7 (S.D.N.Y. Mar. 3, 2020).  As the First Circuit has noted, the argument that a prior relationship obviates sex discrimination because harassing treatment is based on personal animus rather than discrimination overlooks the obvious: "Presumably the prior relationship would never have occurred if the victim were not a member of the sex preferred by the harasser, and thus the victim's sex is inextricably linked to the harasser's decision to harass."  *Forrest v. Brinker Int'l Payroll Co., LP*, 511 F.3d 225, 229 (1st Cir. 2007); *see also Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1741 (2020).

Without knowing Lipkin's motives, one plausible inference is that his conduct was not sexual harassment because their prior close relationship provided the context for him asking an intimate question about his body or medical needs.  Another plausible view

26

is that his conduct—he exposed himself twice, demanded that she look at his lesions, and openly discussed his sex life with a new partner—was *particularly* humiliating in light of the fact that they had once been involved in an intimate romantic relationship.  Thus, the Court cannot conclude as a matter of law that his behavior was not sexual harassment.  In addition, Lipkin's other demeaning actions, such as kicking Hornig under the table, telling her to shut up, yelling at her, singling her out in meetings by referring to her as "Dr. Hornig,"[27] and speaking to her "in a nasty and patronizing way,"[28] while not sufficient by themselves to support a hostile work environment claim, *see Beale v. Mount Vernon Police Dep't*, 895 F. Supp. 2d 576, 590 (S.D.N.Y. 2012), are relevant to the totality of the circumstances.  A reasonable jury could therefore find that Lipkin's conduct created a hostile work environment.

    b.   Columbia's Liability under Title VII

 "Although Title VII does not encompass individual liability, when, as here, the alleged harasser is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer under Title VII."  *Quintero v. Angels of the World, Inc.*, No. 19 Civ. 6126 (DG), 2021 WL 4464123, at *10 (E.D.N.Y. Sept. 10, 2021), *report and recommendation adopted sub nom. Quintero v. Stoupas*, No. 19 Civ. 6126 (DG) (RLM), 2021 WL 4463488 (E.D.N.Y. Sept. 29, 2021) (internal quotation marks and citation omitted); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 103 (2d Cir. 2010).  But, even where conduct is automatically imputed to the employer, "the defending employer may be permitted, subject to proof by a preponderance of the evidence, to raise the *Faragher/Ellerth* affirmative defense to liability or damages."  *Gorzynski*, 569 F.3d at 103.  That affirmative defense "consists of two elements:  that (1) 'the employer exercised reasonable care to prevent and correct promptly any

---

[27] Doc. 82 (Anthony Decl.) ¶ 3.

[28] Doc. 86 (Hornig Decl.) ¶ 172.

[discriminatory] harassing behavior,' and (2) 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Id.* (first quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 807 (1998); and then quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765 (1998)); *see also Ferraro v. Kellwood Co.,* 440 F.3d 96, 101–02 (2d Cir. 2006); *Barrows v. Seneca Foods Corp.*, 512 F. App'x 115, 119 (2d Cir. 2013) (summary order).

Although Columbia has not explicitly made this argument,[29] it is entitled to the defense based on the undisputed evidence in the record.  First, Columbia took prompt remedial action following Hornig's complaint.  Dean Fried directed Lipkin to attend one-on-one training with a legal expert to review Columbia's prohibitions on sexual harassment and retaliation.  Doc. 78 ¶ 39.  Second, Columbia had a complaint system in place through the Office of Equal Opportunity and Affirmative Action (EOAA), and Hornig was apprised of her opportunity to pursue an investigation through that office, which she declined, preferring instead to work directly with Dean Fried and Vice Dean Santella.  *Id.*; Doc. 76-2 (Hornig Dep.) at 37–38.  Accordingly, summary judgment is warranted on Hornig's Title VII claim against Columbia, insofar as her claim is based on a sexual harassment based on hostile work environment theory.

c.  NYCHRL Hostile Work Environment Claim

Because Hornig's sexual harassment claim against Lipkin would survive even the more stringent Title VII standard, as outlined above, it necessarily also meets the standard under NYCHRL.  Summary judgment on Hornig's NYCHRL sexual harassment claim against Lipkin is therefore denied.  *See Garrigan,* 2014 WL 2134613, at *5 ("even if a previous relationship might suffice in some courts to render sexual harassment personal and not genderbased under Title VII, it does not under the NYCHRL.").

---

[29] In their moving papers, Defendants maintain that Lipkin's conduct was not sexual harassment, rather than specifically raising the *Faragher/Ellerth* defense.  However, Columbia also argues that it took prompt remedial action after Hornig reported the July 2015 incident.

As for Columbia's liability, the "*Faragher/Ellerth* defense is inapplicable in the NYCHRL context." *Green v. New York City Transit Auth.*, No. 15 Civ. 8204 (ALC), 2020 WL 5632743, at *9 (S.D.N.Y. Sept. 21, 2020) (citing *Zakrzewska v. New School*, 620 F.3d 168, 170 (2d Cir. 2010)). An employer is liable under the NYCHRL for the acts of its employee or agent when the "employee or agent exercised managerial or supervisory responsibility." *Id.* (quoting N.Y.C. Admin. Code § 8-107(13)(b)(1)). Since Lipkin had supervisory authority over Hornig during the relevant times, Columbia can be held strictly liable under the NYCHRL. *Garrigan,* 2014 WL 2134613, at *6 ("The NYCHRL imposes strict liability on employers for discriminatory acts of managerial employees." (citing *Zakrzewska v. New School*, 928 N.E.2d 1035, 1040 (N.Y. 2010))).

### 3. Legal Standard for Disparate Treatment Claims

"To state a separate gender discrimination claim, plaintiff must plead 'a separate and distinct *prima facie* case,' alleging an adverse action *beyond* the creation of a hostile work environment." *Parra v. City of White Plains*, 48 F. Supp. 3d 542, 553 (S.D.N.Y. 2014) (quoting *Bethea v. City of New York,* 2014 WL 2616897, at *6 (E.D.N.Y. June 12, 2014)). Hornig's disparate treatment claims implicate a separate analytical framework and rely on distinct facts, as set forth below.

"Claims of sex-based discrimination under Title VII . . . are analyzed under the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 74–75 (2d Cir. 2016). Under that framework, the employee first "must establish a *prima facie* case of sex discrimination." *Id.* at 75. To do this, she must show that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Id.* (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009)). "The burden of establishing a *prima facie* case is not onerous, and has been frequently described as minimal." *Scaria v. Rubin*, 117 F.3d 652, 654 (2d Cir.

1997) (per curiam).  "Once the *prima facie* case has been shown, the burden then must
shift to the employer to articulate some legitimate, nondiscriminatory reason for the ad-
verse employment action."  *Walsh*, 828 F.3d at 75 (internal quotation marks and citation
omitted).  If the employer does so, the burden shifts back to the employee, and the em-
ployee's "admissible evidence must show circumstances that would be sufficient to per-
mit a rational finder of fact to infer that the defendant's employment decision was more
likely than not based in whole or in part on discrimination."  *Id.* (internal quotation marks
and citation omitted).

As the Court noted in denying Hornig's motion for a preliminary injunction,
"[t]he *sine qua non* of a gender-based discriminatory action claim under Title VII is that
the discrimination must be *because of* sex."  *Hornig I*, 2018 WL 5800801, at *4 (quoting
*Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007) (per curiam)); *see also Vega v. Hemp-
stead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (the "'ultimate issue' in an
employment discrimination case is whether the plaintiff has met her burden of proving
that the adverse employment decision was motivated at least in part by an 'impermissible
reason,' *i.e.,* a discriminatory reason." (quoting *Stratton v. Dep't for the Aging for City of
N.Y.,* 132 F.3d 869, 878 (2d Cir. 1997))).  A plaintiff may meet that burden either through
direct evidence of intent to discriminate, or by indirectly showing circumstances giving
rise to an inference of discrimination.  *Vega*, 801 F.3d at 87 (citations omitted).  For ex-
ample, "[a]n inference of discrimination can arise from circumstances including, but not
limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading
terms; or its invidious comments about others in the employee's protected group; or the
more favorable treatment of employees not in the protected group; or the sequence of
events leading to the plaintiff's discharge.'"  *Littlejohn v. City of New York*, 795 F.3d
297, 312 (2d Cir. 2015) (quoting *Leibowitz*, 584 F.3d at 502).  A plaintiff may also estab-
lish an inference of discrimination by "creating a 'mosaic' of intentional discrimina-
tion by identifying 'bits and pieces of evidence' that together give rise to an inference of

discrimination." *Conforti v. Sunbelt Rentals, Inc.*, 201 F. Supp. 3d 278, 294 (E.D.N.Y. 2016) (quoting *Vega*, 801 F.3d at 87).

In determining whether a plaintiff has established direct or indirect evidence of discrimination, "[n]o one piece of evidence need be sufficient, standing alone, to permit a rational finder of fact to infer that defendant's employment decision was more likely than not motivated in part by discrimination." *Walsh*, 828 F.3d at 76.  As such, a plaintiff's claims will survive summary judgment if the plaintiff produces "evidence sufficient to allow a rational factfinder to infer that the employer was actually motivated in whole *or in part by* . . . discrimination." *Kearney v. ABN AMRO, Inc.*, 738 F. Supp. 2d 419, 426 (S.D.N.Y. 2010) (quoting *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir. 1997)).  At all times, the burden of persuasion lies with the plaintiff.  *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)).

The NYCHRL is more protective.  "[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (internal quotation marks and citations omitted).  Thus, to defeat summary judgment, a plaintiff "need only show differential treatment—that she [wa]s treated 'less well'—because of a discriminatory intent," *Mihalik*, 715 F.3d at 110, "in a way that was more than trivial, insubstantial, or petty," *Kellman v. Metro. Transp. Auth.*, 8 F. Supp. 3d 351, 379 (S.D.N.Y. 2014).  *See also Maynard v. Montefiore Med. Ctr.*, No. 18 Civ. 8877 (LAP), 2021 WL 396700, at *5 (S.D.N.Y. Feb. 4, 2021).  Still, the NYCHRL is not a "general civility code." *Mihalik*, 715 F.3d at 110.  Plaintiffs still bear the burden of establishing that the challenged conduct bears a causal connection to the discriminatory motive. *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 76 (2d Cir. 2015) (summary judgment is appropriate "if the record establishes as a matter of

law' that discrimination *or* retaliation play[ed] no role in the defendant's actions." (internal quotation marks and citations omitted)).

4. *Analysis*

a. *Prima Facie* Case

Defendants do not dispute that Hornig meets the first two prongs of a *prima facie* case under the *McDonnell Douglas* balancing test.  However, they argue that Hornig's claim fails because she has not established that any adverse actions taken were because of sex.

i.   Adverse Employment Actions

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment."  *Vega*, 801 F.3d at 85 (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).  To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Galabya*, 202 F.3d at 640 (internal quotation marks and citations omitted).  For the purpose of Title VII discrimination claims, the Second Circuit has explained, "[e]xamples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation marks and citations omitted); *see also Spence v. Bukofzer*, No. 15 Civ. 6167 (ER), 2017 WL 1194478, at *7 (S.D.N.Y. Mar. 30, 2017).

At least some of the experiences of which Hornig complains—for example, losing the title of Medical Director; receiving less support on her research and grant submissions than other faculty at the Center; and ultimately being transferred out of the Center[30] and

---

[30] The Court previously noted that Hornig's complaint about the transfer of her office "borders on the frivolous," and that courts within this district have concluded that moving an employee's office to a less

accordingly losing her title as Director of Translational Research—are sufficient to constitute adverse employment actions under Title VII.  Moreover, "even if [Hornig]'s other allegations of discrimination do not independently constitute adverse employment actions, they may provide relevant background evidence regarding the second factor of a gender discrimination claim, namely whether [Hornig's] gender was a motivating factor in the [d]efendants' decision" to take adverse action.  *Conforti*, 201 F. Supp. 3d at 297.

ii.   Causal Connection

Hornig has marshalled no direct evidence giving rise to an inference of disparate treatment based on sex discrimination, and scant indirect evidence.  In her opposing memorandum of law, Hornig largely repeats the allegations made in her complaint, listing fifteen actions that she claims support the conclusion of unlawful sex discrimination and retaliation.  But her memorandum simply recites the incidents without explaining *how* each one was an instance of sex discrimination and then concludes that there are fact issues precluding summary judgment.

First, there is no direct evidence of discrimination:  Hornig has not established that Lipkin or anyone else made comments to her that were probative of sex discrimination.  *See Littlejohn*, 795 F.3d at 312 (noting that "none of [d]efendants' actions directly indicates racial bias"); *see also DeMuth v. United States Small Bus. Admin.*, 819 F. App'x 23, 25 (2d Cir. 2020) (summary order), *cert. denied sub nom. DeMuth v. Small Bus. Admin.*, 141 S. Ct. 1741 (2021) (no reasonable jury could find that plaintiff was dismissed for a discriminatory or retaliatory reason where she admitted "that neither her supervisor .

---

desirable space "does not constitute an adverse employment action[.]"  *Hornig I*, 2018 WL 5800801 at *6 (quoting *Trachtenberg v. Dep't of Educ. of City of New York*, 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013)).  However, as the Ninth Circuit indicated in *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115 (9th Cir. 2000), a race and national origin discrimination case, the nature of scientists' work is relevant.  Because of the nature of Hornig's work, the office transfer did not merely involve having a less desirable office but also implicated her access to laboratories and research spaces controlled by the Center, Doc. 87 ¶¶ 87–88.  *See Chuang*, 225 F.3d at 1125–26.  While the transfer and new office did not constitute irreparable harm warranting a preliminary injunction, in context, there is a fact issue as to whether the transfer was an adverse action for the purposes of her discrimination and retaliation claims.

. . nor any other . . . supervisors criticized her work in sexist terms or made derogatory statements about women," and plaintiff's allegations that she faced sex discrimination were conclusory).  The record does not reveal any sexist or misogynistic slurs or remarks that Lipkin or anyone else used, or even other remarks that could be indicative of sex discrimination.  *See Weinstock*, 244 F.3d at 53 (Cardamone, J., dissenting) (explaining that referring to a female chemistry professor by her first name, while male professors were not referred to by their first names, and describing her as "nice" and "nurturing" were suggestive of defendant's perception of plaintiff's "intellectual weakness" and therefore probative of gender discrimination).

Hornig argues that the Court should apply the "mosaic" approach explained by the Second Circuit in *Vega*.  "Because discrimination claims implicate an employer's usually unstated intent and state of mind, rarely is there direct, smoking gun, evidence of discrimination.  Instead, plaintiffs usually must rely on bits and pieces of information to support an inference of discrimination, *i.e.*, a mosaic of intentional discrimination."  *Vega*, 801 F.3d at 86 (internal quotation marks and citation omitted).  Yet the "bits and pieces" that Hornig has assembled still do not add up to disparate treatment action, because she has not shown that any of the allegedly adverse employment actions were taken because of her sex.[31]

---

[31] Hornig attempts to establish causation by referring to Lipkin's "pattern of misogyny and many complaints of sex discrimination" at the Center; she seeks to introduce in her opposition to Defendants' motion for summary judgment, for the first time, other women's experiences in the Center and their allegations of discriminatory or retaliatory actions by Lipkin.  Hornig describes the complaints of three other women against Lipkin:  Anthony filed an internal Columbia sex discrimination complaint to the EOAA asserting that Lipkin had given a letter of non-renewal to staff associate Isamara Navarrete-Macias for "inciting discussions around gender equity," Doc. 82 (Anthony Decl.) ¶¶ 34–35; Dr. Angela Rasmussen, a former associate research scientist at the Center, filed a complaint alleging that Lipkin had retaliated against her because she said there was evidence of discrimination against women technicians who received lower salaries than men, and thereafter received a letter of non-renewal; and Ellen Kobak, an administrative assistant at the Center, complained about the Center's "culture and climate" in 2017 to Joanne Bowman and that stated that Lipkin treated her in an "intimidating and humiliating" manner.  Eddy's declaration also states, "I felt that Lipkin treated me differently because I was a woman.  For example, I remember an instance when he commented on my posture and told me to stand up straight.  I do not believe he would have said this to a man."  Doc. 89 ¶ 26.  The Court agrees with Defendants that this belated argument is unpersuasive,

Arguably, Hornig has now shown that she was treated differently from similarly situated male staff. *See Shumway v. United States Parcel Serv., Inc.*, 118 F.3d 60, 63–64 (2d Cir. 1997); *Ponticelli v. Zurich Am. Ins. Grp.*, 16 F. Supp. 2d 414, 426 (S.D.N.Y. 1998) ("To establish a *prima facie* case of gender-based discrimination, a plaintiff must show that she was treated less favorably than comparable male employees in circumstances from which a gender-based motive could be inferred." (citation omitted)).  In its earlier decision, the Court noted that Hornig's claims that no male faculty had been subjected to similar treatment were conclusory and she had not identified any similarly situated male faculty.  *Hornig I*, 2018 WL 5800801, at *4.  With respect to the great majority of her claims, Hornig still has not pointed to any similarly situated colleagues and has merely testified that she believes Lipkin did not or would not have treated men the same way.[32]  However, with regard to her claim about denial of staffing support for research and grant submissions, Hornig has identified two male faculty members, Briese and

---

because, aside from Eddy's declaration, none of these arguments is supported by statements made on personal knowledge or by otherwise admissible evidence.  *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999); *Rivera v. Metro. Transit Auth.*, 750 F. Supp. 2d 456, 461 (S.D.N.Y. 2010).  Eddy's statement that Lipkin would not have made this remark to a man is speculative and insufficient to support the pattern of misogyny that Hornig claims.

[32] For example, in response to questions about whether Lipkin's inserting himself as a principal investigator on her grants funded by the CFI was sex discrimination, Hornig testified as follows:

> Q:  "[D]o you have any basis to believe that your gender was a factor in that change?
>
> A:  "I think that many of these events were similar to the ones we've described throughout the day."
>
> Q:  "So is it your contention then -- are you saying that because it's your view a man would not have been treated the same way; is that what you're saying?  Is that the basis of your contention?"
>
> A:  "Yes, I feel it would not have happened, at least not in the same way.  I think it would have been – I don't know of any other instances where things change like that for the male faculty."

Doc. 91-4 (Hornig Dep.) at 19.  Similarly, in her declaration, she states that Lipkin did not or would not treat men the same way he had treated her.  Doc. 86 (Hornig Decl.) ¶¶ 34 (transfer from the Center), 63 (destruction of frozen samples), 120 (productivity), 127 (male faculty who did not get papers done were not disparaged as Hornig was).  However, Hornig has provided little "evidence of this alleged differential treatment other than her own testimony[.]"  *Ya-Chen Chen v. City Univ. of New York*, No. 11 Civ. 0320 RA, 2014 WL 1285595, at *9 (S.D.N.Y. Mar. 31, 2014), *aff'd,* 805 F.3d 59 (2d Cir. 2015).

Williams, who were provided additional staff support to help them complete papers.[33]
Doc. 91-4 (Hornig Dep.) at 3.  "When a plaintiff seeks to meet her prima face case by ref-
erence to the disparate treatment of an allegedly similarly situated employee, 'the plain-
tiff must show that she shared sufficient employment characteristics with that comparator
so that they could be considered similarly situated.'"  *Potash v. Fla. Union Free Sch.
Dist.*, 972 F. Supp. 2d 557, 579–80 (S.D.N.Y. 2013) (quoting *McGuinness v. Lincoln
Hall,* 263 F.3d 49, 53 (2d Cir. 2001)).  Employment characteristics which can support a
finding that two employees are "similarly situated" include "similarities in education,
seniority, performance, and specific work duties."  *DeJesus v. Starr Technical Risks
Agency, Inc.,* 03 Civ. 1298 (RJH), 2004 WL 2181403, at *9 (S.D.N.Y. Sept. 27, 2004);
*see also Graham v. Long Island R.R.,* 230 F.3d 34, 40 (2d Cir. 2000).  While Williams
was a junior faculty member and thus not "similarly situated" to Hornig, who was more
senior than him, Doc. 75 at 32 n.20, Briese, who had been recruited to Columbia at the
same time as Hornig, may be an appropriate comparator.[34]  Accordingly, in regard to her
complaints about disparate staffing and support, Hornig has met the modest burden to es-
tablish a *prima facie* case.

     b.  Nondiscriminatory Justifications and Pretext

     Defendants have proffered legitimate nondiscriminatory justifications for all of
the actions of which Hornig complains.  Specifically, as to Hornig's claim that she was
denied staffing support, Defendants explained that Dr. Nagy-Szakal, who was originally
slotted to work on the SFARI Autism project, ultimately worked on the ME/CFS micro-
biome project because it better fit her research interests.  Doc. 78 ¶¶ 108–09.  Further-
more, the parties agree that there was significant staff turnover at the Center in 2016 and
2017.  *Id.* ¶ 114.  As to Hornig's claims about limitations on her access to support from

---

[33] Hornig's deposition testimony about staffing for Briese and Williams was in response to a question about
the time period from 2013 to approximately mid-2015.  Doc. 91-4 (Hornig Dep.) at 3.

[34] Of course, no male faculty at the Center were exactly similarly situated to Hornig in that none of them
had previously been in a relationship with Lipkin.

Deoras, Vice Dean Santella and Lipkin have provided declarations and testimony that Deoras no longer wanted to work with Hornig due to personal conflicts.  Doc. 97 ¶ 223. The Court agrees that there was nothing discriminatory in Lipkin encouraging Nagy-Sza-kal to pursue research that fit her interests, or in general constraints on the Center as a whole due to staff shortages.  Defendants assert that Williams and Briese were provided more technical support than Hornig because their work is more laboratory based and re-quires them to generate the primary data before analyzing it, which often necessitates greater staffing—this is a facially legitimate reason for the disparate staffing.

Thus, the burden shifts back to Hornig to establish that Defendants' explanations were pretextual.  "To establish 'pretext' under Title VII, a plaintiff need only establish that discrimination played a role in an adverse employment decision.  In other words, a Title VII plaintiff need only prove that the employer's stated non-discriminatory reason was *not the exclusive* reason for the adverse employment action."  *Naumovski v. Norris*, 934 F.3d 200, 214 (2d Cir. 2019) (internal quotation marks and citations omitted). Hornig does not meet this burden.  There is scant evidence even to support a *prima facie* case of sex discrimination, and she has not introduced evidence that Defendants' explana-tions about disparate staffing were pretextual or that staffing decisions were motivated even in part by sex discrimination.[35]  To survive summary judgment, Hornig must do "more than cite to [her] mistreatment and ask the court to conclude that it must have been related to [her sex]."  *Lizardo v. Denny's Inc.*, 270 F.3d 94, 104 (2d Cir. 2001).

Accordingly, Defendants are entitled to summary judgment on Hornig's Title VII disparate treatment claim.  While the record supports Defendants' position that sex dis-crimination did not play a role in any of the challenged employment actions, *Ya-Chen Chen*, 805 F.3d at 76, Hornig's NYCHRL sex discrimination claims survive regardless.

---

[35] Because Hornig has not established that Lipkin's treatment of her was discrimination under Title VII, the Court need not address her "cat's paw" argument that he influenced the Mailman administration to discriminate against her here.

"[T]he NYCHRL does not distinguish between discrimination and hostile work environment claims; rather, both are governed by N.Y.C. Admin. Code § 8–107(1)(a)." *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 84–85 (E.D.N.Y. 2020) (citing *Sotomayor v. City of N.Y.*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012)).

### B. Retaliation

#### 1. Legal Standard

To make a *prima facie* case of retaliation under Title VII, a plaintiff must present enough evidence to allow a reasonable trier of fact to find "(1) that she engaged in protected participation or opposition under Title VII, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action." *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001) (internal quotation marks and citation omitted). "A plaintiff's burden at this *prima facie* stage is *de minimis*." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

In the context of a Title VII retaliation claim, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57 (2006)). Thus, adverse actions for the purposes of retaliation claims cover a broader range of conduct than in discrimination claims: "[T]he anti-retaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington*, 548 U.S. at 64. In determining what constitutes an adverse action for the purposes of Title VII retaliation claims, the Supreme Court has noted that, "Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* at 69 (internal quotation

marks and citations omitted); *see also Kessler v. Westchester Cnty. Dep't of Soc. Servs.,* 461 F.3d 199, 207–09 (2d Cir. 2006).

As to the fourth prong, the causal connection may be proven "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant," or "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010) (internal quotation marks and citation omitted); *see also Littlejohn*, 795 F.3d at 319. "Direct evidence is evidence tending to show, without resort to inference, the existence of a fact in question," while "[i]ndirect evidence may consist of temporal proximity or other circumstantial evidence." *Dodd v. City Univ. of New York*, 489 F. Supp. 3d 219, 247 (S.D.N.Y. 2020) (internal quotation marks and citations omitted). While the Second Circuit has not articulated a bright line rule as to how much time constitutes temporal proximity, the Supreme Court has suggested that it "must be 'very close,'" and courts in this Circuit have tended to require no more than two months between the protected activity and the adverse action in order to find causation through temporal proximity alone. *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam)).

Once the plaintiff establishes a *prima facie* case, the defendant must "then point[] to evidence of a legitimate, nonretaliatory reason for the challenged employment decision." *Cifra*, 252 F.3d at 216. If the defendant does identify a nonretaliatory justification for that action, the burden shifts back to the plaintiff and "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Id.*

Title VII retaliation claims "must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Maynard*, 2021 WL 396700, at *6 (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570

U.S. 338, 360 (2013)).  "However, 'but-for' causation does not require proof that retalia-
tion was the only cause of the employer's action, but only that the adverse action would
not have occurred in the absence of the retaliatory motive."  *Zann Kwan v. Andalex Grp.
LLC,* 737 F.3d 834, 846 (2d Cir. 2013).  Courts should consider the "full[] perspective"
rather than review the record "in piecemeal fashion, trusting innocent explanations for in-
dividual strands of evidence."  *Dodd*, 489 F. Supp. 3d at 252 (internal quotation marks
and citation omitted); *see also Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir.
1999).

Retaliation claims under the NYCHRL are similarly analyzed under a burden-
shifting framework.  *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 361–
62 (S.D.N.Y. 2012) (citations omitted).  To establish a *prima facie* claim of retaliation
under the NYCHRL, the plaintiff must establish: (1) she engaged in a protected activity,
(2) her employer was aware that she had participated in such activity, (3) her employer
engaged in conduct which was reasonably likely to deter a person from engaging in that
protected activity, and (4) there is a causal connection between the protected activity and
the alleged retaliatory conduct.  *Feldesman*, 2019 WL 1437576, at *12 (citing *Brightman
v. Prison Health Serv., Inc.*, 970 N.Y.S.2d 789, 791 (N.Y. App. Div. 2013)).  However,
the NYCHRL diverges from the Title VII analysis in two respects.  *Maynard*, 2021 WL
396700, at *6.  First, "the plaintiff need not prove any adverse employment action; in-
stead, she must prove that something happened that would be reasonably likely to deter a
person from engaging in protected activity."  *Benzinger v. Lukoil Pan Americas, LLC*,
447 F. Supp. 3d 99, 129 (S.D.N.Y. 2020) (internal quotation marks and citations omit-
ted); *see also Mihalik*, 715 F.3d at 112 (citations omitted).  Second, "the NYCHRL does
not require a plaintiff to show but-for causation.  Instead, summary judgment is appropri-
ate only if the plaintiff cannot show that retaliation played any part in the employer's de-
cision."  *Dodd*, 489 F. Supp. 3d at 269 (internal quotation marks and citation omitted);
*see also Brightman*, 970 N.Y.S.2d at 791–92 ("To establish its entitlement to summary

judgment in a retaliation case, a defendant must demonstrate that the plaintiff cannot make out a *prima facie* claim of retaliation or, having offered legitimate, nonretaliatory reasons for the challenged actions, that there exists no triable issue of fact as to whether the defendant's explanations were pretextual.").

    *2.  Analysis*

    The first two prongs of Hornig's *prima facie* retaliation claim are not in dispute: by complaining about Lipkin's alleged sexual harassment, she engaged in protected activity, and Lipkin and Columbia were aware of that activity.  Accordingly, the Court considers the third and fourth prongs of her *prima facie* case, whether Defendants have articulated legitimate nonretaliatory motives, and whether Hornig can establish pretext.

    *a.  Prima Facie* Case

    i.  Adverse Employment Actions

    "In the context of retaliation, 'adverse employment action' is broader than it is in the context of discrimination," *Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 309 (2d Cir. 2017) (citation omitted), and "covers a broader range of conduct," *Vega*, 801 F.3d at 90.   In the retaliation context, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  *Id.* (quoting *Burlington*, 548 U.S. at 57); *see also Patane*, 508 F.3d at 116 (finding plaintiff's allegations that employers failed to assign her work in order to induce her to quit her job met this standard for adverse employment action because it would cause another employee to "think twice" about engaging in protected activity).[36]  Nonetheless, the employer's actions must be harmful to the point of

---

[36] Defendants argue that Hornig has not established adverse employment actions that would deter a reasonable employee from complaining, given that she did in fact repeatedly complain, and has continued to complain, about her alleged mistreatment, and therefore because she was never deterred from making additional complaints, her retaliation claims cannot stand.  *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 572 (2d Cir. 2011).  Defendants correctly represent that the record supports that Hornig has repeatedly complained to Columbia about allegedly discriminatory or retaliatory actions.  Notably, however, both Anthony and Eddy in their declarations expressed a subjective fear of retaliation for opposing Lipkin and speaking up in support of Hornig.  Doc. 82  (Anthony Decl.) ¶¶ 16–17; Doc. 89 (Eddy Decl.) ¶¶ 25, 27.

dissuading others from engaging in protected activity, rather than "petty slights or minor annoyances that often take place at work and that all employees experience," *Tepperwien v. Entergy Nuclear Operations, Inc.,* 663 F.3d 556, 568 (2d Cir. 2011) (internal quotation marks and citation omitted). A court should evaluate "alleged acts of retaliation . . . both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Id.*

Hornig points to several incidents as retaliatory, including: Lipkin's adding himself as a principal investigator to her grants; disparate staffing on her projects as compared to that of other researchers;[37] barriers to grant submission and being told that she could not apply for certain grants; disputes over her placement as an author on papers; destruction of frozen samples; and finally, her transfer out of the Center. "Some of those alleged actions plainly do not suffice to support a claim of retaliation on their own," *Husser v. New York City Dep't of Educ.*, 137 F. Supp. 3d 253, 273 (E.D.N.Y. 2015), such as her complaint about the misattribution of her role in the *Science* magazine article—which was apparently promptly corrected by the magazine—and her seating assignment at the Chinese consulate dinner, which are precisely the kind of "petty slights or trivial inconveniences," that, by themselves, would not suffice even under the NYCHRL standard, *Kellman*, 8 F. Supp. 3d at 390 (S.D.N.Y. 2014) (quoting *Mihalik*, 715 F.3d at 112). Taken as a whole, however, Hornig "has adduced evidence that, in the aggregate, could allow a reasonable jury to determine the conditions of her employment following her

---

Viewing the record as a whole, the Court cannot conclude that Hornig did not suffer adverse actions that would dissuade a reasonable worker from engaging in protected activities, since two other employees state that they feared harm to their careers—or observed others experience harm to their careers—for crossing Lipkin.

[37] While Hornig's deposition testimony about Briese's and William's staffing was in response to a question about the time period from approximately 2013 to approximately mid-2015, Hornig's response did not include specific dates about the staffing disparities. Doc. 91-4 (Hornig Dep.) at 3. The Court will construe the ambiguity in her favor and consider for the purposes of her *prima facie* case that disparate staffing on certain projects may have taken place after she reported the July 2015 incident and therefore constitute an adverse action for her retaliation claim.

complaint . . . were made sufficiently adverse to support a retaliation claim." *Husser*, 137 F. Supp. 3d at 273 (E.D.N.Y. 2015).  Viewed in context, Hornig has "plausibly paint[ed] a mosaic of retaliation," *id.* (citing *Vega*, 801 F.3d at 92), that could deter a reasonable staff member from complaining.  However, none of the pre-July 2015 behavior of which Hornig complains may constitute adverse actions for the purposes of her retaliation claim.

  ii. Causal Connection

  The Court next considers whether Hornig has introduced either indirect or direct evidence of causation.  Here, she has proffered both circumstantial evidence that she was treated differently from other staff, as well as some evidence of retaliatory animus.[38]

  First, Hornig's claim about disparate staffing and lack of support with research projects as compared to Briese, who had not complained about Lipkin, is some circumstantial evidence of disparate treatment.  Doc. 87 ¶ 227; Doc. 91-4 (Hornig Dep.) at 3.  Moreover, Lipkin stripped Hornig of her Medical Director title on July 29, 2015, less than three weeks after the incident and during the phone call conversation in which Lipkin acknowledged and apologized for his behavior.  Doc. 97 ¶ 153.  Assuming the loss of the title to be an adverse action, such temporal proximity is circumstantial evidence of retaliation.  *Hicks*, 593 F.3d at 170.  Second, for purposes of the instant motion, sufficient

---

[38] Defendants argue that Hornig cannot establish retaliation because the conduct she complains of occurred throughout her time at Columbia.  At her deposition, Hornig testified that there had been "long-term issues" between her and Lipkin pre-dating their 2011 breakup, including "difficulties in allowing for appropriate recognition" for work she had done, "difficulties in being allowed to pursue opportunities to present my work," "active discouragement or even kicking me during times when I was speaking up at meetings," "issues relating to staffing" and "the ability to use staff that were on grants where I was a [principal investigator] . . . whether or not it was a [grant with multiple principal investigators], interference with my supervision of individuals when I did have access to working with [them]."  Doc. 76-1 (Hornig Dep.) at 10–12.  Defendants are correct that "[t]o constitute retaliation, '[t]he alleged protected activity must predate evidence of the alleged retaliatory animus.'"  *Petyan v. New York City L. Dep't*, No. 14 Civ. 1434 (GBD) (JLC), 2015 WL 1855961, at *13 (S.D.N.Y. Apr. 23, 2015), *report and recommendation adopted,* No. 14 Civ. 1434 (GBD) (JLC), 2015 WL 4104841 (S.D.N.Y. July 2, 2015) (quoting *Vecchione v. Dep't of Educ. of N.Y.C.,* No. 10 Civ. 6750 (GBD), 2014 WL 2116146, at *4 (S.D.N.Y. May 16, 2014) and collecting cases).  However, the case at bar is distinct from *Petyan* and similar cases in that Hornig does not only assert a continuation of a previous pattern, but also additional retaliatory activity, such as losing the Medical Director title and being moved from the Center.

evidence in the record supports Hornig's contention that Lipkin bore her retaliatory animus. The admissible portions of the declarations submitted by Anthony, Muller, and Eddy based on their personal observations agree that Lipkin evinced hostile behavior and animus towards Hornig after mid-2015.[39]

Given that "the burden for establishing a *prima facie* case of retaliation is '*de minimis*,'" the Court concludes that Hornig's allegations are sufficient to state the necessary causal connection. *Colon v. City of New York*, No. 19 Civ. 10435 (PGG) (SLC), 2021 WL 4943552, at *19 (S.D.N.Y. Jan. 15, 2021), *report and recommendation adopted,* No. 19 Civ. 10435 (PGG) (SLC), 2021 WL 4427169 (S.D.N.Y. Sept. 26, 2021); *see also Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018).

   b.   Nonretaliatory Justifications and Pretext

Defendants have pointed to a legitimate, nonretaliatory justification for each action that Hornig claims was retaliatory, often citing her productivity, standard Columbia internal systems, and/or her personal conflicts with other Center staff members as legitimate reasons for Lipkin's actions, and Columbia's support for the same. For example, Lipkin claims that in removing Hornig's "Medical Director" title, he sought to eliminate any possible confusion so that other staff members did not go to her for medical examinations. Doc. 78 ¶ 155. As for Lipkin's displacing Hornig as principal investigator on the

---

[39] Muller's declaration explains that, in her view, Lipkin and Hornig had an amicable professional relationship when she began working at the Center, despite their recent breakup, but that over time Lipkin became "dismissive" of Hornig's input at meetings and was hostile towards her. Doc. 83 ¶¶ 1–2, 8–9. Eddy states that Lipkin "treat[ed Hornig] disrespectfully" and "repeatedly demeaned and patronized" her, "often attempted to or did exclude Hornig from scheduled meetings on papers or projects she led, or that used data or samples from projects on which she was a Principal Investigator," discouraged other Center staff from speaking positively about Hornig, contradicted and undermined Hornig in front of their Norwegian colleagues on the ABC study in August 2016, and, after mid-2015, directed her not to allocate Center technician time to Hornig's projects. Doc. 89 ¶¶ 4, 6–8, 16–20, 24–25. Anthony's declaration explains that after mid-2015, Lipkin "regularly ostracized and isolated" Hornig and "created a culture where she was treated differently than everyone else." Doc. 82 ¶ 3. Anthony further attests that after mid-2015, Lipkin regularly "dismissed or misrepresented Hornig's productivity to [Center] staff," "was extremely disrespectful toward her," and "began limiting the ability of people to work with, support and collaborate with her." *Id.* ¶¶ 4–5. According to Anthony, Lipkin blamed Hornig for financial difficulties at the Center, due to her lawsuit and her reporting grant discrepancies. *Id.* ¶¶ 8–9. As noted above, the Court does not consider Lipkin's statements cited in Anthony's declaration for the truth of the matter asserted about the Center's finances.

CFI grants, Defendants show that Hornig had a pattern of missing deadlines that had been an issue with CFI leadership dating back to at least 2014.  Doc. 78 ¶¶ 98–99.  As for Hornig's transfer out of the Center, Defendants argue that this was a decision that Dean Fried and Vice Dean Santella made in their own independent judgment, for several reasons, including:  (1) Hornig herself having made clear that she no longer wanted to be supervised by Lipkin at the Center and preferred to transfer to another department, such as psychiatry or neurology; (2) conflicts between Hornig and other Center staff members; (3) Hornig's lack of productivity; (4) and a breakdown in communication with the rest of the research team on a particular paper.  Doc. 78 ¶ 80; Doc. 74 (Santella Decl.) ¶ 16; Doc. 76-5 (Fried Dep.) at 15 ("[I]t was not Dr. Lipkin's request, but my own judgment as dean . . . that this was the best decision for the Center, for Dr. Hornig[.]").

The parties do not dispute that Hornig had missed deadlines on at least some occasions, had had personal conflict with some members of the Center staff apart from her conflicts with Lipkin, and that she had at one point sought to transfer to another department in Columbia, out of the Center.  All of these are facially legitimate, nonretaliatory reasons for Columbia's and Lipkin's actions.  Accordingly, the "presumption of retaliation dissipates," and the burden shifts back to Hornig to establish "that the desire to retaliate was the but-for cause of the challenged employment action."  *Ya-Chen Chen*, 805 F.3d at 70 (internal quotation marks and citations omitted).

In the retaliation context, "[p]retext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the *prima facie* case, without more."  *Byrne v. Yale Univ., Inc.*, 450 F. Supp. 3d 105, 120 (D. Conn. 2020) (quoting *Percoco v. Lowe's Home Centers, LLC*, 208 F. Supp. 3d 437, 444 (D. Conn. 2016)).  The Second Circuit has explained that "Title VII distinguishes between those reasons that are factually false and those that are false in order to hide discriminatory or retaliatory motives."  *Id.* (citing *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1337 (2d Cir. 1997)).  Here,

evidence in the record in addition to Hornig's own testimony and declaration—Bresna-han's comment that Lipkin would "demolish" Hornig, and the admissible portions of An-thony's and Eddy's declaration—suffices to raise fact issues as to whether Lipkin had a retaliatory motive.  A jury should decide whether Lipkin's explanations, including that he only wanted to spare Hornig from others going to her for medical advice, are credible. Defendants assert that because Lipkin did not have the authority to transfer Hornig from the Center and was not involved in that decision, she has no claim of retaliation arising out of her transfer.  But Lipkin testified that he spoke to Dean Fried and Vice Dean San-tella about Hornig's departure from the Center before it happened, and he sought Dean Fried's approval to remove her.  Doc. 91-2 (Lipkin Dep.) at 4–6.  And Hornig's transfer out of the Center was included on Pramberger's July 2018 "list of what we have done for Ian over the past years[.]"  Doc. 91-19; Doc 91-8 (Fried Dep.) at 9, 12.  Thus, there is a disputed issue of fact as to whether Lipkin's preferences were behind her transfer from the Center, and therefore the "cat's paw" theory may be applicable.  *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 274–75 (2d Cir. 2016) (holding that "when an em-ployer in effect adopts an employee's unlawful animus by acting *negligently* with respect to the information provided by the employee, and thereby affords that biased employee an outsize role in its own employment decision, . . . the employee's motivation [can] be imputed to the employer and used to support a claim under Title VII.")

"[T]he court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir. 2005).  A jury could infer a retaliatory motive here.  Given the conflicting evi-dence in the record as to what motivated the adverse employment actions Hornig experi-enced, there are disputed issues of fact as to Hornig's retaliation claim, and summary judgment is not warranted.  Because Hornig's Title VII retaliation claim survives, her

NYCHRL retaliation claim necessarily does as well.  Defendants' motion for summary judgment on these claims is denied.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED as to Hornig's sex discrimination claim brought under Title VII against Columbia, DENIED as to her NYCHRL sex discrimination claim, and DENIED as to her retaliation claims under both Title VII and the NYCHRL.  The parties are directed to appear for a telephonic status conference on April 22, 2022 at 11:00 am.  The parties are instructed to call (877) 411-9748 and enter the access code 3029857# at that time.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 72, 77, and 90.

SO ORDERED.

Dated:    March 31, 2022
             New York, New York

_____
             EDGARDO RAMOS, U.S.D.J.